*JH*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AYANNA WALKER, )
)
　　　　　　　　　　*Plaintiff,* )
) Case No. 07 C 6148
　　v. )
) Judge Milton I. Shadur
CALUMET CITY, ILLINOIS, )
)
　　　　　　　　　　*Defendant.* )

*FILED*

*Oct. 31, 2007*

*MICHAEL W DOBBINS*
*CLERK, U.S. DISTRICT COURT*

*J.H.*

## MEMORANDUM IN SUPPORT OF AYANNA WALKER'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Ayanna Walker ("Walker") moves the Court for entry of temporary restraining order and/or a preliminary injunction enjoining enforcement of Calumet City's ("City") Point of Sale Inspection Ordinance ("Ordinance") (Ex. A). Below, we set forth (I) relevant procedural history of related litigation brought by the Realtor Association of West/South Suburban Chicagoland ("Association"), including this Court's entry of a preliminary injunction regarding the same Ordinance, (II) a detailed explanation of the Ordinance and other ordinances at City's disposal to address health and safety issues, and (III) why Walker is entitled to immediate injunctive relief. Based on the Court's familiarity with the Ordinance and the arguments of the parties, Walker respectfully requests that the Court enter a TRO immediately until such time as the Court has time to more fully consider Walker's request for a preliminary injunction.

## I.　　RELEVANT PROCEDURAL HISTORY OF ASSOCIATION'S LAWSUIT

Association filed a suit against City on April 24, 2006, which challenged the constitutionality of City's then-enacted Point of Sale Inspection Ordinance. After that suit was filed, City amended its Point of Sale Inspection Ordinance to remedy certain deficiencies alleged by Association. The amendment, however, did not remedy all Constitutional defects and, upon

Association's motion, the Court entered a preliminary injunction against enforcement of the amended Point of Sale Inspection Ordinance on August 8, 2006. Thereafter, City amended its ordinance again and moved to dissolve the August 8 injunction. The Court granted the motion to dissolve and, after briefing, on December 8, 2006, enjoined the new ordinance (the "December 8 Injunction") (Ex. B). *Importantly, the Ordinance whose enforcement was enjoined by the December 8 Injunction is exactly the same Ordinance which Walker seeks to enjoin enforcement of by this motion.* Thus, the Court has already considered the arguments set forth below and decided that injunctive relief is warranted.

City appealed the entry of the December 8 Injunction. During the pendency of the appeal, this Court granted Walker, a City property owner, leave to join Association in the lawsuit and to file an amended complaint. A new injunction is required, however, because on October 17, 2007, the Seventh Circuit vacated the December 8 Injunction on the ground that Association lacks "prudential" standing and ordered that the "suit" brought by Association be dismissed without prejudice. On October 23, 2007, this Court dismissed the "suit" without prejudice, including the claims asserted by Walker. On October 31, Walker refiled her lawsuit and now seeks the same relief this Court previously awarded pursuant to the December 8 Injunction. Because the Seventh Circuit vacated the December 8 Injunction, all of the unconstitutional wrongs and irreparable harm that caused the Court to issue the December 8 Injunction will again be imposed on Walker and other City property owners. To prevent such irreparable harm, the Court should enter a new injunction in favor of Walker.

## II.   STATEMENT OF FACTS

### A.   Walker's Property and Similarly Situated Property

Walker owns property in City located at 521-23 Greenbay Avenue. Complaint at ¶7. Walker's property contains four dwelling units. Each unit has passed City's annual

inspections. *Id.* The property is listed for sale and subject to the Ordinance. *Id.* By virtue of its Ordinance, City has taken and interfered and continues to take and interfere with Walker's right to alienate her property without due process. *Id.*

As of October 29, 2007, according to the multiple listing service, there were 46 real estate listings in City with contracts pending. *Id.* at ¶18. There are 642 active listings of property in City. *Id.* Each such property is subject to the Ordinance if not enjoined.

## B.    Key Aspects of Ordinance

### 1.    Transfer Stamp and Point of Sale Inspection Requirement

The Ordinance provides that property can only be sold if City issues transfer stamps. Calumet City Municipal Code ("Code") §§ 82-325, 82-328 (Ex. C). In all but one instance[1], the only way for sellers to obtain transfer stamps is to first obtain a final or conditional "Certificate of Compliance" from City and to pay any outstanding water bill (even if disputed). Ex. A at §§ 14-1(h); 14-1(i), Ex. C at § 82-327(b). City will issue a Certificate of Compliance only if it decides that property "passed" a point of sale inspection. To "pass" an inspection and obtain a Certificate of Compliance, a property owner must make all repairs (using a licensed contractor) ordered by City after the inspection. *Id.*; *see also* Ex. A at § 14-1(k).

The Ordinance has no due process safeguards of any kind and no appeal process to challenge City's refusal to issue a Certificate of Compliance or a repair order issued by an inspector. *Id.* Thus, property owners such as Walker must capitulate to an inspector's demands, even if the repair work is unnecessary from a public health or safety standpoint, if they want to sell their property. *Id.* In addition, the Ordinance requires citizens to pay the water bill before City will issue transfer stamps. *Id.* at § 14-1(i). Although the Ordinance states that an owner can

---

[1] The only situation in which a Certificate Of Compliance is not required to obtain transfer stamps is when an owner refuses his consent to an inspection and City fails to obtain a warrant to conduct the search. Ex. A at §14-1(f).

dispute the water bill in a "predeprivation hearing," the ordinance does not explain the due

process protections, if any, of such hearing and requires the owner to pay the bill "under protest"

while she challenges it. Thus, if a property owner such as Walker wants to sell her property, she

must capitulate and pay (albeit "under protest") what City claims it is owed. *Id.* Otherwise, she

will be unable to obtain the necessary transfer stamp. *Id.*

### 2.    Lack Of Restriction On The Scope Of Inspection

The Ordinance does not restrict, in any way, the scope of searches. Ex. A.

Rather, City inspectors are permitted to search for any violation of City's codes (regardless of

whether the violation relates to health or safety issues) and the Ordinance does not contain any

limitations on the duration or location of inspections. *Id.* The record shows that, while the

original Ordinance was in force, City repeatedly stopped sales of property (by refusing to issue

Certificates of Compliance) until property owners made "cosmetic repairs" unrelated to health,

safety, and public welfare such as:

- Painting windows, tightening a loose soap dish, replacing a "decorative cover" on a vanity (Ex. D);

- Replacing floor tiles, tightening a loose soap dish, painting a bedroom wall, putting a "globe" on a light, painting a bathroom ceiling (Ex. D);

- Repairing closet doors, painting door trims, repairing kitchen cabinets (Ex. D); and

- "Patch – Paint – Clean – Decorate" (Ex. D).

A seller of property such as Walker cannot refuse to make cosmetic repairs because she needs a

"Certificate of Compliance" to obtain a "transfer stamp" to sell her property. Exs. A, C.

### 3.    Deconversion Provisions.

The Ordinance permits City to order the "deconversion" of "illegally converted"

property. Ex. A at §§ 14-1(c)(2), 14-1(g). The Ordinance contains no due process protection

4

against City improperly ordering the deconversion of legal nonconforming property as a precondition of the right to sell the property. Ex. A. For example, "illegally converted" is not defined and there are no guidelines that explain how City determines whether property is "illegal." *Id.* Additionally, there is no hearing at which property owners are permitted to be represented by counsel and to submit evidence that the property is legal. *Id.* Similarly, property owners cannot appeal a decision by City's inspector that the property is illegal. *Id.* There is no right to judicial review. *Id.* Thus, City may prevent the sales of any nonconforming property, such as Walker's property, simply by declaring it illegal. *Id.*

In prior briefing in the litigation brought by Association, City asserted that citizens could appeal an adverse decision pursuant to City's Zoning Ordinance § 12.5 (which created a Zoning Appeal Board pursuant to 65 ILCS 5/11-13-3). The appeals process cited by City below, however, does not apply to the Ordinance or its deconversion provisions; rather it is limited to the appeal of <u>zoning decisions</u>, *i.e.* the request for a variance. Amended Complaint at ¶15; Ex. E. The Zoning Ordinance § 12.5, establishes a Zoning Board of Appeals with jurisdiction to "hear and decide appeals from any order, requirement, decision or determination made by the zoning administrator under this ordinance." *Id.* The zoning administrator has no role in the enforcement of the Ordinance. *Id.*

## C.     City's Other Ordinances

City has two other ordinances that allow inspections to address health and safety issues. First, City enacted Code, Article IX, §§ 2-941 et seq. ("Code Enforcement Ordinance"), which allows City to enforce building codes and to prevent violations that create legitimate public health and safety problems (including illegal conversions). Ex. F. Second, City enacted Code, Article X, Division 2, § 14-711 et seq. ("Rental Dwelling Inspection Ordinance") which

5

allows City to annually inspect multi-family dwellings, such as Walker's property, to ensure compliance with building and maintenance codes. Ex. G.

Importantly, the Code Enforcement Ordinance and the Rental Dwelling Inspection Ordinance, unlike the Ordinance, contain due process protection -- including the right to a hearing and judicial review -- and do not allow City to prevent the sale of private property by simply refusing to allow it. Under the Code Enforcement Ordinance, a property owner is entitled to an administrative hearing where he is permitted to be represented by counsel, to present testimony and other evidence to challenge City's complaint, and to subpoena and cross-examine City officials regarding the alleged code violation. Ex. F at §§ 2-943, 2-946. Further, a property owner may petition for rehearing of an adverse decision before the enforcement administrator, *id.* at § 2-949, and appeal any final decision to a Cook County Court. *Id.* at § 2-950. Finally, if a property owner is found guilty of a code violation, he is fined, *id.* at § 2-952, not deprived of his Constitutional right to sell his property. None of these due process protections are present in the Ordinance.

## III.    WALKER IS ENTITLED TO INJUNCTIVE RELIEF

To obtain a preliminary injunction, Walker must demonstrate each of the following: (A) some likelihood of success on the merits; (B) without injunctive relief, Walker will suffer irreparable harm for which there is no adequate remedy at law; (C) the irreparable harm Walker will suffer absent the requested relief will outweigh the irreparable harm City will suffer if the relief is granted (measured over the length of time that the relief will be in force). The more likely it is that Walker will succeed on the merits, the less the balance of irreparable harms need weigh toward its side. *Abbot Lab. v. Mead Johnson & So.*, 971 F.2d 6, 11–12 (7th Cir. 1992); and (D) the public interest will be served if injunctive relief is granted (in terms of the consequences to non-parties); *Jak Prod. Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993);

6

*Abbott Lab.*, 971 F.2d at 11–12; *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). As the Court held when it issued the December 8 Injunction, Walker can readily satisfy each of these requirements.

### A.    Likelihood of Success on the Merits

#### 1.    Unreasonable Restraint on Walker's Right to Sell Her Property

The Ordinance unreasonably and unconstitutionally restrains the alienability of Ms. Walker's property. The Ordinance provides that property cannot be sold unless City issues a transfer stamp. Ex. A at § 14-1(h); Ex. C at §§ 82-325, 82-327(b), 82-328. With one limited exception (*see* n. 1, above), the only way for Ms. Walker to obtain a transfer stamp is to first obtain a "Certificate of Compliance" which, in turn, can only be obtained if an inspector decides her property "passed" a point of sale inspection. Ex. A. A property owner can "pass" a point of sale inspection only if it completes all repairs required by the inspector -- even if those repairs are cosmetic in nature -- by using a licensed contractor. *Id.* at § 14-1(k). Thus, even if property complies with all City codes, a property owner may not sell her property if City refuses to issue a "Certificate of Compliance." When City fails or refuses to issue a "Certificate of Compliance" a property owner has no right to a hearing to contest the inspector's decision, an administrative appeal or judicial review. *Id.*

> In its "prudential standing" Opinion, the Seventh Circuit correctly noted (at 4-5):
>
> The challenged ordinance is quite likely to delay the sale of homes in the area serviced by the real estate brokers whose association has brought this suit, to reduce sales prices, and thus to reduce the brokers' commissions . . .
>
> The initial victims of an ordinance impeding the sale of homes are homeowners who would like to sell -- or perhaps all homeowners subject to the ordinance; for as we said, any impairment of the salability ('alienability' in an older legal vocabulary) is one of the rights that, along with such other rights as the right to the exclusive enjoyment of the property, make a fee-simple interest more valuable than other interest in property, such as that of a licensee.

7

In addition to the Seventh Circuit's statements that the Ordinance impairs sales, the Illinois Attorney General has ruled that, although cities are permitted to adopt ordinances to protect public health and safety, they may not use such ordinances to restrict the free transfer of property. Op. Ill. Att'y Gen. No. 94-024 (Oct. 25, 1994), 1994 WL 601863 ("Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq.) (West 1992)) to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines ... Further, municipalities may impose various fees for other services relating to real property. *In no instance, however, are municipalities authorized to limit the alienability of property in order to enforce such code.*") (emphasis added) (Ex. H). But the Ordinance does exactly what the Illinois Attorney General has said municipalities may not do. *Huggins v. Isenbarger*, 798 F.2d 203, 208-10 (7th Cir. 1986) ("a federal court is not authorized on that account to give the Attorney General's views lesser weight than they would receive if they appeared in a bound volume of legal opinions").

City has in the past argued that restraint on alienation has nothing to do with the constitutionality of a law. City's assertion is plainly wrong. The Supreme Court has frequently emphasized that the term "property" as used in the Constitution "includes the entire 'group of rights inhering in the citizen's [ownership].'" *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 142 (1978) (Renquist, J., dissenting), *quoting, United States v. General Motors Corp.*, 323 U.S. 373 (1945). This group of rights includes the right to "dispose of [property]." *Id.* at 143, *quoting, General Motors Corp.*, 323 U.S. at 377-78. *See also* cases cited *infra* at 10-11. As set forth above, the Seventh Circuit agrees that the right to sell property is a protected right. Thus, by taking the right to sell property, City is violating the Constitution.

8

The Illinois Supreme Court has also made clear that municipalities may not use ordinances to interfere with the free alienability of property. *Petropoulos v. Chicago*, 5 Ill. 2d 270, 274-75, 125 N.E.2d 522, 525 (Ill. 1955) ("To place a legal restriction on the use of such property to the extent the same is rendered practically unsaleable would be an utter violation of a man's right to alienate property"). The Court should follow this authority and find that the Ordinance unconstitutionally interferes with the free alienability of property.

City previously cited *Butcher v. City of Detroit*, 131 Mich. App. 698, 347 N.W.2d 702 (Mich. App. Ct. 1984) to support its claim that the Ordinance is constitutional. As this Court previously recognized, *Butcher* does not control because the ordinance at issue there is different from City's Ordinance. In contrast to the Ordinance, as respects the transfer of residential property to be occupied by the buyer, the *Butcher* ordinance required a POS inspection and an "inspection report" but did not force the owner to repair all defects as a condition to right to sell property. *Butcher*, 131 Mich.App. at 700-01, 347 N.W.2d at 704, *citing* Detroit City Code Secs. 12-7-2(b), 12-7-8 (Derived from Ord. 123-H, §1, effective June 30, 1976). Thus, the *Butcher* ordinance did not interfere with or delay the sale of property and has no bearing here.

### 2.    <u>Lack of Procedural Due Process</u>

"Due process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999), 196 F.3d at 813, *quoting Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "[S]ome kind of hearing is required at some time *before* a person is finally deprived of his property rights." *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 11 (1978) (internal cite omitted) (emphasis added).

The Supreme Court has repeatedly applied this fundamental due process rule – that a hearing is required *before* a property right can be taken away – when the "taking" adversely affects the fundamental right to freely sell residential property. For example,

9

*Connecticut v. Doehr*, 501 U.S. 1 (1991) held unconstitutional a Connecticut statute that

permitted prejudgment attachment of real estate without a hearing.  In reaching its conclusion,

the Supreme Court emphasized the significance of an owner's right to freely sell his home

without governmental interference:

> [T]he property interests that attachment affects are significant.  For a property owner . . . attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property . . . . *Id.* at 11.

The Supreme Court also held that the taking of the right to sell property – even if only temporary

– requires due process protection:

> But the Court has never held that only such extreme deprivations trigger due process concern. To the contrary, our cases show that even the temporary or partial impairment to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection. *Id.* at 12 (citation omitted).

Similarly, the Court stated:

> The Fourteenth Amendment draws no bright lines around three-day, 10-day, or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause. *Id.* at 15, *quoting Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).

The Supreme Court held that a *post-deprivation* hearing is not sufficient to comply with due

process because a post-deprivation hearing "would not cure the temporary deprivation that an

earlier hearing might have prevented." *Id.* at 15.

Similarly, in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53-

54 (1993), the Supreme Court held that, as respects the deprivation of real property such as a

home, the requirement for a predeprivation hearing is critically important because, without a

hearing, property owners are deprived of "valuable rights of ownership, including the right of

sale." In *Daniel Good*, the Court held that a hearing was required before a home could be seized

pursuant to 21 U.S.C. §881(a)(7) on the ground that the home was used to facilitate a federal

drug offense.  Relevant to our case, the Supreme Court observed at pp. 53-54:

> [A property owner's] right to maintain control over his home, and to be free
> from governmental interference, is a private interest of historic and continuing
> importance. ... The seizure deprived [the property owner] of valuable rights of
> ownership, including the right of sale ... All that the seizure left him was the
> right to bring a claim for the return of title at some unscheduled future hearing.
> ... The seizure of a home produces a far greater deprivation than the loss of
> furniture, or even attachment.  It gives the Government not only the right to
> prohibit sale, but also the right to ... modify the property, to condition
> occupancy ... and to supersede the owner in all rights pertaining to the use,
> possession, and enjoyment of the property.

See also *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 96 (1977)

(emphasizing the value of the right to sell real property when the Court prohibited a township

from banning "for sale" signs, based, in part, on the effect of the ban on "one of the most

important decisions [residents] have a right to make: where to live and raise their families").

The Ordinance fails to comply with the Supreme Court's edict that, at a

minimum, a hearing must be provided *before* a property right can be taken.  As respects point of

sale inspections, the Ordinance has no due process safeguards that allow citizens to challenge the

failure to issue a Certificate of Compliance or an inspector's repair order.  Ex. A.  Property

owners are not entitled to a hearing at which they can challenge a finding of a code violation or a

repair order.  *Id.*  Property owners have no right to appeal the refusal to issue a Certificate of

Compliance or judicial review of any aspect of City's action or inaction.  *Id.*  Property owners

must capitulate to City's inspectors' demands, even if the repair work is unnecessary from a

public health or safety standpoint, if they want to sell their property.  *Id.*  The Ordinance

prohibits the transfer of every residential property unless City consents, but no due process

protection attaches.  In effect, City has enjoined the transfer of residential property -- without a

complaint, evidence, a hearing or any procedural or substantive rules -- until it decides to

11

consent. The home seller has no protection if an inspector conditions City's consent on "repairs" that have no relationship to health or safety. Such a scheme does not comport with due process.[2]

As respects deconversions, the Ordinance does not provide any procedural due process protection to ensure that City does not wrongfully deprive property owners of the "valuable property right" to sell legal nonconforming property. *Village of Oak Park v. Gordon*, 32 Ill. 2d 295, 298, 205 N.E.2d 464, 466 (Ill. 1965). For example, the Ordinance does not explain how City will determine whether property is "legal" or "illegal." Ex. A. Further, property owners are not granted a hearing where they can be represented by counsel, rebut City's positions or submit evidence to show that the property is not an illegal conversion. Further, there is no right to an administrative appeal of a determination that property is "illegal." *Id.*; *see also supra* at 5 (discussing how the zoning appeal process cited by City by its terms would not apply to a deconversion order). There is also no right to judicial review.

Ironically, City provides a "predeprivation hearing" when an owner disputes the amount owed on a water bill (probably less than $100), but provides no such hearing when City orders the deconversion of, or refuses to issue a Certificate of Compliance to allow the sale of, property worth hundreds of thousands of dollars. Ex. A at §14-H ("predeprivation hearing" consistent with *Memphis Light, Gas & Water* is required regarding any dispute over water bill). Even as respects the water bill, however, the Ordinance fails. Although an owner can dispute the water bill in a "predeprivation hearing," the Ordinance does not provide any detail regarding the due process protection of such hearing and requires the owner to pay the disputed bill "under protest" while he challenges the bill if he wants to obtain a transfer stamp. *Id.*

---

[2] As explained above, the Zoning Board of Appeals does not have jurisdiction to hear appeals arising out of point of sale inspections. However, even if it did, that would not save the Ordinance. At most, the Zoning Board of Appeals applies *post*-deprivation. As the many cases cited above hold, however, due process requires a *pre*-deprivation hearing.

12

It is also telling that in the Code Enforcement Ordinance (and to a lesser extent, the Rental Dwelling Inspection Ordinance), City provides the due process protections (that should be included in the Ordinance) even though much less is at stake in terms of potential deprivation of property rights. For example, under the Code Enforcement Ordinance, a property owner must be served with a complaint and then is entitled to an administrative hearing where he is permitted to be represented by counsel, to present testimony and other evidence to challenge City's complaint, and to subpoena and cross-examine City officials regarding the alleged code violation. Ex. F at §§ 2-943, 2-946. Further, a property owner may petition for rehearing of an adverse decision before the enforcement administrator, *id.* at § 2-949, and appeal any final decision to a Cook County Court. *Id.* at § 2-950. Finally, if a property owner is found guilty of a code violation, he is fined, *id.* at § 2-952, not deprived of his Constitutional right to sell his property. Because none of these due process protections are present in the Ordinance, it fails to provide adequate procedural due process.

*   *   *

In sum, as the Court has previously held, Walker has a high likelihood of success on the argument that the Ordinance violates the Constitution because it improperly interferes with the free alienability of property and does not provide procedural due process.

**B.    Without Injunctive Relief, Walker Will Be Denied Her Constitutional Rights -- An Irreparable Harm for Which There is No Adequate Remedy at Law**

The deprivation of a constitutional right is in itself an "irreparable injury" as a matter of law. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, No. 98 C 1932, 1998 U.S. Dist. Lexis 7287 at *19 (May 8, 1998) ("irreparable harm is presumed to flow from a constitutional violation which is not fully compensable by monetary damages") (Ex. I). There is also no adequate remedy at law for the deprivation of a

13

Constitutional right. Based on City's prior conduct, City will continue to interfere with the right to sell property unless the Ordinance is enjoined. For example, during the pendency of Association's lawsuit, City unconstitutionally interfered with the sale of the Forsythe Property, which resulted in this Court finding City had violated the Injunction.

### C.    The Irreparable Harm That Will Be Suffered Absent the Requested Relief Outweighs the Irreparable Harm that City May Suffer if Relief is Granted

This Court previously found that the balance of harms "substantially" favored the granting of an injunction. Ex. D at ¶4. That finding is correct. The wrongful denial of an injunction will result in irreparable harm: the deprivation of Walker's Constitutional right to freely sell her property without unreasonable restraint by City without due process.

In contrast, City will not be harmed by the injunction. Even with the injunction in place, City may continue to enforce its safety codes through its Code Enforcement Ordinance and the Rental Dwelling Inspection Ordinance. Those ordinances allow City to eliminate code violations, including those created by illegally converted property, that relate to public health and safety, without encroaching on the right to sell property.

### D.    The Public Interest Will Be Served If The Injunction is Granted

The public interest is best served by protecting Walker and other City citizens from City's constitutional violations. It is in the public interest not to allow City to interfere with the right to sell property unless owners comply with its demands, no matter how unreasonable, and without any due process protection. The public is better served by letting the market dictate how, what and when repairs should be made and by whom. Buyers and sellers should be free to negotiate such issues without City precluding sales unless its demands are met. As of October 29, there were 46 real estate listings in City with contracts pending and 642 active listings of property in City. Each owner of such property will have his or her Constitutional rights violated

14

if the Ordinance is not enjoined. All owners of nonconforming property are at risk that City will declare their property illegal, without due process. Plainly, it is in the public interest to make sure citizens have due process rights, including the right to contest the inspector's repair orders, appeal, and have judicial review before City prohibits a sale or orders that nonconforming property be deconverted.

Finally, the public would not be harmed because, even if the Ordinance is enjoined, City may use the Code Enforcement Ordinance and the Rental Dwelling Inspection Ordinance to address legitimate health and safety issues.

## CONCLUSION

The Court should reaffirm its prior decision and enter an injunction enjoining City's enforcement of the Ordinance.

October 31, 2007

Philip C. Stahl
Patrick T. Nash
Maggie M. Hanel
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700

Respectfully submitted,

AYANNA WALKER

By: _____
     One of her Attorneys

15

136080v3

## CERTIFICATE OF SERVICE

I, Patrick T. Nash, certify that on this 31st day of October, 2007, I served the

foregoing **AYANNA WALKER'S MOTION FOR TEMPORARY RESTRAINING**

**ORDER AND/OR PRELIMINARY INJUNCTION, MEMORANDUM IN SUPPORT OF**

**AYANNA WALKER'S MOTION FOR TEMPORARY RESTRAINING ORDER**

**AND/OR PRELIMINARY INJUNCTION** to the following by Electronic Mail before 4:00

p.m. and by U.S. Mail upon:

> Mark H. Sterk
> Odelson & Sterk, Ltd.
> 3318 West 95th Street
> Evergreen Park, Illinois  60805

And by Electronic Mail and Hand Delivery before 4:00 p.m. on:

> John B. Murphey
> Rosenthal, Murphey & Coblentz
> 30 North LaSalle Street
> Suite 1624
> Chicago, IL  60602

Patrick T. Nash

136080v3

Exhibit
A

## ARTICLE I. IN GENERAL

### Sec. 14-1. Point of sale inspection requirement; certificate of compliance procedures.

(a) *Department created; definition; general requirement.*

(1) A department of inspectional services is hereby created pursuant to this section. The department of inspectional services ("department") shall be headed by a director of inspectional services ("director," which shall also include the director's designees) who shall be appointed by the mayor with the advice and consent of the city council. All inspectional services concerning point of sale matters within the city, including building and housing, shall be under the jurisdiction of the department. The buildingcommissioner, electrical inspector, plumbing inspector, housing director and all department inspectors and staff shall be responsible for reporting to the director relative to all matters relating to this section and the director shall have full authority to direct, train and provide appropriate personnel subject to city council approval as to expenditures and/or requirements as provided herein.

(2) For the purpose of this section, the term "point of sale inspection" means an inspection of real property by the department conducted in connection with a taxable transfer of real estate to determine whether the condition of said property conforms to the specific regulations identified in this section.

(3) A point of sale inspection shall be required relative to any transfer of any interest in property which is subject to this section, except as exempted herein.

(b) *Notice of transfer of real property required.* Whenever an owner of real property in the city proposes to engage in a transfer of real property in the city which is subject to taxation under Chapter 82, Article X of the Calumet City Municipal Code (Real estate transfer tax), such owner shall provide the department a notice of transfer for said property, on a form therefore provided by the department.

(c) *Compliance; inspection; pertinent code requirements.* The notice of transfer form shall also constitute the director's request to inspect such property ("compliance inspection") to determine whether such property is in compliance with the following specific requirements, which the corporate authorities of the city find are related to the public health, safety and welfare:

(1) *Compliance with specific city codes.* All structures shall be in compliance with city building ordinances, including any property maintenance codes adopted by the city, which codes are set forth elsewhere in this chapter 14.

(2) *Inspection to determine possible illegal conversions.* All structures shall be inspected to determine whether they have been illegally converted. For purposes of this subsection, "illegally converted" means that the property was converted to another or additional use beyond that for which the property was originally permitted, and which (i) is in violation of the property's zoning limitations and (ii) is not a legal nonconforming use under section V of the City Zoning Ordinance.

(d) *Proposed compliance inspection.* When the owner files the notice of transfer, the department will schedule a proposed compliance inspection to be conducted within twenty-eight (28) calendar days of the notice. The notice of transfer form shall include the following:

(1) Date and time of the proposed compliance inspection;

(2) A statement that the owner or occupant has the right to withhold consent to the compliance inspection and require the city to obtain a warrant to conduct the inspection;

(3) For occupied rental dwellings, the city must also request and obtain the consent of the tenant prior to conducting any inspection; and

(4) A space for the owner and/or to indicate that the owner and/or tenant either consent to the compliance inspection, or refuse consent.

(e) *Refusal to consent; warrant procedures.* If the owner or occupant does not consent to the proposed inspection, the director may appear before any judge in the Circuit Court of Cook County and seek an administrative search warrant to allow an inspection. Any such application shall be made within ten (10)

ARTICLE I. IN GENERAL

calendar days after the owner's nonconsent. The application for the warrant shall specify the basis upon which the warrant is being sought and shall include a statement that the inspection will be limited to a determination whether there are violations of the Code provisions identified in this section, and whether there have been any illegal conversions. The court may consider any of the following factors along with such other matters as it deems pertinent in its decision as to whether a warrant shall issue:

(1) Eyewitness account of violation;

(2) Citizen complaints;

(3) Tenant complaints;

(4) Plain view violations;

(5) Violations apparent from city records;

(6) Property deterioration;

(7) Age of property;

(8) Nature of alleged violation;

(9) Condition of similar properties in the area;

(10) Documented violations on similar properties in the area;

(11) Passage of time since last inspection;

(12) Previous violations on the property.

(f) *Uninspected property; transfer stamps.* In the event the owner or occupant refuses to consent to an inspection, and the director does not seek a warrant (or if court refuses an application for the warrant), the department shall notify the city clerk that "uninspected property" transfer stamps may issue. In connection with the issuance of transfer stamps, the city clerk shall advise the purchaser of such property that it is "uninspected property."

(g) *Inspection procedures.* In the event consent is given or a warrant issued, the department shall conduct the compliance inspection as provided in subsections (c) and (d). Within three (3) business days after the compliance inspection the department shall issue a written notice of violations and repairs, if any, necessary to bring the property into compliance with this section. In the event the inspection reveals a structure which has been illegally converted, the department shall issue a notice of deconversion, specifying the measures which must be taken in order to bring the illegally converted structure into compliance with applicable zoning regulations.

(h) *Follow-up repairs; reinspection.* A party issued a notice of repairs as provided for in subsection (g) shall proceed to make such repairs. Upon completion of said repairs and notice thereof to the department, the department will conduct a reinspection within three (3) business days thereafter. Upon completion of the follow-up repairs, and the completion of any deconversion measures required by the department, the department shall issue a certificate of compliance.

(i) *Payment of current water bills; predeprivation hearing.* The seller must pay the current water bill (as defined in subsection 82-327(b) of the Municipal Code) and other fees owed by the seller to Calumet City prior to the issuance of transfer stamps. In the event the owner disputes any such obligation (or any portion thereof), the office of city clerk shall promptly provide the owner with a predeprivation due process hearing consistent with the principles enunciated in *Memphis Light, Gas & Water Division v Craft*, 436 U.S. 1 (1978). The city clerk's office shall provide the hearing within three (3) business days of a request. If the owner disputes the city's determination as to liability, the owner may pay said bill under protest, and may pursue any remedies available to said seller to recover the claimed overcharge.

(j) *Conditional certificate of compliance; procedures.* An owner who has not completed the repairs identified through the inspection may nevertheless transfer ownership of property if:

(1) The owner or agent has deposited with the city an amount of money determined by the director or his designee to be sufficient to bring the structure into compliance with all city building and zoning ordinances and any applicable housing, fire or property maintenance codes or regulations; and

(2) The buyer, conveyee, transferee, assignee or successor in title, ownership or interest (hereinafter

ARTICLE I. IN GENERAL

"buyer") has entered into an agreement with the city whereby the buyer agrees to bring the structure into compliance within the time period determined by the director or his designee, to bring the structure into compliance with all applicable Code requirements within a period not to exceed one hundred eighty (180) calendar days after the closing of the transaction ("closing").

(3)  If the buyer enters into such an agreement, a conditional certificate of compliance will issue an order to allow the closing to be completed. The conditional certificate of compliance shall be issued by the department and shall terminate on the one hundred eighty-first day after closing and no extensions shall be granted. A buyer who elects to accept the premises, subject to the inspection with existing violations, and who agrees, in order to close, to be responsible as provided herein, shall execute a sworn affidavit satisfactory to the director, which will clearly indicate that the buyer is fully aware of the existing violations as well as the possibility of violations that may have existed but were undiscovered due to lack of access and agrees to accept the requirement and obligation to bring the structure into compliance within one hundred eighty (180) days of the closing. The city shall issue a certificate of compliance upon completion of the repairs necessary to bring the dwelling or structure into compliance.

(4)  In the event the buyer fails to complete the required repairs, and have the repairs verified on reinspection, the director is hereby authorized to pursue enforcement proceedings through the Calumet City administrative adjudication process, or, at his discretion, through the Circuit Court of Cook County. The buyer hereby agrees to submit to the jurisdiction and venue of the Calumet City Administrative Adjudication Process and the Circuit Court of Cook County and to waive service of summons subject only to the notice requirement as required by law in order to enable the city to expeditiously obtain an order of compliance with this section.

(5)  If reasonable proof that the repairs have been completed is not received by the director or his designee within the required period for the repairs to be completed, the city, may also issue a citation for violation of this chapter and/or the escrow repair agreement, and may also pursue any applicable administrative or judicial remedies to bring the structure and property into compliance with applicable codes and regulations.

(6)  The fine for violations of this chapter shall be not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) per day for each day the violations remain uncorrected.

(k)  *Licensed and bonded contractors.* All contractors performing repairs identified in the point of sale inspection, or issuing certifications shall be licensed by the city and bonded and shall make available, upon request, copies of their license(s), verification of their liability insurance, errors and omissions insurance policies, and surety bond.

(l)  *Validity of certificate of compliance.* A certificate of compliance issued to the seller shall be valid for one hundred eighty (180) days from the date of issuance.

(m)  *No warranty.* In issuing a certificate of compliance or a conditional certificate of compliance, the city and its agents do not make any warranty, representation or statement nor does it intend to insure or guarantee to either buyer or seller of the property subject to the point of sale inspection or any of their designees, agents, representatives, heirs or assigns or any other interested party, including mortgage companies, insurance companies, banks or any other party which may have any interest relative to the property subject to the point-of-sale inspection, nor does the city affirm that there are no additional unnoted violations relative to any other provisions of any of the Municipal Code of the City of Calumet City, or relevant statutes, ordinances, rules and regulations of the County of Cook, the State of Illinois, or the United States of America.

(o)  *Inspection fee schedule.*

(1)  The fee for a point of sale inspection shall be one hundred-fifty dollars ($150.00) for all single-family residential inspections. The failure of an owner/seller or his designee to appear at the time of inspection shall result in a fifty-dollar penalty.

(2)  The fee for a point of sale inspection shall be one hundred-fifty dollars ($150.00) plus twenty-five additional dollars ($25.00) for each residential unit in excess of one unit.

(3)  A fee of twenty cents ($0.20) per square foot shall be charged for each commercial/industrial unit inspected with a minimum fee of two hundred dollars ($200.00) per commercial/industrial unit.

(4)  Each fee set for the above covers the cost of one follow-up inspection to verify compliance. In the event that additional inspections are required because full compliance did not exist at the time of the

ARTICLE I. IN GENERAL

reinspection, then an additional reinspection fee of fifty dollars ($50.00) per unit shall be assessed.

(5)  If an owner, agent or tenant has failed to appear for two (2) previously scheduled inspections, an additional inspection fee of fifty dollars ($50.00) per unit shall be assessed.

(Ord. No. 06-68, § 1, 8-24-2006)

**Editor's note:** Section 1 of Ord. No. 06-68, adopted Aug. 24, 2006, amended § 14-1 in its entirety to read as herein set out. Former § 14-1 pertained to similar subject matter and derived from § 6-308 of the 1980 Code; Ord. No. 96-28, adopted May, 9, 1996; Ord. No. 04-50, adopted Aug. 10, 2004; and Ord. No. 06-48, adopted June 22, 2006.

## Sec. 14-2. Rebates for overhead sewers.

(a)  The city will rebate up to fifty (50) percent of the cost with a maximum of two thousand five hundred dollars ($2,500.00) to the homeowner for all completed overhead sewer repairs or installations that have been preapproved by the city. The city will additionally rebate up to fifty (50) percent of the cost with a maximum of two thousand five hundred dollars ($2,500.00) to the homeowner for all completed installation, repair or replacement of sewer traps, valves, and waterproofing.

(b)  The applicant must submit a request for funding reimbursement to the city on forms prescribed by the city for preapproval. Two (2) estimates and the recommendation of a contractor who is licensed with the city are required. After the work is completed, the property will be inspected to verify compliance with Code requirements. The homeowner must provide paid receipts and their property index number (PIN).

(Ord. No. 03-61, §§ 1, 2, 10-9-2003; Ord. No. 04-09, § 1, 3-11-2004; Ord. No. 05-12, § 1, 2-10-2005)

Secs. 14-3--14-20. Reserved.

Exhibit
B

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| REALTOR® ASSOCIATION OF WEST/<br>SOUTH SUBURBAN<br>CHICAGOLAND,<br>　　　　　　　　*Plaintiff,*<br><br>　　　v.<br><br>CALUMET CITY, ILLINOIS,<br>　　　　　　　　*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06 C 2271<br><br><br>Judge Milton I. Shadur |

## ORDER GRANTING PRELIMINARY INJUNCTION

This matter has come on to be heard on the motion of plaintiff ("Association") for a preliminary injunction, with due notice having been given and this Court being fully advised in the premises. For the reasons set forth on the record at the hearing of this matter on August 2, 2006 and at other hearings, and based on the written submissions of the parties, this Court finds that as to Association's claims that the Deconversion Provisions and the Amended Point of Sale Inspection Ordinance (as defined below) are facially unconstitutional:

1.　　Association has established associational standing.

2.　　Association has established a high likelihood of success on the merits.

3.　　There is no adequate remedy at law, and Association and its Members will suffer irreparable harm if injunctive relief is not granted.

4.　　Such irreparable harm that Association and its Members will suffer if injunctive relief is wrongfully denied substantially outweighs any irreparable harm that defendant Calumet City ("City") will suffer if injunctive relief is wrongfully granted.

5.　　Granting injunctive relief will not disserve the public interest – indeed, will serve the public interest – in terms of the consequences to non-parties.

# NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    City and its agents, employees, officers, successors and members (collectively included within "City," though treated for convenience as a singular noun in this Order), is prohibited and enjoined from enforcing (a) Section 14-1 of Chapter 14, Article I of the Calumet City Code, as amended by Ordinance No. 06-68 (the "Amended Point of Sale Inspection Ordinance"), including but not limited to any provisions of the Amended Point of Sale Inspection Ordinance that require sellers of legal nonconforming property to "deconvert" them into structures with fewer income-producing rental units (the "Deconversion Provisions"), and (b) Section 327(b) of Chapter 82, Article X of the Calumet City Code ("Section 327(b)"). This Order shall not prohibit City from attempting to collect unpaid water bills by lawful means other than pursuant to Section 327(b).

2.    City is prohibited and enjoined from (a) conducting inspections pursuant to the Amended Point of Sale Inspection Ordinance; (b) prohibiting the sale of property and refusing to issue transfer stamps in the absence of a point of sale inspection and/or issuance of a "certificate of compliance" or "conditional certificate of compliance;" and (c) ordering the deconversion of legal nonconforming property. City shall allow the sale or transfer of property without requiring point of sale inspections or deconversions of legal nonconforming property.

3.    This order shall remain in effect until the trial on the merits, unless modified by this Court.

4.    Because no costs or damages will be incurred or suffered by City if the requested injunction is issued, this Court deems it proper that, pursuant to Fed. R. Civ. P. 65(c), no security need be given by Association.

2

5.    This Court's August 8, 2006 Order Granting Preliminary Injunction as to an earlier version of the now-Amended Point of Sale Ordinance is now moot, and the injunction granted thereby is dissolved.

Dated:       December 8, 2006          ENTERED:

_____

Judge Milton I. Shadur

3

Exhibit
C

## ARTICLE X. REAL ESTATE TRANSFER TAX*

---

**\*State law references:** Authority, 65 ILCS 5/8-11-6a(4).

---

### Sec. 82-321. Definitions.

For the purpose of this article, whenever any of the following words, terms or definitions are used herein, they shall have the meanings ascribed to them in this section:

*Beneficial interest in real property* includes, but is not limited to (1) the beneficial interest in an Illinois land trust; (2) the lessee interest in a ground lease (including any interest of the lessee in the related improvements) that provides for a term of thirty (30) or more years when all options to renew or extend are included, whether or not any portion of the term has expired; or (3) the indirect interest in real property as reflected by a controlling interest in a real estate entity.

*Controlling interest* means:

(1) Fifty (50) percent or more of the combined voting power or fair market value of all ownership interests or beneficial interests in a real estate entity, whether the interests are owned by one (1) or by several persons: or

(2) The right of one (1) or of several persons to receive at the time of any distribution fifty (50) percent or more of the income or profits of a real estate entity.

*Person* means any individual, receiver, administrator, executor, conservator, assignee, trust, estate, partnership, joint venture, club, joint stock company, business trust, political subdivision of the state, corporation, association, limited liability company, syndicate, society, or any group of persons acting as a unit, whether mutual, cooperative, fraternal, nonprofit or otherwise.

*Real estate entity* means any person (other than a state land trust) including, but not limited to, any partnership, corporation, trust, or single or multi-tiered entity, that exists or acts substantially for the purpose of holding directly or indirectly title to or beneficial interest in real property located in the city, whether for personal use, the production of rental income, or investment. It shall be presumed, unless proved otherwise, that an entity is a real estate entity if it owns directly or indirectly real property located in the city having a fair market value greater than seventy-five (75) percent of the total fair market value of all of the entity's assets, determined without deduction for any mortgage, lien or encumbrance.

*Recordation* means the recording of deeds with the office of the recorder of deeds or the registration of deeds with the Registrar of Titles of Cook County, Illinois.

*Transfer price* means the consideration furnished for the transfer of title to, or beneficial interest in, real property, valued in money, whether paid in money or otherwise, including cash, credits and property, determined without any deduction for mortgages, liens or encumbrances, and specifically including the amount of any indebtedness or obligation cancelled or discharged in connection with the transfer. In the case where the controlling interest in a real estate entity is transferred, and the real estate entity holds assets in addition to title to or beneficial interest in real property located in the city, "transfer price" means only that portion of the consideration attributable to the transfer of such real property or such beneficial interest.

(Code 1980, § 26-70; Ord. No. 80-17, § 1, 7-24-1980; Ord. No. 98-21, § 1, 4-30-1998)

### Sec. 82-322. Imposed.

(a) Except as otherwise provided in this article, a tax is imposed upon the privilege of transferring title to, or beneficial interest in, real property located within the corporate limits of the city. The tax shall be imposed at the

following rates:

(1) Eight dollars ($8.00) per one thousand dollars ($1,000.00) of the transfer price, or fraction thereof, of the real property or the beneficial interest in real property up to, and including, two million dollars ($2,000,000.00)

(2) Ten dollars ($10.00) per one thousand dollars ($1,000.00) of the transfer price, or fraction thereof, of the real property or the beneficial interest in real property between two million dollars and one cent ($2,000,000.01) and five million dollars ($5,000,000.00).

(3) Twelve dollars ($12.00) per one thousand dollars ($1,000.00) of the transfer price, or fraction thereof, of the real property or the beneficial interest in real property between five million dollars and one cent ($5,000,000.01) and ten million dollars ($10,000,000.00).

(4) Fourteen dollars ($14.00) per one thousand dollars ($1,000.00) of the transfer price, or fraction thereof, of the real property or the beneficial interest in real property between ten million dollars and one cent ($10,000,000.01) and twenty million dollars ($20,000,000.00).

(5) Sixteen dollars ($16.00) per one thousand dollars ($1,000.00) of the transfer price, or fraction thereof, of the real property or the beneficial interest in real property over twenty million dollars ($20,000,000.00).

(b) (1) The tax imposed by this chapter is due upon the earlier of the delivery or recording of the deed, assignment or other instrument of transfer.

(2) In the case of an assignment of a beneficial interest in a trust, delivery shall be deemed to occur when the trustee receives possession of a valid assignment of the beneficial interest. In the case of other transfers, delivery shall be deemed to occur when the transferee, or the transferee's representative or agent, receives or becomes entitled to receive possession of the instrument of transfer.

(c) The tax imposed by this article shall be due whether the transfer of a controlling interest in a real estate entity is effected by one (1) transaction or by a series of related transactions. For purposes of this subsection, it shall be presumed, unless provided otherwise, that transactions are related if they occur within the same twenty-four (24) month period.

(d) Nothing in this article shall be construed to impose a tax upon any transaction or privilege which, under the circumstances of the United States or the State of Illinois, may not be made the subject of taxation by the city.

(Code 1980, § 26-71; Ord. No. 80-17, § 1, 7-24-1980; Ord. No. 93-35, § 1, 10-28-1993; Ord. No. 95-32, § 1, 7-27-1995; Ord. No. 98-21, § 2, 4-30-1998)


## Sec. 82-323. Exceptions.

(a) The tax imposed by this article shall not apply to the following transactions:

(1) Transactions involving property acquired by or from any governmental body or by any corporation, society, association, foundation or institution organized and operated exclusively for charitable, religious or educational purposes; provided that only the governmental body or corporation, society, association, foundation or institution organized and operated exclusively for charitable, religious or education purposes shall be exempt from the tax imposed by this article;

(2) Transactions which secure debt or other obligations;

(3) Transactions in which deeds, without additional consideration, confirm, correct, modify or supplement deeds previously recorded;

(4) Transactions in which the actual consideration is less than one hundred dollars ($100.00);

(5) Transactions in which the deeds are tax deeds;

(6) Transactions which are releases of property which is security for a debt or other obligation;

(7) Transactions of partitions;

ARTICLE X. REAL ESTATE TRANSFER TAX*

(8)  Transactions made pursuant to mergers, consolidations or transfers or sales of substantially all of the assets of a corporation pursuant to plans of reorganization;

(9)  Transactions between subsidiary corporations and their parents for no consideration other than the cancellation or surrender of the subsidiary corporation's stock;

(10)  Transactions wherein there is an actual exchange of real property except that the money difference or money's worth paid from one to the other shall not be exempt from the tax;

(11)  Transactions representing transfers subject to the imposition of a documentary stamp imposed by the government of the United States.

(12)  Transactions by full-time employees of the City of Calumet City who sell their residence within the city limits and purchase residential property within the city limits for the purpose of relocating their legal residence.

(13)  Transactions in which the deed or other instrument of transfer is issued to the mortgagee or secured creditor pursuant to a mortgage or security interest foreclosure proceeding or sale or pursuant to a transfer in lieu of foreclosure.

(b)  Every deed or other instrument which is tax exempt pursuant to this section shall be presented to the city clerk so as to be appropriately marked by said city clerk as an exempt deed or instrument eligible for recordation without the payment of tax. At such time as a deed or instrument is presented to the city clerk a certificate setting forth the facts which justify exemption shall be presented.

(c)  No other fees shall apply to any transactions in this section, except that a service fee of fifty dollars ($50.00) shall be assessed on all transactions in which deeds, without additional consideration, confirm, correct, modify, or supplement deeds previously recorded.

(Code 1980, § 26-75; Ord. No. 80-17, § 1, 7-24-1980; Ord. No. 82-3, § 1, 2-11-1982; Ord. No. 95-21, § 1, 5-25-1995; Ord. No. 95-32, § 3, 7-27-1995; Ord. No. 98-21, § 3, 4-30-1998; Ord. No. 05-09, § 1, 2-10-2005; Ord. No. 05-51, § 1, 7-28-2005)

## Sec. 82-324. Liability for tax.

The ultimate incidence of and liability for payment of the tax imposed by this section shall be borne as follows:

(1)  One-half ( 1/2) the tax shall be borne by the grantor of any deed subject to this article or by the grantor, assignor or transferor of any instrument conveying the beneficial interest in real estate within the corporate limits of the city.

(2)  One-half ( 1/2) the tax shall be borne by the grantee of any deed subject to this article or by the grantee, assignee or transferee of any instrument conveying the beneficial interest in real estate within the corporate limits of the city.

(Code 1980, § 26-72; Ord. No. 80-17, § 1, 7-24-1980; Ord. No. 95-32, § 1, 7-27-1995)

## Sec. 82-325. Purchase of stamps.

The tax levied by this article shall be paid by the purchase of tax stamps from the city clerk or a designated agent. The payment of such tax shall be denoted by the adhesive stamp or stamps affixed to the fact of the deed or instrument transferring the beneficial interest.

(Code 1980, § 26-73; Ord. No. 80-17, § 1, 7-24-1980)

## Sec. 82-326. Filing of declaration.

At such time as the tax levied by this article is paid there shall be filed with the city clerk a fully executed and completed copy of the "real estate transfer declaration" required by Section 3 of the real estate transfer tax of the state, or a declaration of the full consideration paid for the transfer of beneficial interest which declaration shall be on a

ARTICLE X. REAL ESTATE TRANSFER TAX*

form provided by the city clerk. Such declaration shall be deemed as a confidential record.

(Code 1980, § 26-74; Ord. No. 80-17, § 1, 7-24-1980)

## Sec. 82-327. Real estate transfer tax stamps required.

(a) The tax herein levied and imposed shall be collected by the city clerk through the sale of real estate transfer tax stamps, which shall be caused to be prepared by said clerk in such quantities as said clerk may from time to time prescribe. Such stamps shall be available for sale at, and during the regular business hours of the city offices and the offices of such agent as the city may designate. For the purpose of reviewing a request for the stamps, the city shall process a request within forty-eight (48)hours of working time. Upon payment of the tax herein levied and imposed, the stamps so purchased shall be affixed to the deed or other instrument of conveyance. Any person so using or affixing a stamp shall cancel it and so deface it as to render it unfit for reuse by marking it with his initials and the day, month and year when the affixing occurs. Such markings shall be made by writing or stamping in indelible ink or by perforating with a machine or punch; however, the stamp shall not be so defaced as toprevent ready determination of its genuineness.

(b) The city clerk shall issue no stamps for the transfer of any dwelling, structure, commercial or industrial building unless the grantor/seller (i) presents a "certificate of compliance" or other certificate indicating compliance with appropriate city ordinances and/or codes signed by an authorized signatory of the department of inspectional services or (ii) presents an "uninspected property" notice to the city clerk pursuant to subsection 14-1(f) of the City Code. The city clerk shall provide the purchaser notice whether the property is inspected or uninspected.

Additionally, prior to the issuance of transfer tax stamps, and subject to the procedures as set forth in subsection 14-1(i) of the City Code, the grantor/seller shall present to the city clerk proof of a current paid water bill. The term "current" shall be defined as the most recent bill issued to the grantor/seller and certified as same by an authorized official of the water department of the city. The water department shall not issue certification of a paid water bill relative to any transfer of title unless the new owner's name and address is supplied to an official of the water department simultaneously upon request for certification of a paid water bill. Grantors/sellers who are exempt from the requirement of purchase of transfer tax stamps shall be required to comply with the requirements of this section, and shall have the subsection 14-1(i) procedural rights.

(c) The city clerk shall issue no stamps for the transfer of any dwelling, structure, commercial or industrial building unless the city is presented with an original survey for the property being transferred. When the property being transferred is improved with any building, the survey shall not be dated more than one year prior to the date of the transfer.

(Code 1980, § 26-76; Ord. No. 80-17, § 1, 7-24-1980; Ord. No. 96-29, § 1, 5-9-1996; Ord. No. 05-09, § 2, 2-10-2005; Ord. No. 06-68, § 2, 8-24-2006)

## Sec. 82-328. Recordation of deeds.

No deed conveying real property within the corporate limits of the city shall be entitled to recordation by the recorder of deeds or the registrar of titles of the county, unless such deed shall bear either a city real estate transfer tax stamp or an exemption mark from the city clerk.

(Code 1980, § 26-77; Ord. No. 80-17, § 1, 7-24-1980; Ord. No. 82-3, § 2, 2-11-1982; Ord. No. 95-21, § 2, 5-25-1995)

## Sec. 82-329. Duty of trustee.

No trustee of real estate shall accept an assignment of beneficial interest in real estate located in the city unless such instrument shall bear either a city real estate transfer tax stamp or an exemption mark from the city clerk.

(Code 1980, § 26-78; Ord. No. 80-17, § 1, 7-24-1980)

## Sec. 82-330. Proceeds of tax.

ARTICLE X. REAL ESTATE TRANSFER TAX*

All proceeds resulting from the collection of the tax imposed by this article, including interest and penalties, shall be paid into the treasury of the city and shall be credited to and deposited in the general fund of the city.

(Code 1980, § 26-79; Ord. No. 80-17, § 1, 7-24-1980)

### Sec. 82-331. Interest and penalties.

In the event of failure by any person to pay to the city clerk the tax required hereunder when the same shall be due, interest shall accumulate and be due upon said tax at the rate of one (1) percent per month commencing as of the first day following the day when the deed was recorded or the assignment of beneficial interest was accepted by the trustee. In addition, a penalty of fifty (50) percent of the tax and interest shall be assessed and collected against any person who shall fail to pay the tax imposed by this article.

(Code 1980, § 26-80; Ord. No. 80-17, § 1, 7-24-1980)

### Sec. 82-332. Civil liability for tax.

In the event of failure by any person to pay to the city clerk tax required hereunder when the same shall be due, said person shall be liable to the city for such tax, together with interest and penalties. The city may bring an action to collect such tax, interest and penalties in any court of competent jurisdiction.

(Code 1980, § 26-81; Ord. No. 80-17, § 1, 7-24-1980)

### Sec. 82-333. Fine for violation.

In addition to the remaining provisions of this article, any person found guilty in a court of competent jurisdiction of violating, disobeying, omitting, neglecting or refusing to comply with any provision of this article, upon conviction thereof, shall be punished by a fine of not more than five hundred dollars ($500.00) for each offense.

(Code 1980, § 26-82; Ord. No. 80-17, § 1, 7-24-1980)

### Sec. 82-334. Severability.

If any clause, sentence, section, provision or part of this article or the application thereof to any person or circumstance shall be adjudged to be unconstitutional, the remainder of this article or its application to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

(Code 1980, § 26-83; Ord. No. 95-32, § 4, 7-27-1995)

Secs. 82-335--82-370. Reserved.

Exhibit
D



1604 MEMORIAL DR.

CHECK GFI GARAGE & OUTSIDE
?? SOUTH ONLY DR

P.O.S.
8-16-96
11:00

Re-INSP
6-20-9
10 AM

REINSP
6-24-97
1:30
FINAL
6-24-9

P.O.S
12-30-03
2:30

RI
1-15-05
1:00

H

Picked up report 8/16/96
Two spr otg & cleaned 4/21/04 Conf#3857
on completion below 4/7/05

Re-INSP
4-8-05
PAI
C.R.
400

RI
5-13-05
PASS

5-13-05
FINAL

RE-2-22-05
9.00

②

# CALUMET CITY FIRE DEPARTMENT

## DEPARTMENT OF INSPECTIONAL SERVICES
### POINT OF SALE TRACKING SHEET

Location of inspection _1604 MEMORIAL DR_

Present Zoning _R-3_ Aldermanic Ward _4_ Sidwell Grid _36-14-126_

Court Cases Pending _none_

Last Rental Inspection _5/23/03_ Units Approved _3 (4 units 1 - 0/0)_

Last Fire Inspection _6/24/97_ Last Building Inspection _6/24/97_

Any Previous Modifications/ Additions _none_

Current Violations on File? Rental _No_ Fire _No_ Health _N/A_

Reviewed by: Housing _6X_ Date _____ Fire _6X_ Date _____

Building _6X_ Date _____ Health _N/A_ Date _____

Inspector Assigned _U RODECK_

Conditional Certificate Approved by Dept. Director _____ Date _____

Final Inspection Date _5-13-05_ Inspector _Daryl Zurloek_ #106

Certificate Approval by Dept. Director _____ Date _5/13/05_

②

# CALUMET CITY FIRE DEPARTMENT
## DEPARTMENT OF INSPECTIONAL SERVICES
### (708) 891-8120
### RESIDENTIAL/MULTIFAMILY P.O.S. INSPECTION

The following is the result of the inspection on the occupancy at _1604 MEMORIAL_.This inspection is not in any way intended to be a complete list of Code or Municipal Ordinance requirements. Our inspection can be substantially limited by access available and stored items or furniture. It is not meant to take the place of private home inspections nor will it cover the same items. Some occupancies may require certifications to be completed on individual systems such as the heating appliances, roofing, or fire protection systems. Specific requirements of the point of sale inspections and limitations is available by referring to Municipal Code Section 6-308 as amended on May 9,1996.The first inspection and subsequent re-inspection is included in the cost. Any additional inspections or failure of owner/agent/designee to appear for a scheduled inspection will require additional fees.

The inspector will note the deficiencies by writing "NO" in the blank in front of the statement and may additionally circle a specific area or make comments. On the back of the inspection sheets is some of the code language that relates to the deficiencies noted by the inspector. The "PM" sections refer to the present adopted Property Maintenance Code and the "MC" refers to Municipal Code references. There may be additional Code requirements that explain a deficiency. Non-conforming structures may be subject

Some of the repairs may require registered contractors and permits. If you have any questions about this inspection please call us at (708) 891-8120.

INSPECTOR __RoDeck__    1ST INSPECTION DATE __12-30-03__

I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION.
OWNER/AUTHORIZED AGENT IN ATTENDANCE __Sharon Tiller__

PRINTED NAME __Sharon Tiller__

INSPECTOR __RoDeck__    REINSPECTION DATE __1-15-04__    TIME __1:00__
I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION.

OWNER/AUTHORIZED AGENT IN ATTENDANCE __Sharon Tiller__

APPROVED FOR CERT. OF COMPLIANCE _____    DATE __5/13/05__

318

# GENERAL EXTERIOR

PM-303.1      All exterior property and premises shall be maintained in a clean, safe, and sanitary condition. The occupant shall keep that part of the exterior property which such occupant occupies or controls in a clean and sanitary condition.

PM-303.2      All premises shall be graded and maintained to prevent the accumulation of stagnant water thereon, or within any structure thereon.

PM-303.3      All sidewalks, driveways, parking spaces, and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions. Stairs shall comply with the requirements of Sections PM-304.1 and PM-702.9.

MC 28-2      All premises and exterior property shall be maintained free from weeds or plant growth in excess of 6 inches. All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants, and vegetation, other than trees or shrubs provided; however this term shall not include cultivated flowers and gardens. (Property Maintenance Code covers this item at PM 303.4)

PM-303.7      All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair.

PM-304.1      The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety, or welfare.

PM-304.2      Each structure to which a street number is assigned shall have such number displayed in a position easily observed and readable form the public right-of-way. All numbers shall be in Arabic numerals at least 3 inches high and ½ inch stroke. **NOTE: This includes garages in alleys.**

PM-304.5      All exterior walls shall be free from holes, breaks, loose, or rotting materials; and maintained weatherproof and properly surface coated where required to prevent deterioration.

PM-304.6      The roof and flashing shall be sound, tight, and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof water shall not be discharged in a manner that creates a public nuisance. **NOTE: These areas are examined from areas not requiring a ladder. The inspectors' approval of this item should not be considered a certification of the roof. The inspectors may require certification or repair of the roof based on their limited observations.**

PM-304.8      All overhang extensions shall be maintained in good repair and be properly anchored so as to be kept in a safe and sound condition.  **Summarized - All exposed elements shall be protected from the elements and against decay or rust.**

PM-304.9      All chimneys shall be maintained structurally safe and sound, and in good repair.

PM-304.11      Every window, door and frame shall be kept in sound condition, good repair and weather tight.

PM-304.11.1      All glazing materials shall be maintained free from cracks and holes.

PM-304.13      All exterior doors and hardware shall be maintained in good condition. Locks at all entrances to dwelling units, rooming units, and guest rooms shall tightly secure the door.

PM-702.11      All means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort.

PM-304.14      Every basement hatchway shall be maintained to prevent the entrance of rates, rain, and surface drainage water.

PM-306.1      All exterior property and premises, and the interior of every structure shall be free from any accumulation of rubbish or garbage.

②

# EXTERIOR OF HOUSE AND GARAGE

1) _YES_ Are property areas being maintained in a clean, safe, and sanitary condition ?

2) _YES_ Are private sidewalks, driveways, and similar areas being kept free from trip hazards, large cracks, etc. ?

3) _YES_ Are the weeds, plant growth, and grasses less than 6 inches ?

4) _YES_ Are fences, retaining walls, porches, and decks in good repair ?

5) _YES_ Is the street address posted on the property and visible from the public right of ways such as the street and alley ?
**Missing or deficient at        REAR OF GARAGE        HOUSE**

6) _YES_ Are the gutters, siding, fascia, and soffit areas free of peeling paint and deterioration ?

7) _YES_ Are all the exterior walls and chimneys in good repair ?

8) _YES_ Is the roof preventing the elements from damaging the structure ?
**CERTIFICATION NEEDED YES ____ NO _X_**

9) _NO_ Are all windows, doors, screens, and frames in good repair on the exterior ?

10) _YES_ Do the exit doors have single keyed locks/dead bolts or is key permanently in place ?

11) _YES_ Are all light fixtures and electrical outlets in good repair and are outside outlets protected by a ground fault interrupter circuit ?

12) _YES_ Are all sheds or auxiliary structures in good repair ?

## EXTERIOR COMMENTS

*#9 OLDER WINDOWS NEED PAINT

# MAJOR SYSTEMS

**HB0003 & PM 705.5**

Summarized state law. Smoke detectors shall be provided on each level of the occupancy and within 15 feet of bedrooms. In dwelling units with split levels, a smoke detector installed on the upper level shall suffice for the adjacent lower level if the lower level is less than one full story below the upper level.

**PM-404.5**

Clothes dryer venting systems shall be independent of all other systems and shall be vented in accordance with the manufacturers instructions

## PLUMBING

**PM 505.1**

All plumbing fixtures shall be properly installed and maintained in good working order, and shall be kept free from obstructions, leaks and defects and be capable of performing the function for which such plumbing fixtures area designed. All plumbing fixtures shall be maintained in a safe, sanitary, and functional condition.

**PM-506.2**

The water supply shall be maintained free from contamination, and all water inlets for plumbing fixtures shall be located above the flood level rim of the fixture.

**PM-506.4**

Water heating facilities shall be properly installed, maintained, and capable of providing an adequate amount of water to be drawn at every sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110 degrees. An approved combination temperature and pressure relief valve discharge pipe shall be properly installed and maintained on water heaters. **NOTE: The relief valve discharge pipe must be the proper size, type, and 6-12" from the floor. The venting must be properly installed and without rust and/or negative slope.**

**PM-507.1**

All plumbing fixtures shall be properly connected to either a public sewer system or to an approved private sewage disposal system.

## HEATING

**PM-603.1**

All mechanical equipment, fireplaces, and solid burning appliances shall be properly installed and maintained in a safe working condition, and shall be capable of performing the intended function. **NOTE: These systems shall not have evidence of back venting, rusted flues, or excessive rust in the appliance. Additional certifications may be required.**

**PM-603.2**

All cooking and heating equipment, components, and accessories in every heating, cooking and water heating devices shall be maintained free from leaks and obstructions.

**PM-603.3**

All fuel burning equipment and appliances shall be connected to an approved chimney or vent.

**PM-603.4**

All required clearances to combustible materials shall be maintained.

**PM-603.7**

Devices purporting to reduce fuel consumption by attachment to a fuel burning appliance, to the fuel line thereto, or from the vent outlet or piping therefrom, shall not be installed unless labeled for such purpose and the installation is specifically approved. **NOTE: Devices such as those manufactured by Ameritherm shall be removed unless proof can be given that they were approved by manufacturer.**

**603 PM.6**

A supply of air for complete combustion of the fuel and for ventilation of the space shall be provided for the fuel burning equipment.

②

ADDENDUM TO INSPECTION FOR 1604 MEMORIAL    DATE 12-30-01

INSPECTOR Rodeck

ADDITIONAL COMMENTS

* APT ONE — SOAP DISH LOOSE AT TUB WALL

☓ SMOKE DETECT SELF CLOSURE AT REAR ENTRY DOOR

☓ APT TWO — BOTH TUBS HAVE LOW WATER PRESSURE

☓ ONE HOT ONE COLD — G.FI. AT MASTER BATH WONT

☓ TEST — PLASTIC HOSE CONNECTORS AT BOTH TOILETS

☓ APT THREE EAST — PLASTIC HOSE CONNECTORS AT

    KIT—

☓ APT THREE WEST — LOW HOT WATER PRESSURE AT

    KIT, KIT RECPTS. HEAVILY PAINTED — TUB FAUCET

☓ NEEDS NEW CARTRIDGE — DECORATIVE COVER MISSING

☓ AT VANITY

②

## MAJOR SYSTEMS PLUMBING

25) *YES*     Is the water heater properly installed ?

26) *YES*     Are the drains and supply pipes free from leaks and is all drains attached to the drain/waste/vent system ?

27) *YES*     Are gas valves present at gas supply piping to appliances and flexible lines free from corrosion ?
MISSING AT _____ REPLACE AT _____

28) *N/A*     Is sump pump piping acceptable at this time ?

_____
_____
_____
_____

## HEATING UNITS

29) *NO*     Is the furnace/wall/boiler units working properly and free from excessive rust or debris ?

_____ FLUE PIPE HAS IMPROPER SLOPE _____
_____

30) *N/A*     Is fireplace free from cracks, creosote, or deterioration, and is damper working ?

31) *YES*     Are smoke detectors present on each level at each hall and within 15 feet of mechanical areas ?
MISSING/INOPERABLE AT _____

32) *YES*     Is the foundation free from large cracks ?

33) *YES*     Is the structure of the building free from unusual sagging, deterioration, and obvious structural problems ?

## ELECTRICAL

34) *NO*     Are electrical panels properly installed and proper size ?

_____ GARAGE PANEL DOUBLE LUGGED + HOLE AT TOP OF
PANEL REPLACE ALL ALUMINUM MAIN WIRES FROM

35) Are all exit and emergency lights operating properly ? *LOAD SIDE OF METER TO*
*OK P.K. 5-11*     *PANELS*

## FIRE PROTECTION SYSTEMS

_____ CERTIFICATION NEEDED ON     STANDPIPE     SPRINKLER SYSTEM
    SMOKE DETECTORS     FIRE ALARM

_____ NO PARKING SIGNS NEEDED AT FIRE DEPARTMENT CONNECTION

_____ EXPIRED EXTINGUISHER SERVICING AT _____

_____ MISSING EXTINGUISHER AT _____

_____ IS SELF CLOSURE INSTALLED ON LAUNDRY ROOM ?

## ELEVATORS

Elevators must be certified as complying with ASME A17.1-90, Safety Code for Elevators and Escalators.

_____ Certification or inspection within last year presented ?

## ELECTRICAL

**MC6-308b1**

Electrical Service: Single family residences shall have a minimum of 100 amp service and multiple unit residences shall comply with the latest code.

**PM-604.3**

Where it is found that the electrical system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient outlets, improper wiring, or installation, deterioration or damage, or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard. NOTE: Similar reasons include but are not limited to, ground fault interrupter circuits shall protect all outlets within 6 feet of plumbing fixtures, those in garages, outside , and basement outlets other than the sump pump.

**PM 605.2**

Every habitable space in a dwelling shall contain at least two separate and remote receptacles outlets. Every laundry area shall contain at least one grounded type receptacle. Every bathroom shall contain at least one receptacle.

**PM-605.3**

Every public hall, interior stairway, water closet compartment, bathroom, laundry room, and furnace room, shall contain at least one electric lighting fixture. NOTE: Other areas of the code allow the inspector to judge sufficiency of the lighting. It is expected that there will be sufficient lighting for safe servicing of the equipment within a room.

## DEFINITIONS

**Bathroom:**   A room containing plumbing fixtures including a bathtub or shower.

**Habitable space:**   Space in a structure for living, sleeping, eating or cooking. Bathrooms, toilet compartments, closets, halls, storage, or utility spaces, and similar space are not considered habitable spaces.

**Openable Area:**   The part of a window or door which is available for unobstructed ventilation and which opens directly to the outdoors.

**Toilet Room:**   A room containing a water closet or urinal but not a bathtub or shower.

## GENERAL STATEMENTS

**PM-101.6**

All repairs, maintenance work, alterations, or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner.

**PM-103.1**

All equipment, systems, devices, and safeguards required by this code or a previous statute or code shall be maintained in good working order. The requirements of this code are not intended to provide the basis for removal or abrogation of fire protection and safety systems and devices in existing structures.

**PM-104.1**

All materials, equipment, and devices approved by the code official shall be constructed and installed in accordance with such approval.

**PM 105.1**

The code official shall enforce all of the provisions of this code.

**PM -405.3**

Every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet of floor area, and every room occupied for sleeping purposes by more than one person shall contain at least 50 square feet of floor area for each occupant thereof .



HARDWIRED SMOKE DET REQD

- 90 YATES

Transfer stamper (Amt = 350m) 12/31/04

# DEPARTMENT OF INSPECTIONAL SERVICES
## POINT OF SALE TRACKING SHEET

LOCATION OF INSPECTION ___ 90 YATES ___

PRESENT ZONING R-1 WARD 3 SIDWELL GRID _____

COURT CASES/ COLLECTIONS OR LIENS PENDING none ___

LAST RENTAL INSPECTION 9/14/04 UNITS APPROVED 6

LAST BUILDING OR FIRE INSPECTION ___ none ___

ANY PREVIOUS MODIFICATIONS/ ADDITIONS permits in file

CURRENT VIOLATIONS ON FILE? RENTAL none BLDG none

(CONTACT HEALTH DEPARTMENT IF APPLICABLE)


REVIEWED BY : ___

INSPECTOR ASSIGNED ___ RoBECK ___

CONDITIONAL CERTIFICATE # _____ DATE_____

FINAL INSPECTION DATE 8-10-05 INSPECTOR Vargis #103

CERTIFICATE APPROVAL BY DEPT. DIRECTOR ___ DATE 8/10/05 SELF-CLOSURE

#2, 11, ADDENDUM SHEET, 29, 34 &
OK, OK                          OK

# CALUMET CITY FIRE DEPARTMENT
## DEPARTMENT OF INSPECTIONAL SERVICES
### (708) 891-8120
### RESIDENTIAL/MULTIFAMILY P.O.S. INSPECTION

The following is the result of the inspection on the occupancy at _90 YATES_ .This inspection is not in any way intended to be a complete list of Code or Municipal Ordinance requirements. Our inspection can be substantially limited by access available and stored items or furniture. It is not meant to take the place of private home inspections nor will it cover the same items. Some occupancies may require certifications to be completed on individual systems such as the heating appliances, roofing, or fire protection systems. Specific requirements of the point of sale inspections and limitations is available by referring to Municipal Code Section 6-308 as amended on May 9,1996.The first inspection and subsequent re-inspection is included in the cost. Any additional inspections or failure of owner/agent/designee to appear for a scheduled inspection will require additional fees.

The inspector will note the deficiencies by writing "NO" in the blank in front of the statement and may additionally circle a specific area or make comments. On the back of the inspection sheets is some of the code language that relates to the deficiencies noted by the inspector. The "PM" sections refer to the present adopted Property Maintenance Code and the "MC" refers to Municipal Code references. There may be additional Code requirements that explain a deficiency. Non-conforming structures may be subject

Some of the repairs may require registered contractors and permits. If you have any questions about this inspection please call us at (708) 891-8120.

INSPECTOR _RoDeck_          1ST INSPECTION DATE _11-5-04_

I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION. OWNER/AUTHORIZED AGENT IN ATTENDANCE _____

PRINTED NAME _SHERRY WINFIELD_

INSPECTOR _Garcia_          REINSPECTION DATE _12/8/04_  TIME _900_
I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION.

OWNER/AUTHORIZED AGENT IN ATTENDANCE _Sherry Winfield_

APPROVED FOR CERT. OF COMPLIANCE _____ DATE _8/10/05_

# GENERAL EXTERIOR

**PM-303.1**    All exterior property and premises shall be maintained in a clean, safe, and sanitary condition. The occupant shall keep that part of the exterior property which such occupant occupies or controls in a clean and sanitary condition.

**PM-303.2**    All premises shall be graded and maintained to prevent the accumulation of stagnant water thereon, or within any structure thereon.

**PM-303.3**    All sidewalks, driveways, parking spaces, and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions. Stairs shall comply with the requirements of Sections PM-304.1 and PM-702.9.

**MC 28-2**    All premises and exterior property shall be maintained free from weeds or plant growth in excess of 6 inches. All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants, and vegetation, other than trees or shrubs provided; however this term shall not include cultivated flowers and gardens. (Property Maintenance Code covers this item at PM 303.4)

**PM-303.7**    All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair.

**PM-304.1**    The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety, or welfare.

**PM-304.2**    Each structure to which a street number is assigned shall have such number displayed in a position easily observed and readable form the public right-of-way. All numbers shall be in Arabic numerals at least 3 inches high and ½ inch stroke. **NOTE: This includes garages in alleys.**

**PM-304.5**    All exterior walls shall be free from holes, breaks, loose, or rotting materials; and maintained weatherproof and properly surface coated where required to prevent deterioration.

**PM-304.6**    The roof and flashing shall be sound, tight, and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof water shall not be discharged in a manner that creates a public nuisance. **NOTE: These areas are examined from areas not requiring a ladder. The inspectors' approval of this item should not be considered a certification of the roof. The inspectors may require certification or repair of the roof based on their limited observations.**

**PM-304.8**    All overhang extensions shall be maintained in good repair and be properly anchored so as to be kept in a safe and sound condition. Summarized - All exposed elements shall be protected from the elements and against decay or rust.

**PM-304.9**    All chimneys shall be maintained structurally safe and sound, and in good repair.

**PM-304.11**    Every window, door and frame shall be kept in sound condition, good repair and weather tight.

**PM-304.11.1**    All glazing materials shall be maintained free from cracks and holes.

**PM-304.13**    All exterior doors and hardware shall be maintained in good condition. Locks at all entrances to dwelling units, rooming units, and guest rooms shall tightly secure the door.

**PM-702.11**    All means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort.

**PM-304.14**    Every basement hatchway shall be maintained to prevent the entrance of rates, rain, and surface drainage water.

**PM-306.1**    All exterior property and premises, and the interior of every structure shall be free from any accumulation of rubbish or garbage.

## EXTERIOR OF HOUSE AND GARAGE

1) *YES*    Are property areas being maintained in a clean, safe, and sanitary condition ?

2) *[crossed out]*    Are private sidewalks, driveways, and similar areas being kept free from trip hazards, large cracks, etc. ?

3) *YES*    Are the weeds, plant growth, and grasses less than 6 inches ?

4) *YES*    Are fences, retaining walls, porches, and decks in good repair ?

5) *YES*    Is the street address posted on the property and visible from the public right of ways such as the street and alley ?
**Missing or deficient at    REAR OF GARAGE    HOUSE**

6) *YES*    Are the gutters, siding, fascia, and soffit areas free of peeling paint and deterioration ?

7) *NO*    Are all the exterior walls and chimneys in good repair ?

8) *YES*    Is the roof preventing the elements from damaging the structure ?
**CERTIFICATION NEEDED YES ____ NO X**

9) *NO*    Are all windows, doors, screens, and frames in good repair on the exterior ?

10) *YES*    Do the exit doors have single keyed locks/dead bolts or is key permanently in place ?

11) *[crossed out]*    Are all light fixtures and electrical outlets in good repair and are outside outlets protected by a ground fault interrupter circuit ?

12) *NA*    Are all sheds or auxiliary structures in good repair ?

**EXTERIOR COMMENTS** #2 SEAL PARKING LOT
#7 CHIMNEY UPPER SECTION NEEDS SMALL
AMOUNT OF TUCKPOINTING
#9 REGLAZE BROKEN WINDOWS REPAIR RIPPED SCREENS
#11 LIGHT AT WEST HAS IMPROPER WIRING TO
USE SEAL TIGHT

# MAJOR SYSTEMS

**HB0003 & PM 705.5**

Summarized state law. Smoke detectors shall be provided on each level of the occupancy and within 15 feet of bedrooms. In dwelling units with split levels, a smoke detector installed on the upper level shall suffice for the adjacent lower level if the lower level is less than one full story below the upper level.

**PM-404.5**

Clothes dryer venting systems shall be independent of all other systems and shall be vented in accordance with the manufacturers instructions

## PLUMBING

**PM 505.1**

All plumbing fixtures shall be properly installed and maintained in good working order, and shall be kept free from obstructions, leaks and defects and be capable of performing the function for which such plumbing fixtures area designed. All plumbing fixtures shall be maintained in a safe, sanitary, and functional condition.

**PM-506.2**

The water supply shall be maintained free from contamination, and all water inlets for plumbing fixtures shall be located above the flood level rim of the fixture.

**PM-506.4**

Water heating facilities shall be properly installed, maintained, and capable of providing an adequate amount of water to be drawn at every sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110 degrees. An approved combination temperature and pressure relief valve discharge pipe shall be properly installed and maintained on water heaters. **NOTE: The relief valve discharge pipe must be the proper size, type, and 6-12" from the floor. The venting must be properly installed and without rust and/or negative slope.**

**PM-507.1**

All plumbing fixtures shall be properly connected to either a public sewer system or to an approved private sewage disposal system.

## HEATING

**PM-603.1**

All mechanical equipment, fireplaces, and solid burning appliances shall be properly installed and maintained in a safe working condition, and shall be capable of performing the intended function. **NOTE: These systems shall not have evidence of back venting, rusted flues, or excessive rust in the appliance. Additional certifications may be required.**

**PM-603.2**

All cooking and heating equipment, components, and accessories in every heating, cooking and water heating devices shall be maintained free from leaks and obstructions.

**PM-603.3**

All fuel burning equipment and appliances shall be connected to an approved chimney or vent.

**PM-603.4**

All required clearances to combustible materials shall be maintained.

**PM-603.7**

Devices purporting to reduce fuel consumption by attachment to a fuel burning appliance, to the fuel line thereto, or from the vent outlet or piping therefrom, shall not be installed unless labeled for such purpose and the installation is specifically approved. **NOTE: Devices such as those manufactured by Ameritherm shall be removed unless proof can be given that they were approved by manufacturer.**

**603 PM.6**

A supply of air for complete combustion of the fuel and for ventilation of the space shall be provided for the fuel burning equipment.

ADDENDUM TO INSPECTION FOR _90 YATES_ DATE _11-5-04_

INSPECTOR _RODECK_

OK

ADDITIONAL COMMENTS

APT 3W - BATHROOM FLOOR TILES MISSING - WALL

OK TILES & SOAP DISH LOOSE & NEED GROUT - PATCH OK

& PAINT B.R WALL - SMOKE DEF. OK (BUSHING *)

APT 3E. BATHROOM OK LIGHT NEEDS GLOBE USING

DOUBLE POLE BREAKER W/ONLY OK ONE WIRE TO IT

APT 2E - * R WEST RECPT REV POL) - LOW

OK - WATER PRESSURE AT LAV FAUCET - BATH FLOOR

OK - TILES LOOSE OR MISSING - KIT FAUCET HOT -

COLD REV. - PANEL OK OK

APT 2W - BATHROOM FLOOR TILES MISSING GROUT OK

TUB WALL TILES - RESTORE B.R CLOSET LIGHT OK

OK * B.R DOOR HAS HOLE - PATCH & PAINT BATHROOM CEILING

PANEL ~OK

APT 1 EAST - KIT. FAUCET OK HOT COLD REV. OK

OK SOAP DISH LOOSE AT TUB WALL - SERVICE

OK - PANEL DOUBLE LUGGED & ONE HOLE MISSING

OK APT 1 WEST - SERVICE PANEL OK DOUBLE LUGGED & HAS

12/8 DOUBLE POLE BREAKER W/ONLY ONE WIRE TO IT

OK

*OK* Filed 10/8/0

**MAJOR SYSTEMS PLUMBING**

PROVIDE RECPT- FOR (SINGLE ONLY)

*OK* 25) *NO*  Is the water heater properly installed ?

26) *YES*  Are the drains and supply pipes free from leaks and is all drains attached to the drain/waste/vent system ?

27) *YES*  Are gas valves present at gas supply piping to appliances and flexible lines free from corrosion ?
MISSING AT _____ REPLACE AT _____

28) *N/A*  Is sump pump piping acceptable at this time ?

_____
_____
_____
_____

**HEATING UNITS**     PP 2651

*OK* 29) *NO*  Is the furnace/wall/boiler units working properly and free from excessive rust or debris ? *present*

~~GLASS AT GUAGE BROKE~~ PROVIDE BACKFLOW PREVENTER (PERMIT REQ'D) RUNNING TOO HOT

30) *N/A*  Is fireplace free from cracks, creosote, or deterioration, and is damper working ?

*OK* 31) *NO*  Are smoke detectors present on each level at each hall and within 15 feet of mechanical areas ?
*12/8*  MISSING/INOPERABLE AT HARDWIRED INTERCONNECTED W/
*per mA* 32) *YES*  Is the foundation free from large cracks ? BATTERY BACK UP

33) *YES*  Is the structure of the building free from unusual sagging, deterioration, and obvious structural problems ?
ELEC PERMIT REQ'D

**ELECTRICAL**

*OK* 34) *NO*  Are electrical panels properly installed and proper size ?   OK 12/8

SEE IND APTS + LABEL COMMON PANEL

_____

35) Are all exit and emergency lights operating properly? 6 FT. OR DEDICATE LAUNDRY RECPTS,

**FIRE PROTECTION SYSTEMS**     OK

____  CERTIFICATION NEEDED ON 12/8  STANDPIPE       SPRINKLER SYSTEM
                                    SMOKE DETECTORS     FIRE ALARM

____  NO PARKING SIGNS NEEDED AT FIRE DEPARTMENT CONNECTION

____  EXPIRED EXTINGUISHER SERVICING AT _____

____  MISSING EXTINGUISHER AT _____

*NO* IS SELF CLOSURE INSTALLED ON LAUNDRY ROOM ?

**ELEVATORS**

Elevators must be certified as complying with ASME A17.1-90, Safety Code for Elevators and Escalators.

____  Certification or inspection within last year presented ?

## ELECTRICAL

**MC6-308b1**

Electrical Service: Single family residences shall have a minimum of 100 amp service and multiple unit residences shall comply with the latest code.

**PM-604.3**

Where it is found that the electrical system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient outlets, improper wiring, or installation. deterioration or damage, or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard. NOTE: Similar reasons include but are not limited to, ground fault interrupter circuits shall protect all outlets within 6 feet of plumbing fixtures, those in garages, outside , and basement outlets other than the sump pump.

**PM 605.2**

Every habitable space in a dwelling shall contain at least two separate and remote receptacles outlets. Every laundry area shall contain at least one grounded type receptacle. Every bathroom shall contain at least one receptacle.

**PM-605.3**

Every public hall, interior stairway, water closet compartment, bathroom, laundry room, and furnace room, shall contain at least one electric lighting fixture. NOTE: Other areas of the code allow the inspector to judge sufficiency of the lighting. It is expected that there will be sufficient lighting for safe servicing of the equipment within a room.

## DEFINITIONS

**Bathroom:** A room containing plumbing fixtures including a bathtub or shower.

**Habitable space:** Space in a structure for living, sleeping, eating or cooking. Bathrooms, toilet compartments, closets, halls, storage, or utility spaces, and similar space are not considered habitable spaces.

**Openable Area:** The part of a window or door which is available for unobstructed ventilation and which opens directly to the outdoors.

**Toilet Room:** A room containing a water closet or urinal but not a bathtub or shower.

## GENERAL STATEMENTS

**PM-101.6**

All repairs, maintenance work, alterations, or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner.

**PM-103.1**

All equipment, systems, devices, and safeguards required by this code or a previous statute or code shall be maintained in good working order. The requirements of this code are not intended to provide the basis for removal or abrogation of fire protection and safety systems and devices in existing structures.

**PM-104.1**

All materials, equipment, and devices approved by the code official shall be constructed and installed in accordance with such approval.

**PM 105.1**

The code official shall enforce all of the provisions of this code.

**PM 405.3**

Every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet of floor area, and every room occupied for sleeping purpose by more than one person shall contain at least 50 square feet of floor area for each occupant thereof .



# DEPARTMENT OF INSPECTIONAL SERVICES
## POINT OF SALE TRACKING SHEET

LOCATION OF INSPECTION  _1683 State St_

PRESENT ZONING _R-3_ WARD _3_  SIDWELL GRID _____

COURT CASES/ COLLECTIONS OR LIENS PENDING _none_

LAST RENTAL INSPECTION _____ UNITS APPROVED _____

LAST BUILDING OR FIRE INSPECTION _2/14/02_

ANY PREVIOUS MODIFICATIONS/ ADDITIONS _permits in file_

CURRENT VIOLATIONS ON FILE?  RENTAL _Yes_ BLDG _Yes_

(CONTACT HEALTH DEPARTMENT IF APPLICABLE)

REVIEWED BY : _____

INSPECTOR ASSIGNED _Robeck_

CONDITIONAL CERTIFICATE # _____ DATE _____

FINAL INSPECTION DATE _____ INSPECTOR _____

CERTIFICATE APPROVAL BY DEPT. DIRECTOR _____ DATE _____



# CALUMET CITY FIRE DEPARTMENT
## DEPARTMENT OF INSPECTIONAL SERVICES
### (708) 891-8120
### RESIDENTIAL/MULTIFAMILY P.O.S. INSPECTION

The following is the result of the inspection on the occupancy at _1683 STATE ST._ This inspection is not in any way intended to be a complete list of Code or Municipal Ordinance requirements. Our inspection can be substantially limited by access available and stored items or furniture. It is not meant to take the place of private home inspections nor will it cover the same items. Some occupancies may require certifications to be completed on individual systems such as the heating appliances, roofing, or fire protection systems. Specific requirements of the point of sale inspections and limitations is available by referring to Municipal Code Section 6-308 as amended on May 9,1996.The first inspection and subsequent re-inspection is included in the cost. Any additional inspections or failure of owner/agent/designee to appear for a scheduled inspection will require additional fees.

The inspector will note the deficiencies by writing "NO" in the blank in front of the statement and may additionally circle a specific area or make comments. On the back of the inspection sheets is some of the code language that relates to the deficiencies noted by the inspector. The "PM" sections refer to the present adopted Property Maintenance Code and the "MC" refers to Municipal Code references. There may be additional Code requirements that explain a deficiency. Non-conforming structures may be subject

Some of the repairs may require registered contractors and permits. If you have any questions about this inspection please call us at (708) 891-8120.

INSPECTOR _Rodeck_          1ST INSPECTION DATE _2-26-04_

I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION.
OWNER/AUTHORIZED AGENT IN ATTENDANCE _Robert J Lesch_

PRINTED NAME _ROBERT J. LESCH_

INSPECTOR _Rodeck_          REINSPECTION DATE _4-14-04_ TIME _9:00_
I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION.

OWNER/AUTHORIZED AGENT IN ATTENDANCE _James B. Law_

APPROVED FOR CERT. OF COMPLIANCE_____ DATE _____

# GENERAL EXTERIOR

**PM-303.1**  All exterior property and premises shall be maintained in a clean, safe, and sanitary condition. The occupant shall keep that part of the exterior property which such occupant occupies or controls in a clean and sanitary condition.

**PM-303.2**  All premises shall be graded and maintained to prevent the accumulation of stagnant water thereon, or within any structure thereon.

**PM-303.3**  All sidewalks, driveways, parking spaces, and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions. Stairs shall comply with the requirements of Sections PM-304.1 and PM-702.9.

**MC 28-2**  All premises and exterior property shall be maintained free from weeds or plant growth in excess of 6 inches. All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants, and vegetation, other than trees or shrubs provided; however this term shall not include cultivated flowers and gardens. (Property Maintenance Code covers this item at PM 303.4)

**PM-303.7**  All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair.

**PM-304.1**  The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety, or welfare.

**PM-304.2**  Each structure to which a street number is assigned shall have such number displayed in a position easily observed and readable form the public right-of-way. All numbers shall be in Arabic numerals at least 3 inches high and ½ inch stroke. **NOTE: This includes garages in alleys.**

**PM-304.5**  All exterior walls shall be free from holes, breaks, loose, or rotting materials; and maintained weatherproof and properly surface coated where required to prevent deterioration.

**PM-304.6**  The roof and flashing shall be sound, tight, and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof water shall not be discharged in a manner that creates a public nuisance. **NOTE: These areas are examined from areas not requiring a ladder. The inspectors' approval of this item should not be considered a certification of the roof. The inspectors may require certification or repair of the roof based on their limited observations.**

**PM-304.8**  All overhang extensions shall be maintained in good repair and be properly anchored so as to be kept in a safe and sound condition. Summarized - All exposed elements shall be protected from the elements and against decay or rust.

**PM-304.9**  All chimneys shall be maintained structurally safe and sound, and in good repair.

**PM-304.11**  Every window, door and frame shall be kept in sound condition, good repair and weather tight.

**PM-304.11.1**  All glazing materials shall be maintained free from cracks and holes.

**PM-304.13**  All exterior doors and hardware shall be maintained in good condition. Locks at all entrances to dwelling units, rooming units, and guest rooms shall tightly secure the door.

**PM-702.11**  All means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort.

**PM-304.14**  Every basement hatchway shall be maintained to prevent the entrance of rates, rain, and surface drainage water.

**PM-306.1**  All exterior property and premises, and the interior of every structure shall be free from any accumulation of rubbish or garbage

**EXTERIOR OF HOUSE AND GARAGE**          *1683*          ③

1) _YES_    Are property areas being maintained in a clean, safe, and sanitary condition ?

2) _YES_    Are private sidewalks, driveways, and similar areas being kept free from trip hazards, large cracks, etc. ?

3) _YES_    Are the weeds, plant growth, and grasses less than 6 inches ?

4) _NO_    Are fences, retaining walls, porches, and decks in good repair ?

5) _YES_    Is the street address posted on the property and visible from the public right of ways such as the street and alley ?

**Missing or deficient at      REAR OF GARAGE      HOUSE**

6) _YES_    Are the gutters, siding, fascia, and soffit areas free of peeling paint and deterioration ?

7) _YES_    Are all the exterior walls and chimneys in good repair ?

8) _YES_    Is the roof preventing the elements from damaging the structure ?

**CERTIFICATION NEEDED YES ____ NO ____**

9) _NO_    Are all windows, doors, screens, and frames in good repair on the exterior ?

10) _YES_    Do the exit doors have single keyed locks/dead bolts or is key permanently in place ?

11) _YES_    Are all light fixtures and electrical outlets in good repair and are outside outlets protected by a ground fault interrupter circuit ?

12) _NA_    Are all sheds or auxillary structures in good repair ?

**EXTERIOR COMMENTS** _PROVIDE JOIST HANGERS AT ALL DECKS_
_BROKEN WINDOW 1ST FL SOUTH_

# MAJOR SYSTEMS

**HB0003 & PM 705.5**

Summarized state law. Smoke detectors shall be provided on each level of the occupancy and within 15 feet of bedrooms. In dwelling units with split levels, a smoke detector installed on the upper level shall suffice for the adjacent lower level if the lower level is less than one full story below the upper level.

**PM–404.5**    Clothes dryer venting systems shall be independent of all other systems and shall be vented in accordance with the manufacturers instructions

## PLUMBING

**PM 505.1**    All plumbing fixtures shall be properly installed and maintained in good working order. and shall be kept free from obstructions. leaks and defects and be capable of performing the function for which such plumbing fixtures area designed. All plumbing fixtures shall be maintained in a safe, sanitary, and functional condition.

**PM–506.2**    The water supply shall be maintained free from contamination, and all water inlets for plumbing fixtures shall be located above the flood level rim of the fixture.

**PM–506.4**    Water heating facilities shall be properly installed, maintained, and capable of providing an adequate amount of water to be drawn at every sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110 degrees. An approved combination temperature and pressure relief valve discharge pipe shall be properly installed and maintained on water heaters. **NOTE: The relief valve discharge pipe must be the proper size, type, and 6-12" from the floor. The venting must be properly installed and without rust and/or negative slope.**

**PM–507.1**    All plumbing fixtures shall be properly connected to either a public sewer system or to an approved private sewage disposal system.

## HEATING

**PM–603.1**    All mechanical equipment, fireplaces, and solid burning appliances shall be properly installed and maintained in a safe working condition. and shall be capable of performing the intended function. **NOTE: These systems shall not have evidence of back venting, rusted flues, or excessive rust in the appliance. Additional certifications may be required.**

**PM–603.2**    All cooking and heating equipment, components, and accessories in every heating , cooking and water heating devices shall be maintained free from leaks and obstructions.

**PM–603.3**    All fuel burning equipment and appliances shall be connected to an approved chimney or vent.

**PM–603.4**    All required clearances to combustible materials shall be maintained.

**PM–603.7**    Devices purporting to reduce fuel consumption by attachment to a fuel burning appliance, to the fuel line thereto, or from the vent outlet or piping therefrom. shall not be installed unless labeled for such purpose and the installation is specifically approved. NOTE: Devices such as those manufactured by Ameritherm shall be removed unless proof can be given that they were approved by manufacturer..

**603 PM.6**    A supply of air for complete combustion of the fuel and for ventilation of the space shall be provided for the fuel burning equipment.

jhem 40-3

③

ADDENDUM TO INSPECTION FOR ~~KHS~~ STATE _____ DATE 2-26-04

INSPECTOR RODECK _____

ADDITIONAL COMMENTS _____

4-14  2D- DISHWASHER DISCHARGE ON WRONG SIDE OF P-TRAP

REMOVE POWER TO MED. CAB. RECPT,

2A- PLUG HOLES INSIDE SERVICE PANEL

3D- DISHWASHER DISCHARGE ON WRONG SIDE OF P-TRAP

REPAIR B.R. CLOSET DOORS - CLOSET LIGHTS NEED

GLOBES - SECURE KIT CABS ABOVE OVEN - TOILET

LOOSE AT FLOOR (FLOOR & WALL TILES MISSING)

BATHROOM (REMOVE POWER TO MED. CAB. RECPT)

SECURE SMOKE DET. TOP FLOOR STAIRWAY

3C - DISHWASHER DISCHARGE ON WRONG SIDE OF

P-TRAP - EAST RECPT. (LR) NO POWER - TENANT

TO DEGREASE OVEN & AREAS - A.C. UNIT RECPT.

OPEN GROUND & (USING DOUBLE POLE BREAKER AT 110)

WEST B.R. EAST RECPT. LOOSE AT WALL - RIGHT

FAUCET AT LAV. NEEDS WASHERS & REPAIR VANITY RECPT,

CLOSET LIGHTS NEED GLOBES - REMOVE POWER TO MED CAB

3A- KIT. EXHAUST NEEDS REPAIR - PLASTIC HOSE CONNECTION

AT KIT FAUCET - DISHWASHER DISCHARGE PIPE ON

WRONG SIDE OF P-TRAP - CLOSET LIGHTS NEED GLOBES

3B (BATHROOM FLOOR TILES MISSING) LOOSE

3B- KIT FAUCET NEEDS NEW CARTRIDGE - KIT. CAB

14  FRONTS MISSING ALSO FLOOR TILES - DISHWASHER

DISHCHARGE PIPE ON WRONG SIDE OF P-TRAP

LR SOUTH RECPT. REV. POL. - PATIO SCREEN RIPPED -

RIGHT LAV DRAIN IS SLOW

③

ADDENDUM TO INSPECTION FOR ~~Jment 40~~ STATE    DATE 2-26-04

INSPECTOR Rodeck

ADDITIONAL COMMENTS

✗/14  1B- PLACE CAP AT KIT DRAW (NO DUCTTAPE) - SERVICE
PANEL DOUBLE LUGGED- CLOSET LIGHTS NEED GLOBES -
BATH GFI. HEAVILY PAINTED - ENTRY DOOR TRMS NEED PAINT
1A - DOUBLE POLE BREAKER FOR A.C. UNIT - ENTRY DOOR TRMS
NEED PAINT (CLOSET LIGHT NEEDS GLOBE)

K/14  1D - DISHWASHER DISCHARGE AFTER P-TRAP - PROVIDE
DOUBLE POLE BREAKER FOR A.C. & PLUG HOLE INSIDE
1C - DISHWASHER DISCHARGE WRONG SIDE OF P-TRAP
TUB DRAIN IS SLOW - MOLD AT LINEN CLOSET WALLS
CLOSET LIGHTS NEED GLOBES (COULD NOT LOCATE PANEL)
2B - KIT CABS NEED REPAIR - DISHWASHER DISCHARGE ON
WRONG SIDE OF P-TRAP - TENANT TO DEGREASE OVEN & AREAS
BATH G.F.I. NOT TESTING - BATH FLOOR TILES MISSING
REPLACE HEAVILY PAINTED REGS, CLOSET LIGHTS NEED GLOBES
(PLUG HOLE INSIDE SERVICE PANEL)

K/14  2C - SMOKE DET - DISHWASHER DISCHARGE ON
WRONG SIDE OF P-TRAP - REPAIR KIT DRAWER

*#7 1683*

③

## MAJOR SYSTEMS PLUMBING

25) **YdS** Is the water heater properly installed ?

26) **YdS** Are the drains and supply pipes free from leaks and is all drains attached to the drain/waste/vent system ?

27) **YdS** Are gas valves present at gas supply piping to appliances and flexible lines free from corrosion ?
MISSING AT _____ REPLACE AT _____

28) **N/A** Is sump pump piping acceptable at this time ?

OK ___ PROVIDE 1" CLEARANCE FROM BOILER & WATER HEATER
f-14 ___ FLUE AT WALL

## HEATING UNITS   EXHAUST ALL RANGE HOODS TO EXTERIOR

29) **NO** Is the furnace/wall/boiler units working properly and free from excessive rust or debris ?

CERT REQ  LIC IN CHIC CITY CONTRACTOR
ALSO  BACK FLOW PREVENTER  OK

30) **N/A** Is fireplace free from cracks, creosote, or deterioration, and is damper working ?

31) **NO** Are smoke detectors present on each level at each hall and within 15 feet of mechanical areas ?
MISSING/INOPERABLE AT  SEE IND APTS.

32) **YdS** Is the foundation free from large cracks ?

33) **YES** Is the structure of the building free from unusual sagging, deterioration, and obvious structural problems ?

## ELECTRICAL

34) **NO** Are electrical panels properly installed and proper size ?

SEE IND APTS  COMMON -OK

35) Are all exit and emergency lights operating properly ?

## FIRE PROTECTION SYSTEMS

___ CERTIFICATION NEEDED ON  STANDPIPE   SPRINKLER SYSTEM
SMOKE DETECTORS   FIRE ALARM
___ NO PARKING SIGNS NEEDED AT FIRE DEPARTMENT CONNECTION
___ EXPIRED EXTINGUISHER SERVICING AT_____
___ MISSING EXTINGUISHER AT _____
___ IS SELF CLOSURE INSTALLED ON LAUNDRY ROOM ?

## ELEVATORS

Elevators must be certified as complying with ASME A17.1-90, Safety Code for Elevators and Escalators.

_____ Certification or inspection within last year presented ?

## ELECTRICAL

**MC6-308h1**

Electrical Service: Single family residences shall have a minimum of 100 amp service and multiple unit residences shall comply with the latest code

**PM-604.3**

Where it is found that the electrical system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient outlets, improper wiring, or installation, deterioration or damage, or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard. NOTE: Similar reasons include but are not limited to, ground fault interrupter circuits shall protect all outlets within 6 feet of plumbing fixtures, those in garages, outside , and basement outlets other than the sump pump.

**PM 605.2**

Every habitable space in a dwelling shall contain at least two separate and remote receptacles outlets. Every laundry area shall contain at least one grounded type receptacle. Every bathroom shall contain at least one receptacle.

**PM-605.3**

Every public hall, interior stairway, water closet compartment, bathroom, laundry room, and furnace room, shall contain at least one electric lighting fixture. NOTE: Other areas of the code allow the inspector to judge sufficiency of the lighting. It is expected that there will be sufficient lighting for safe servicing of the equipment within a room.

## DEFINITIONS

**Bathroom:**    A room containing plumbing fixtures including a bathtub or shower.

**Habitable space:**    Space in a structure for living, sleeping, eating or cooking. Bathrooms, toilet compartments, closets, halls, storage, or utility spaces, and similar space are not considered habitable spaces.

**Openable Area:**    The part of a window or door which is available for unobstructed ventilation and which opens directly to the outdoors.

**Toilet Room:**    A room containing a water closet or urinal but not a bathtub or shower.

# GENERAL STATEMENTS

**PM-101.6**

All repairs, maintenance work, alterations, or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner.

**PM-103.1**

All equipment, systems, devices, and safeguards required by this code or a previous statute or code shall be maintained in good working order. The requirements of this code are not intended to provide the basis for removal or abrogation of fire protection and safety systems and devices in existing structures.

**PM-104.1**

All materials, equipment, and devices approved by the code official shall be constructed and installed in accordance with such approval.

**PM 105.1**    The code official shall enforce all of the provisions of this code.

**PM 405.3**

Every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet of floor area, and every room occupied for sleeping purposes by more than one person shall contain at least 50 square feet of floor area for each occupant thereof

*Pos*
*2-26-04*
*gdu*

# CITY OF CALUMET CITY
## DEPARTMENT OF INSPECTIONAL SERVICES
708-891-8120
### NOTICE OF INTENT TO SELL AND APPLICATION FOR OCCUPANCY INSPECTION

**Notice is hereby given that the property hereinafter described is being offered for sale and the undersigned, as the owner or authorized agent, hereby requests the City of Calumet City to inspect the premises hereinafter described, both interior and exterior, and does hereby consent to said inspection. Applicant signing this authorization acknowledges that the back of this form has been read and agreed to, and acknowledges that a copy of the Point of Sale Requirement Ordinance is available upon request.**

Property Address __1683 State__  Phone _____  Occupied by SELLER/(TENANT) VACANT

Legal Description of Property and **ALL** associated R.E. Index #'s: __29-12-202-089-1013 through 1024__

*If address or index number is improper this form shall be invalid.*

Current Owner Name: __STATE STREET LLC__ Bus. Phone __773/581-3300__ Home Phone_____
*If land trust, state beneficiaries with names and addresses. Attach on another sheet if necessary.*

Address: __6036 S. Central, Chicago, IL     60638__
Street                    City          State          Zip

Property Type? Commercial ___ Residential ___ Multifamily _X_ # of Units __12__

Listing broker: __Brian Kuzdas__  Company: __Brookshire Investments Inc.__ Phone: __773/581-3300__

Selling Broker (If under contract) __Brian Kuzdas__ Company __Brookshire Investments Inc.__ Contract Price $__590,000.__

Prospective buyer (Include all buyers to prospective deed): __Keith Avery__
*If trust state beneficiaries.*
Buyers Current Address: __9605 S. Claremont     Chicago     IL     60643__
Street                    City          State          Zip

Will the buyer occupy the property? Yes____ No _X_ Buyers Phone: __773/881-4027__ Date of Closing __3/5/04__

Buyers Lending Institution: __BankFinancial__  Phone: __800/894-6100__

Check Appropriate Type of Loan: Conventional _X_ FHA/HUD_____ VA____ CASH/OTHER_____

## THIS FORM MUST BE FILLED OUT IN ITS ENTIRETY OR IT WILL NOT BE ACCEPTED

Owner/Authorized Agent Signature: __Anthony Caciopo__ Print Name __Anthony Caciopo__ Date: __Feb. 19, 2004__

### DO NOT WRITE BELOW THIS LINE - FOR OFFICIAL USE ONLY

FEE PAID BY CASH/CHECK # __1460__ AMOUNT _____ DATE __2/05/04__ CLERK SIGNATURE _____

ORIGINAL - CITY          YELLOW - CITY INSPECTOR          PINK- APPLICANT

# FEES FOR POINT OF SALE

$100.00    All multifamily and residential buildings for the initial inspection and ONE reinspection.

S.10 per S.F.    All commercial and industrial buildings with the minimum fee of $100.00 and a maximum fee of $750.00.

$50.00    Additional follow up inspections on all buildings after initial and first reinspection.

$50.00    Penalty for an failure of an Owner/Seller or his/her designee/agent to appear at any inspection.

---

## Portion of Ordinance Relating to Point of Sale Inspection

In issuing a Certificate of Compliance, whether temporary or permanent, the City of Calumet City does not make any warranty, representation or statement nor does it intend to insure or guarantee to either the Buyer or Seller of the property subject to the point-of-sale inspection or any of their designees, agents, representatives, heirs, or assigns, or any other interested party, including but not limited to mortgage companies, insurance companies, banks or any other party which may have any interest relative to the property subject to the point-of-sale inspection, nor does the City affirm that there are no additional unnoted violations relative to any other provisions of any of the codified ordinances of the City of Calumet City, the B.O.C.A. Code or relevant statutes, ordinances, rules, and regulations of the County of Cook, the State of Illinois or the United States of America.
COPIES OF THE COMPLETE ORDINANCE ARE AVAILABLE FROM THE CITY OF CALUMET CITY CLERKS OFFICE

---

This form must be completed & with the Department at least 2 weeks prior to requesting an inspection. The "Certificate of Compliance" or "Conditional Certificate with sworn affidavit" must be dated not more than 180 days before the closing date. The required fees must be paid prior to the inspection to the City of Calumet City. The final water bill must also be paid prior to issuance of the real estate transfer stamps.



# CALUMET CITY FIRE DEPARTMENT

## DEPARTMENT OF INSPECTIONAL SERVICES
### POINT OF SALE TRACKING SHEET

Location of inspection ___98 Luella___

Present Zoning _R3_  Aldermanic Ward _5_  Sidwell Grid _____

Court Cases Pending ___None___

Last Rental Inspection __1/31/02__  Units Approved __5__

Last Fire Inspection _____  Last Building Inspection _____

Any Previous Modifications/ Additions __None__

Current Violations on File?  Rental _Yes_  Fire _none_  Health _N/A_
_Bldg/_

Reviewed by:  Housing _N_  Date _____  Fire _N_  Date _____

Building _DS_  Date _____  Health _N/A_  Date _____

Inspector Assigned __S. Kodcele__

Conditional Certificate Approved by Dept. Director _____  Date _____

Final Inspection Date _7-19-04_  Inspector _Kodack_

Certificate Approval by Dept. Director _____  Date _7-19-04_

# CALUMET CITY FIRE DEPARTMENT
## DEPARTMENT OF INSPECTIONAL SERVICES
### (708) 891-8120
### RESIDENTIAL/MULTIFAMILY P.O.S. INSPECTION

The following is the result of the inspection on the occupancy at _98 LUELLA_ .This inspection is not in any way intended to be a complete list of Code or Municipal Ordinance requirements. Our inspection can be substantially limited by access available and stored items or furniture. It is not meant to take the place of private home inspections nor will it cover the same items. Some occupancies may require certifications to be completed on individual systems such as the heating appliances, roofing, or fire protection systems. Specific requirements of the point of sale inspections and limitations is available by referring to Municipal Code Section 6-308 as amended on May 9,1996.The first inspection and subsequent re-inspection is included in the cost. Any additional inspections or failure of owner/agent/designee to appear for a scheduled inspection will require additional fees.

The inspector will note the deficiencies by writing "NO" in the blank in front of the statement and may additionally circle a specific area or make comments. On the back of the inspection sheets is some of the code language that relates to the deficiencies noted by the inspector. The "PM" sections refer to the present adopted Property Maintenance Code and the "MC" refers to Municipal Code references. There may be additional Code requirements that explain a deficiency. Non-conforming structures may be subject

Some of the repairs may require registered contractors and permits. If you have any questions about this inspection please call us at (708) 891-8120.

INSPECTOR _RoDeeK_          1ST INSPECTION DATE _7-29-03_

I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION. OWNER/AUTHORIZED AGENT IN ATTENDANCE _____

PRINTED NAME _Harold Tate II_

INSPECTOR _Robak / Kowalczyk_ REINSPECTION DATE _4-12-04_  TIME _8:00_
I AM THE OWNER/AUTHORIZED AGENT OF THE ABOVE PROPERTY AND CAN LEGALLY AUTHORIZED THIS INSPECTION. I HAVE RECEIVED PERMISSION FROM ANY TENANTS/LEASEES TO ENTER THEIR PROPERTY FOR THIS INSPECTION.

OWNER/AUTHORIZED AGENT IN ATTENDANCE _Cara Willia_

APPROVED FOR CERT. OF COMPLIANCE _____ DATE _7/19/04_

# GENERAL EXTERIOR

**PM-303.1**  All exterior property and premises shall be maintained in a clean, safe, and sanitary condition. The occupant shall keep that part of the exterior property which such occupant occupies or controls in a clean and sanitary condition.

**PM-303.2**  All premises shall be graded and maintained to prevent the accumulation of stagnant water thereon, or within any structure thereon.

**PM-303.3**  All sidewalks, driveways, parking spaces, and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions. Stairs shall comply with the requirements of Sections PM-304.1 and PM-702.9.

**MC 28-2**  All premises and exterior property shall be maintained free from weeds or plant growth in excess of 6 inches. All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants, and vegetation, other than trees or shrubs provided; however this term shall not include cultivated flowers and gardens. (Property Maintenance Code covers this item at PM 303.4)

**PM-303.7**  All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair.

**PM-304.1**  The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety, or welfare.

**PM-304.2**  Each structure to which a street number is assigned shall have such number displayed in a position easily observed and readable form the public right-of-way. All numbers shall be in Arabic numerals at least 3 inches high and ½ inch stroke. **NOTE: This includes garages in alleys.**

**PM-304.5**  All exterior walls shall be free from holes, breaks, loose, or rotting materials; and maintained weatherproof and properly surface coated where required to prevent deterioration.

**PM-304.6**  The roof and flashing shall be sound, tight, and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof water shall not be discharged in a manner that creates a public nuisance. **NOTE: These areas are examined from areas not requiring a ladder. The inspectors' approval of this item should not be considered a certification of the roof. The inspectors may require certification or repair of the roof based on their limited observations.**

**PM-304.8**  All overhang extensions shall be maintained in good repair and be properly anchored so as to be kept in a safe and sound condition.  Summarized - All exposed elements shall be protected from the elements and against decay or rust.

**PM-304.9**  All chimneys shall be maintained structurally safe and sound, and in good repair.

**PM-304.11**  Every window, door and frame shall be kept in sound condition, good repair and weather tight.

**PM-304.11.1**  All glazing materials shall be maintained free from cracks and holes.

**PM-304.13**  All exterior doors and hardware shall be maintained in good condition. Locks at all entrances to dwelling units, rooming units, and guest rooms shall tightly secure the door.

**PM-702.11**  All means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort.

**PM-304.14**  Every basement hatchway shall be maintained to prevent the entrance of rates, rain, and surface drainage water.

**PM-306.1**  All exterior property and premises, and the interior of every structure shall be free from any accumulation of rubbish or garbage.

08/02 LUELLA

## EXTERIOR OF HOUSE AND GARAGE

1) _YES_ Are property areas being maintained in a clean, safe, and sanitary condition ?

oł 2) _NO_ Are private sidewalks, driveways, and similar areas being kept free from trip hazards, large cracks, etc. ?

oł 3) _NO_ Are the weeds, plant growth, and grasses less than 6 inches ?

4) _YES_ Are fences, retaining walls, porches, and decks in good repair ?

oł 5) _NO_ Is the street address posted on the property and visible from the public right of ways such as the street and alley ?
Missing or deficient at (REAR OF GARAGE & HOUSE)

6) _NO_ Are the gutters, siding, fascia, and soffit areas free of peeling paint and deterioration ?

oł 7) _NO_ Are all the exterior walls and chimneys in good repair ?

8) _YES_ Is the roof preventing the elements from damaging the structure ?
CERTIFICATION NEEDED YES ____ NO ____

9) _NO_ Are all windows, doors, screens, and frames in good repair on the exterior ?

10) _YES_ Do the exit doors have single keyed locks/dead bolts or is key permanently in place ?

11) _NO_ Are all light fixtures and electrical outlets in good repair and are outside outlets protected by a ground fault interrupter circuit ?

12) _N/A_ Are all sheds or auxiliary structures in good repair ?

**EXTERIOR COMMENTS** #2 SEAL PARKING AREA
oł #3 CUT BACK BUSHES & TREE RUBBING AT ROOF
✗✗ #6 DOWNSPOUTS NEED ELBOWS
oł #7 TUCKPOINT GAPS AT LIMESTONE SILLS
✗ #9 REGLAZE BROKEN WINDOWS - REPLACE RIPPED
✗✗ OR MISSING STORMS, SCREENS, & WINDOWS. -
✗✗ WINDOWS NEED GLAZING COMPOUND & PAINT
✗ #11 PROVIDE OUTSIDE TYPE BULBS AT WEST
✗ UNABLE TO TEST EAST G.F.I ELEC. WAS OFF
✗ SOFFIT PANELS MISSING NORTHWEST CORNER, GUTTERS
✗ DAMAGED AT N.W. CORNER AND NORTH CORNER. ALSO DOWNSPOUT
✗ ELBOW MISSING AT FRONT DOOR N.E. CORNER. ADD OLD
✗ DRYER VENT GROUND FLOOR SOUTH WEST CORNER

# MAJOR SYSTEMS

**HB0003 & PM 705.5**

Summarized state law.  Smoke detectors shall be provided on each level of the occupancy and within 15 feet of bedrooms. In dwelling units with split levels, a smoke detector installed on the upper level shall suffice for the adjacent lower level if the lower level is less than one full story below the upper level.

**PM–404.5**   Clothes dryer venting systems shall be independent of all other systems and shall be vented in accordance with the manufacturers instructions

## PLUMBING

**PM 505.1**   All plumbing fixtures shall be properly installed and maintained in good working order, and shall be kept free from obstructions, leaks and defects and be capable of performing the function for which such plumbing fixtures area designed. All plumbing fixtures shall be maintained in a safe, sanitary, and functional condition.

**PM-506.2**   The water supply shall be maintained free from contamination, and all water inlets for plumbing fixtures shall be located above the flood level rim of the fixture.

**PM-506.4**   Water heating facilities shall be properly installed, maintained, and capable of providing an adequate amount of water to be drawn at every sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110 degrees. An approved combination temperature and pressure relief valve discharge pipe shall be properly installed and maintained on water heaters. **NOTE: The relief valve discharge pipe must be the proper size, type, and 6–12" from the floor. The venting must be properly installed and without rust and/or negative slope.**

**PM-507.1**   All plumbing fixtures shall be properly connected to either a public sewer system or to an approved private sewage disposal system.

## HEATING

**PM-603.1**   All mechanical equipment, fireplaces, and solid burning appliances shall be properly installed and maintained in a safe working condition, and shall be capable of performing the intended function. **NOTE: These systems shall not have evidence of back venting, rusted flues, or excessive rust in the appliance. Additional certifications may be required.**

**PM-603.2**   All cooking and heating equipment, components, and accessories in every heating, cooking and water heating devices shall be maintained free from leaks and obstructions.

**PM-603.3**   All fuel burning equipment and appliances shall be connected to an approved chimney or vent.

**PM-603.4**   All required clearances to combustible materials shall be maintained.

**PM-603.7**   Devices purporting to reduce fuel consumption by attachment to a fuel burning appliance, to the fuel line thereto, or from the vent outlet or piping therefrom, shall not be installed unless labeled for such purpose and the installation is specifically approved. **NOTE: Devices such as those manufactured by Ameritherm shall be removed unless proof can be given that they were approved by manufacturer.**

**603 PM.6**   A supply of air for complete combustion of the fuel and for ventilation of the space shall be provided for the fuel burning equipment.

ADDENDUM TO INSPECTION FOR **98 LUELLA**    DATE **7-29-03**

INSPECTOR **RODECK**

ADDITIONAL COMMENTS    Carpeting missing — Front Entry Jamb brk.    * Hang Closet Door

OK APT ONE - PATCH - PAINT - CLEAN - DECORATE ETC.

OK HANG DOORS - REPAIR KIT. & VANITY BOTTOMS

OK DOOR TO LAUNDRY ROOM TO HAVE SELF CLOSURE -

OK INSTALL MISSING WINDOWS - SMOKE DET - PLASTIC

OK HOSE CONNECTIONS AT PLUMBING FIXTURES - LIGHTS

OK NEED GLOBES - NO ELEC OR WATER    Shut off Valve *   Leaks at Toilet

OK APT TWO SOUTH - PATCH - PAINT - CLEAN - DECORATE -

OK REPAIR BATHROOM CEILING - L.R. HAS HEAVILY PAINTED

OK RECPT. - ENTRY DOOR TO BE VARNISHED - SMOKE

OK DET. - PLASTIC HOSE CONNECTIONS AT PLUMBING

OK FIXTURES - TUB HANDLE MISSING - LIGHTS NEED

OK GLOBES - TOILET LOOSE AT FLOOR (NO WATER)

OK APT 2 NORTH - PATCH & PAINT - BATH WALL TILES

OK MISSING - SMOKE DET. - CLEAN - DECORATE -

OK WATER IS OFF - ENTRY DOOR JAMB BROKEN -

OK KIT CAB FRONTS MISSING - KIT. G.F.I. REV. POL.

OK TOILET LOOSE AT FLOOR - L.R. COVER PLATE

OK MISSING AT LIGHT SWITCH

ADDENDUM TO INSPECTION FOR _98 LUELLA_ DATE _7-29-03_

INSPECTOR _RODECK_

ADDITIONAL COMMENTS _____

OK APT THREE NORTH — ENTRY DOOR JAMB
OK BROKEN — NEW DOORS TO BE VARNISHED
OK REAR ENTRY DOOR IS BROKEN — BATH VANITY MISSING
OK TOILET LOOSE AT FLOOR — FRIDGE RECPT. HEAVILY
OK PAINTED — COVER PLATES MISSING — SMOKE DET.
OK LIGHTS NEED GLOBES — PATCH, PAINT, CLEAN,
OK DECORATE

OK APT THREE SOUTH — DEGREASE OVEN & ITS AREA
OK PLASTIC HOSE CONNECTIONS AT PLUMBING FIXTURES
OK ENTRY DOORS MISSING HARDWARE — PATCH, PAINT
OK CLEAN DECORATE — HANG DOORS — LIGHTS NEED
OK GLOBES — ENTRY DOOR JAMB BROKEN — B.R DOORS
OK MISSING HARDWARE — SMOKE DET.

FAX # _____

ADDENDUM TO INSPECTION FOR _98 Luella_   DATE _4-12-04_

INSPECTOR _Rodeck - Kowalczyk_

ADDITIONAL COMMENTS _____

ok Apt 1 - Carpeting missing - Front Door Jamb broken

ok Shutoff value at toilet leaks - Laundry Room Door to be

ok Self Closing - Hang Closet Doors - Windows Boarded over

2N - Kit GFI Rev. Pol - Kit Cabinets fronts missing - FINISH - Toilet

ok loose - Tiles missing at Bath window Area - Bath GFI

ok Has open Ground - Kit. Exhaust Fan inoperable - L.R. Recpts.

ok open Ground - Carpeting missing - Bath light Globe missing

ok 2S - Some Baseboard missing - Kit. Faucet missing Sprayer

ok Bath lav. Needs New washers - Toilet loose - Globe missing ok

ok at Front Door - Toilet runs Non stop and missing Seat ok

ok 3N - Improper fit at front Door Knob - Kit. Exhaust Fan inoperable ok

ok Baseboards missing - Fire retardant Gas line at New Furnace

Review the Condition Kit (Gas Split Smittons) ok

ok 3S - B.R. Door missing Hardware - B.R. window cracked - Hang

ok Doors - Replace missing light Globes - Bath Floor tile missing - ok

ok Smoke Detector missing - Kit Cabinet Fronts missing - L.R. Recpt.

ok loose   ok

Hallways - Light Globes missing - Hardwired Smoke Detectors

ok Missing or Hanging by wires - Tile missing at stairs

Laundry Room - Bare wire running thru panel to other panel
ok   Breaker missing at Panel #4 - Label All Panels &
(# Play   circuits
Notes)   Junction Box missing Knock out at Panel &
behind Furnace - Repair & Secure Bx/conduit
(at N.E. Wall)   ok #

_WATER IS OFF_    _JE88 ¿UELLA_

**MAJOR SYSTEMS PLUMBING**

25) _NO_    Is the water heater properly installed ? _MISSING_

26) _YES_    Are the drains and supply pipes free from leaks and is all drains attached to the drain/waste/vent system ?

27) _YES_    Are gas valves present at gas supply piping to appliances and flexible lines free from corrosion ?
MISSING AT _____ REPLACE AT _____

28) _N/A_    Is sump pump piping acceptable at this time ?

_____
_____
_____
_____

**HEATING UNITS**

29) _NO_    Is the furnace/wall/boiler units working properly and free from excessive rust or debris ?

_BOILER MISSING — PLUMBING PERMIT REQ_
_____

30) _N/A_    Is fireplace free from cracks, creosote, or deterioration, and is damper working ?
31) _NO_    Are smoke detectors present on each level at each hall and within 15 feet of mechanical areas ? _NOT WORKING, APTS,_
MISSING/INOPERABLE AT _HANGING BY WIRES STAIRWAY_
32) _YES_    Is the foundation free from large cracks ?
33) _YES_    Is the structure of the building free from unusual sagging, deterioration, and obvious structural problems ?

**ELECTRICAL**

34) _NO_    _NO ACCESS TO ANY PANELS (NO LIGHTS)_
Are electrical panels properly installed and proper size ?

_METER BOND REQ — SOME APTS HAVE 220_
_RECPTS W/ NO DOUBLE POLE BREAKERS_
_LABEL ALL CIRCUITS_

35) Are all exit and emergency lights operating properly ?

**FIRE PROTECTION SYSTEMS**

____    CERTIFICATION NEEDED ON    STANDPIPE    SPRINKLER SYSTEM
                                   SMOKE DETECTORS    FIRE ALARM
____    NO PARKING SIGNS NEEDED AT FIRE DEPARTMENT CONNECTION
____    EXPIRED EXTINGUISHER SERVICING AT_____
        MISSING EXTINGUISHER AT _____
_NO_    IS SELF CLOSURE INSTALLED ON LAUNDRY ROOM ?

**ELEVATORS**

Elevators must be certified as complying with ASME A17.1-90, Safety Code for Elevators and Escalators.

____    Certification or inspection within last year presented ?

## ELECTRICAL

**MC6-308b1**

Electrical Service: Single family residences shall have a minimum of 100 amp service and multiple unit residences shall comply with the latest code.

**PM-604.3**

Where it is found that the electrical system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient outlets, improper wiring, or installation, deterioration or damage, or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard. **NOTE: Similar reasons include but are not limited to, ground fault interrupter circuits shall protect all outlets within 6 feet of plumbing fixtures, those in  garages, outside , and basement outlets other than the sump pump.**

**PM 605.2**

Every habitable space in a dwelling shall contain at least two separate and remote receptacles outlets. Every laundry area shall contain at least one grounded type receptacle. Every bathroom shall contain at least one receptacle.

**PM-605.3**

Every public hall, interior stairway, water closet compartment, bathroom, laundry room, and furnace room, shall contain at least one electric lighting fixture. **NOTE: Other areas of the code allow the inspector to judge sufficiency of the lighting. It is expected that there will be  sufficient lighting for safe servicing of the equipment within a room.**

## DEFINITIONS

**Bathroom:**  A room containing plumbing fixtures including a bathtub or shower.

**Habitable space:**  Space in a structure for living, sleeping, eating or cooking. Bathrooms, toilet compartments, closets, halls, storage, or utility spaces, and similar space are not considered habitable spaces.

**Openable Area:**  The part of a window or door which is available for unobstructed ventilation and which opens directly to the outdoors.

**Toilet Room:**  A room containing a water closet or urinal but not a bathtub or shower.

# GENERAL STATEMENTS

**PM-101.6**  All repairs, maintenance work, alterations, or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner.

**PM-103.1**  All equipment, systems, devices, and safeguards required by this code or a previous statute or code shall be maintained in  good working order. The requirements of this code are not intended to provide the basis for removal or abrogation of fire protection and safety systems and devices in existing structures.

**PM-104.1**  All materials, equipment, and devices approved by the code official shall be constructed and installed in accordance with such approval.

**PM 105.1**  The code official shall enforce all of the provisions of this code.

**PM 405.3**  Every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet of floor area, and every room occupied for sleeping purposes by more than one person shall contain at least 50 square feet of floor area for each occupant thereof .

Exhibit
E

## APPENDIX B ZONING*

---

**\*Editor's note:** Appendix B sets out the zoning ordinance, enacted on Jan. 13, 1983, by Ord. No. 83-1, as the same was originally enacted by the city. Amendments will be cited in a history note following the affected section. The editor has incorporated a uniform printing style for purposes of maintaining Code format; however, no substantive changes have been made.

**Cross references:** Buildings and building regulations, ch. 14; community development, ch. 18; environment, ch. 26; floods, ch. 34; sexually oriented entertainment businesses, § 54-1941 et seq.; mobile home parks, ch. 58; planning, ch. 66; signs, ch. 70; streets, sidewalks and other public places, ch. 78; telecommunications, ch. 86; ordinances related to zoning, app. C.

---

Sec. I. Title.
Sec. II. Intent and purpose.
Sec. III. Rules and definitions.
Sec. IV. General provisions.
Sec. V. Nonconforming buildings and uses.
Sec. VI. Zoning districts and zoning district map.
Sec. VII. Residence districts.
Sec. VIII. Commercial business district.
Sec. IX. Industrial districts.
Sec. X. Off-street parking and loading.
Sec. XI. Signs.
Sec. XII. Administration.
Sec. XIII. Amendments.
Sec. XIV. Violations: penalty.
Sec. XV. Enactment.

*An Ordinance to Classify, Regulate and Restrict the Location of Trades and Industries and the Location of Buildings Designed for the Specified Industrial, Commercial, Residential and Other Uses and to Regulate and Limit the Height and Bulk of Buildings Hereafter Erected; to Regulate and Determine the Area of Yards, Courts and Other Open Spaces Within and Surrounding Such Buildings and to Establish the Boundaries of Districts for the Said Purposes and Prescribing Penalties for the Violation of its Provisions, and for Creating a Board of Appeals.*

*Now, Therefore, Be and It Is Hereby Ordained by the City Council of Calumet City, Illinois:*

## Sec. I. Title.

This ordinance shall be known, referred to and recited as "The Zoning Ordinance of the City of Calumet City."

(Code 1980, App. B, § I)

## Sec. II. Intent and purpose.

The prime tool of planning is land use control, most commonly referred to as zoning. The purposes of zoning are many, but foremost among these purposes are:

To promote and protect the public health, safety, morals, comfort and general welfare of the people;

To divide the City of Calumet City into zones or districts restricting and regulating therein

*Location.* The sign or signs shall front the principal street, a parking.area, or in the case of corner building, on that portion of the side street wall within fifty (50) feet of the principal street.

*Projection.* Signs may project into the public way but not beyond a line six (6) inches inside the curbline and the bottom of such signs shall not be less than ten (10) feet above the finished grade of the sidewalk.

Any sign projecting or suspended from a building shall not exceed twelve (12) feet in height and its location and arrangement shall be subject to approval by the zoning administrator. No sign except those suspended from buildings shall be erected or placed between the street line and the building line.

*Height.* No sign shall project higher than thirty (30) feet above curb level.

### 11.1 Permitted signs, manufacturing districts.

The following signs are permitted:

All signs permitted in the business districts shall be permitted in the industrial districts.

One (1) billboard, not to exceed one thousand two hundred (1,200) square feet in area, thirty (30) feet in height and sixty (60) feet in length, including border and trim, per buildable lot in a commercial or industrial district adjacent to an interstate tollway or expressway, but not within five hundred (500) feet of any other billboard,. A billboard may be double faced, placed back to back or V-type and be deemed to be one (1) billboard.

(Code 1980, App. B, § XI; Ord. No. 96-30, § 1(Exh. A), 5-23-1996; Ord. No. 00-44, § 1, 8-24-2000)


## Sec. XII. Administration.

### 12.1 Enforcing officer.

The building commissioner of the City of Calumet City shall be the zoning administrator of the City of Calumet City. Said administrator shall see that the provisions of this ordinance are properly enforced.

Restrictions on employees. No official or employee responsible for the enforcing of this ordinance shall engage directly or indirectly in the construction industry or the building professions, or in any type of gainful employment or business that conflicts with official duties or the interests of the business incorporated in this ordinance.

### 12.2 Zoning permit.

No building or structure shall be erected, reconstructed, enlarged, or moved until a permit shall have been applied for in writing and issued by the building commissioner. Said permit shall be posted in a prominent place on the premises prior to and during the period of erection, reconstruction, enlargement or moving.

Before a permit is issued for the erection, moving, alteration, enlargement or occupancy of any building, or structure or use of premises, the plans and intended use shall indicate conformity in all respects to the provisions of this ordinance.

*Site plan.* Every application for permit submitted to the building commissioner shall be accompanied by a site plan, drawn to scale, showing the zoning lot, required yards, the location of buildings on the lot, accurate dimensions of the lot, and any existing and proposed uses together with

such other information as may be necessary for the enforcement of this ordinance.

Certain permit applications and zoning petitions may require site development plan approval under subsection 12.9 and landscape plan approval under subsection 12.10 of this ordinance.

### 12.3 Interpretation of ordinance.

In interpreting and applying the provisions of this ordinance, they shall be held to be the minimum requirements for the promotion of health, safety, morals, convenience of the general welfare.

### 12.4 Certificate of occupancy.

A certificate of occupancy to be issued by the building commissioner shall be required for any of the following, except buildings incidental to agricultural operations other than residences:

(a) Occupancy and use of a building thereafter erected or enlarged;

(b) Change in use of an existing building;

(c) Occupancy and use of land to a use of a different classification, except for the raising of crops;

(d) Change in the use of land to a use of a different classification, except for the raising of crops;

(e) Any change in the use of a nonconforming use.

No such occupancy, use or change of use, shall take place until a certificate of occupancy therefore shall be issued.

Written application for a certificate of occupancy for a new building or for an existing building which has been enlarged shall be made at the same time as the application for the building permit for such building. Said certificate shall be acted upon within seven (7) days after a written request for the same has been made to the building commissioner after the erection or enlargement of such building or part thereof has been completed in conformance with the provisions of this ordinance.

Pending the issuance of such a certificate, a temporary certificate of occupancy may be issued by the building commissioner for a period of not more than six (6) months during the completion of the construction of the building or of alterations which are required under the terms of any law or ordinance. Such temporary certificate may be renewed, but it shall not be construed in any way to alter the respective rights, during or obligations of the owner or of the city relating to the use or occupancy of the land or building, or any other matter covered by this ordinance, and such temporary certificate shall not be issued except under such restrictions and provisions as will adequately ensure the safety of the occupants.

Written application for a certificate of occupancy for the use of vacant land, or for a change in the use of land or of a building, or for a change in a nonconforming use, as herein provided, shall be made to the building commissioner.

If the proposed use is in conformity with the provisions of this ordinance, the certificate of occupancy therefore shall be issued within seven (7) days after the application for the same has been made.

Each certificate of occupancy shall state that the building or proposed use of a building or land complies with all provisions of this ordinance.

A record of all certificates of occupancy shall be kept on file in the office of the building commissioner and a copy shall be forwarded on request, to any person having proprietary or tenancy interest in the building or land affected.

### 12.5 Zoning board of appeals.

*Zoning board of appeals established.*

There is hereby established a zoning board of appeals. Said zoning board of appeals shall consist of seven (7) members appointed by the mayor by and with the advice and consent of the city council of the City of Calumet City.

Each member so appointed shall serve for a term of five (5) years. Vacancies shall be filled in the same manner for the unexpired term. Members may be removed by the city council for cause after written charges have been filed and after a public hearing has been held if demanded by the member so charged.

One (1) of the members of said zoning board of appeals at the time of his appointment shall be designated by the mayor with the consent of the city council, as chairman of said zoning board of appeals and shall hold said office as chairman until a successor is appointed. Such chairman, or in his absence, the acting chairman, may administer oaths and compel the attendance of witnesses.

The zoning board of appeals shall have a secretary and may employ a court reporter who shall make and keep a record of all of its meetings and official acts.

The zoning board of appeals in existence at the time of the passage of this ordinance shall be recognized as the zoning board of appeals established under the provisions of this ordinance, and the members previously appointed under the old ordinance shall be recognized as members thereof, and shall serve for such period of time as designated at time of appointment, the time to run from the date of the original appointment under the old ordinance.

*Jurisdiction.*

The zoning board of appeals is hereby vested with the following jurisdiction and authority:

(a)  To hear and decide appeals from any order, requirement, decision or determination made by the zoning administrator under this ordinance;

(b)  To hear applications for variations from the terms provided in this zoning ordinance in the manner prescribed by, and subject to, the standards established herein, and make recommendations to the city council regarding such applications.

(c)  To review and make recommendations to the city council on certain proposed site plans and landscape plans in accord with subsection 12.9 and 12.10 of this ordinance.

*Meetings.*

All meetings of the zoning board of appeals shall be held at the call of the chairman and at such other times as the zoning board of appeals may determine.

All meetings of the zoning board of appeals shall be open to the public.

The zoning board of appeals shall keep minutes of its proceedings, showing the vote of each member upon every question, or absent or failing to vote, indicating such fact, and shall also keep records of its examinations and other official actions. Findings of fact shall be included in the minutes of each case and the reasons for granting or denying such application shall be specified. Every rule, regulations and every order, requirement, decision, or determination of the zoning board of appeals shall immediately be filed in the office of the executive secretary and shall be of public record.

The zoning board of appeals shall adopt its own rules of procedure and may require submission to each record, plats and other information necessary to make its determination. A copy of said rules and procedure, and all recommendations thereto, and shall be filed in the office of the building commissioner.

The minutes of the zoning board of appeals shall be open to public examination at reasonable hours.

Expenses incurred by the zoning board of appeals are to be itemized and shall be borne by Calumet City.

The building commissioner is authorized to require applicants for building permits as a condition for issuance of said permit to provide reasonable aesthetic and sound barriers between contiguous barriers which have different zoning classifications.

*Finality of decisions of the zoning board of appeals.* Decisions and findings of the zoning board of appeals on appeal from any order, requirement, decision or determination made by the zoning administration shall be final administrative determinations and shall be subject to review by court as by law may be provided.

*12.6 Variations.* *

---

*\*Editor's note:* Section 3 of Ord. No. 00-44 adopted Aug. 24, 2000, states "that all billboards in existence on the effective date of this ordinance are hereby exempt from the requirements of Section 2."

---

*Purpose.* The zoning board of appeals, after a public hearing, may recommend that the city council vary the regulations of this ordinance in harmony with their general purpose and intent, only in the specific instances hereinafter set forth and only where the board of appeals made findings of fact in accordance with the standards hereinafter prescribed, and further finds that there are practical difficulties or particular hardships in the way of carrying out the strict letter of the regulations of this ordinance.

*Application for variation and notice of hearing.*

An application for a variation shall be filed in writing with the city clerk. The application shall contain such information as the zoning board of appeals may from time to time, by rule, require. The city council shall by motion or resolution refer the same to the zoning board of appeals.

The zoning board of appeals shall publish notice of a public hearing on the application for variation, stating the time and place and the purpose of the hearing. Notice shall be published at least fifteen (15) days but not more than thirty (30) days in a paper of general circulation in Calumet City. Notice of the public hearing may be mailed to the petitioner and the owners of all property deemed by the zoning board of appeals to be affected thereby.

The zoning board of appeals shall, within thirty (30) days after the public hearing or hearings, render its recommendation in writing to the owner or applicant and the city council of its action.

*Standards for variations.*

The zoning board of appeals shall not recommend a variance in the regulations of this ordinance, unless it shall make findings based upon the evidence presented to it in each specific case that each and all the standards for hardships set forth in the Illinois Municipal Code are complied with and specifically that:

(a) Because of the particular physical surroundings, shape or topographical conditions of the specific property involved, a particular hardship to the owner would result, as distinguished from a mere inconvenience, if a strict letter of

Exhibit F

## ARTICLE IX. CODE ENFORCEMENT*

*Cross references: Fire code prevention, § 30-161 et seq.

State law references: Administrative adjudication of ordinances, 65 ILCS 5/1-2.1-1 et seq.

### Sec. 2-941. Purpose.

The stated purpose of this article is to provide for the fair and efficient enforcement of the Municipal Code of Calumet City, Illinois, other than those ordinances pertaining to vehicular standing, parking or vehicle compliance regulation (hereafter the "City Code"), as may be allowed by law and directed by ordinance, through an administrative adjudication of violations; and, establishing a schedule of fines and penalties, and authority and procedures for collection of unpaid fines and penalties.

(Code 1980, § 2-501; Ord. No. 99-63, § VI, 11-10-1999)

### Sec. 2-942. Creation.

There is hereby established a department of the city government to be known as the ordinance enforcement department and to have the power to enforce any municipal ordinance as from time to time authorized by the city council, except for (i) any offense enforced pursuant to Article VII.5 of Chapter 17 of this Code; (ii) any offense under the Illinois Vehicle Code (625 ILCS 5/1-100 et seq.); or a similar offense that is a traffic regulation governing the movement of vehicles; and, (iii) except for any reportable offense under 625 ILCS 5/6-204. The establishment of the ordinance enforcement department does not preclude the mayor and city council from using any other method or court with jurisdiction to enforce ordinances of the city.

(Code 1980, § 2-503; Ord. No. 99-63, 11-10-1999)

### Sec. 2-943. Administrative composition.

(a)  The ordinance enforcement department shall be composed of a hearing officer, an ordinance enforcement administrator, system coordinator/computer operator and hearing room security personnel, with the power and authority as hereinafter set forth.

(1)  The hearing officer is authorized and directed to:

a.  The hearing officer, prior to appointment, must be an attorney licensed to practice law for at least three (3) years in the State of Illinois. The hearing officer shall preside over all adjudicatory hearings and shall have the following powers and duties:

1.  To administer oaths;

2.  To hear testimony and accept evidence that is relevant to the existence of the City Code violation;

3.  To issue subpoenas directing witnesses to appear and give relevant testimony at the hearing, upon the request of the parties or their representatives;

4.  To preserve and authenticate the record of the hearing and all exhibits and evidence introduced at the hearing;

5.  To issue and sign a written finding, decision and order stating whether a City Code violation exists;

6. To impose penalties, sanctions or such other relief consistent with applicable City Code provisions and assessing costs upon finding a party liable for the charged violation, except however, that in no event shall the hearing officer have authority to impose a penalty of incarceration; and,

7. To review final determination of liability for an ordinance violation in accordance with the administrative review procedures hereinafter set forth.

b. Prior to conducting administrative adjudication proceedings under this article, the hearing officer shall have successfully completed a formal training program which includes the following:

1. Instruction on the rules of procedure of the administrative hearings over which the hearing officer shall preside;

2. Orientation to each subject area of the code violations that he/she will adjudicate;

3. Observation of administrative hearings; and

4. Participation in hypothetical cases, including ruling on evidence and issuing final orders.

(2) The ordinance enforcement administrator is authorized and directed to:

a. Operate and manage the ordinance enforcement department.

b. Adopt, distribute and process all notices as may be required under this article or as may be reasonably required to carry out the purpose of this article.

c. Collect moneys paid as fines and/or penalties assessed after a final determination of liability.

d. Certify copies of final determinations of an ordinance violation adjudicated pursuant to this article, and any factual reports verifying the final determination of any violation liability which was issued in accordance with this article.

e. Promulgate rules and regulations reasonably required to operate and maintain the administrative adjudication system hereby created.

f. Collect unpaid fines and penalties through private collection agencies and direct the pursuit of all post-judgment remedies available by law.

(3) The system coordinator/computer operator is hereby authorized and directed to operate and maintain the computer programs for the administrative adjudication system of the ordinance enforcement department hereby created, on a day-to-day basis, including but not limited to:

a. Input of violation notice information.

b. Establishing hearing dates and notice dates.

c. Record fine and penalty assessment and payments.

d. Issue payment receipts.

e. Issue succeeding notice of hearing dates and/or final determination of liability.

f. Keep accurate records of appearances and nonappearances at administrative hearings, pleas entered, judgments entered, sanctions imposed, if any, fines and penalties assessed and paid.

(4) All hearing room security personnel shall be qualified off-duty, full-time, part-time or auxiliary police officers who are hereby authorized and directed to:

a. Maintain hearing room decorum.

b. Have and execute authority as is granted to courtroom deputies of the circuit court.

c. Perform such other duties or acts as may reasonably be required and as directed by the hearing officer or ordinance enforcement administrator.

(b) The mayor is hereby authorized to appoint persons to hold the positions above set forth. Other than the hearing officer, one person may hold and fulfill the requirements of one (1) or more of the above stated

positions and compensation for each of the above stated positions shall be as approved by the city council.

(Code 1980, § 2-504; Ord. No. 99-63, 11-10-1999; Ord. No. 01-56, 11-19-2001)

### Sec. 2-944. Procedures.

The system of administrative adjudication of any ordinance violation authorized to be adjudicated hereunder, shall afford a party due process of law and the hearings shall be conducted in accordance with the following procedures:

(1) Violation notices of any City Code shall be issued by the persons authorized under this Code and shall contain information and shall be certified and constitute prima facie evidence of the violation cited as hereinafter set forth.

(2) All full-time, part-time and auxiliary police officers as well as other specifically authorized individuals of any department of the city shall have the authority to issue violation notices.

(3) Any individual authorized hereby to issue violation notices and who detects any ordinance violation authorized to be adjudicated under this article, is authorized to issue notice of violation thereof and shall make service thereof as is hereinafter set forth.

(4) The violation notice of the City Code shall contain, but shall not be limited to, the following information:

a. The name of the party violating the ordinance, if known.

b. The date, time and place of the violation (date of issuance).

c. The particular ordinance violated.

d. The fine and any penalty which may be assessed for the ordinance violation.

e. The signature and identification number of the person issuing the notice.

f. The date and location of the adjudicating hearing of ordinance violations, and the penalties for failure to appear at the hearing.

g. That payment of the indicated fine and any late payment shall operate as a final disposition of the violation.

(Code 1980, § 2-505; Ord. No. 99-63, 11-10-1999; Ord. No. 01-56, 11-19-2001)

### Sec. 2-945. Service.

(a) Service of any violation notice shall be made by the person issuing such notice by:

(1) Handing the notice to the person responsible for the ordinance violation;

(2) Handing the notice to the responsible person or leaving the notice with any person twelve (12) years of age or older at the residence of the responsible person;

(3) Mailing the notice by first class mail, postage prepaid, to the person responsible for the ordinance violation; or,

(4) Posting the notice upon the property where the violation is found when the person is the owner or manager of the property.

(b) The correctness of facts contained in any violation notice shall be verified by the person issuing said notice by:

(1) Signing his name to the notice at the time of issuance; or

(2) In the case of a notice produced by a computer device, by signing a single certificate, to be kept by the ordinance enforcement administrator, attesting to the correctness of all notices produced by the device while under his control.

(c) The original or a facsimile of the violation notice shall be retained by the ordinance enforcement administrator and kept as a record in the ordinary course of business.

(d) Any violation notice issued, signed and served in accordance herewith, or a copy of the notice, shall be *prima facie* correct and shall be *prima facie* evidence of the correctness of the facts shown on the notice.

(Code 1980, § 2-506; Ord. No. 99-63, 11-10-1999)

## Sec. 2-946. Administrative hearings.

An administrative hearing to adjudicate any alleged City Code ordinance violation on its merits shall be granted to the person named in the ordinance violation notice. All administrative hearings shall be recorded and shall culminate in a determination of liability or nonliability, made by the hearing officer, who shall consider facts and/or testimony without the application of the formal or technical rules of evidence. Evidence, including hearsay, may be admitted only if it is of a type commonly relied upon by reasonable prudent persons in the conduct of their affairs. The hearing officer shall, upon a determination of liability, assess fines, penalties and costs in accordance with section 2-952 hereof. Persons appearing to contest the alleged violation on its merits may be represented by counsel at their own expense. The burden of proof shall be on the alleged offender to refute the *prima facie* case set forth in the verified notice of violation.

(Code 1980, § 2-507; Ord. No. 99-63, 11-10-1999)

## Sec. 2-947. Notices.

(a) Upon failure of the person receiving a notice of a violation of the City Code to appear at the time and date designated for a hearing, the ordinance enforcement administrator shall send, or cause to be sent, notices as provided in subsection (b) of this section, by first class mail, postage prepaid, to the person who received the notice of an ordinance violation. Service of notices sent in accordance herewith shall be complete as of the date of deposit in the United States mail.

(b) The notices sent pursuant to subsection (a) of this section shall be in the following sequence and contain, but not be limited to, the following information:

(1) Date and location of violation cited in the violation notice.

(2) Particular ordinance violated.

(3) Fine and any penalty that may be assessed for late payment.

(4) A section titled "Notice of Hearing" which shall clearly set forth that the person receiving a notice of the City Code ordinance violation may appear at an administrative hearing to contest the validity of the violation notice on the date and at the time and place as specified in the notice of hearing.

(5) Date, time and place of the administrative hearing at which the alleged violation may be contested on its merits.

(6) Statement that failure to either pay fine and any applicable penalty or failure to appear at the hearing on its merits on the date and at the time and place specified will result in a final determination of liability for the "cited" violation in the amount of the fine and penalty indicated.

(7) Statement that upon the occurrence of a final determination of liability for the failure, and the exhaustion of, or the failure to exhaust, available administrative or judicial procedures for review, any unpaid fine or penalty will constitute a debt due and owing the city.

(c) A notice of final determination of liability shall be sent following the conclusion of administrative hearing, as is hereinafter set forth, and shall contain, but not be limited to, the following information and warnings:

(1) A statement that the unpaid fine and any penalty assessed is a debt due and owing the city;

(2) A statement of any sanction ordered or costs imposed which costs are debts due and owing the city; and

(3) A warning that failure to pay the fine and any penalty due and owing the city within the time

specified may result in proceeding with collection procedures in the same manner as a judgment entered by any court of competent jurisdiction.

(Code 1980, § 2-508; Ord. No. 99-63, 11-10-1999)

## Sec. 2-948. Final determination of liability.

A final determination of liability shall occur following the failure to pay the fine or penalty after the hearing officer's determination of liability and the exhaustion of, or the failure to exhaust, any administrative review procedures hereinafter set forth. Where a person fails to appear at the administrative hearing to contest the alleged violation on the date and at the time and place specified in a prior served or mailed notice pursuant to section 2-947(b) hereof, the hearing officer's determination of liability shall become final either upon a denial of a timely petition to set aside that determination or upon the expiration of the period for filing a petition without a filing having been made.

(Code 1980, § 2-509; Ord. No. 99-63, 11-10-1999)

## Sec. 2-949. Petition to set aside determination.

A petition to set aside a final determination of liability may be filed with the ordinance enforcement administrator within twenty-one (21) days of the date of the final determination of liability and payment of twenty-five dollars ($25.00).

(Code 1980, § 2-510; Ord. No. 99-63, 11-10-1999)

## Sec. 2-950. Judicial review.

Any final decision by a hearing officer that a City Code violation does or does not exist shall constitute a final determination for purposes of judicial review under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.).

(Code 1980, § 2-511; Ord. No. 99-63, 11-10-1999)

## Sec. 2-951. Enforcement of judgment.

(a) Any fine, other sanction, or costs imposed, or part of any fine, other sanction, or costs imposed, remaining unpaid after the exhaustion of or the failure to exhaust judicial review procedures under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.) are a debt due and owing the municipality and may be collected in accordance with applicable law.

(b) After expiration of the period in which judicial review under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.) may be sought for a final determination of a code violation, unless stayed by a court of competent jurisdiction, the findings, decision, and order of the hearing officer may be enforced in the same manner as a judgment entered by a court of competent jurisdiction.

(c) In any case in which a hearing officer finds that a defendant has failed to comply with a judgment ordering a defendant to correct a code violation or imposing any fine or other sanction as a result of a code violation, any expenses incurred by the city to enforce the judgment including, but not limited to, attorney's fees, court costs, and costs related to property demolition or foreclosure after they are fixed by the hearing officer, shall be a debt due and owing the municipality and may be collected in accordance with applicable law.

(d) A lien shall be imposed on the real estate or personal estate, or both, of the defendant in the amount of any debt due and owing the city under this section. The lien may be recorded and enforced in the same manner as a judgment lien pursuant to a judgment of a court of competent jurisdiction. No lien may be enforced under this section until it has been recorded in the manner provided by Article XII of the Code of Civil Procedure (735 ILCS 5/1-101 et seq.) or by the Uniform Commercial Code (810 ILCS 5/1-101et seq.).

(e) A hearing officer may set aside any judgment entered by default and set a new hearing date upon a petition filed within twenty-one (21) days after the issuance of the order of default if the hearing officer determines that the petitioner's failure to appear at the hearing was for good cause or at any time if the

ARTICLE IX. CODE ENFORCEMENT*

petitioner establishes that the municipality did not provide proper service of process.

(Code 1980, § 2-512; Ord. No. 99-63, 11-10-1999)

## Sec. 2-952. Schedule of fines/penalties.

For an ordinance violation of the City Code, fines and penalties shall be as established from time to time by the mayor and city council.

(Code 1980, § 2-513; Ord. No. 99-63, 11-10-1999)

Exhibit G

## DIVISION 2. RENTAL DWELLING INSPECTIONS*

---

**\*Editor's note:** Ord. No. 06-49, adopted June 22, 2006, amended division 2 in its entirety to read as herein set out. Former division 2, which consisted of §§ 14-711--14-718, pertained to similar subject matter and derived from the 1980 Code; Ord. No. 87-5, adopted Mar. 26, 1987; Ord. No. 87-16, adopted July 23, 1987; Ord. No. 88-2, adopted Feb. 25, 1988; Ord. No. 89-8, adopted Feb. 9, 1989; Ord. No. 89-40, adopted Nov. 9, 1989; Ord. No. 90-1, adopted Jan. 11, 1990; Ord. No. 94-16, adopted May 12, 1994; and Ord. No. 04-42, adopted June 29, 2004.

---

### Sec. 14-711. Certificate of occupancy requirement.

(a)   No owner, agent or person (hereinafter referred to as "responsible party") in charge of a one-family, two-family or multiple-family dwelling (hereinafter referred to as "rental dwelling"), as those terms are defined in the property maintenance code, shall allow any person to occupy the same as a tenant or lessee or for valuable consideration unless said dwelling or structure shall have been inspected and determined to be in compliance with all of the provisions of the property maintenance code as well as all health and building ordinances as evidenced by a certificate of occupancy issued by the department of inspectional services ("department"). Thereafter, all rental properties shall be inspected annually and an updated certificate of occupancy issued.

(b)   No certificate of occupancy shall be issued unless the applicant[,] owner or operator agrees in his application to an inspection pursuant to this section. Notwithstanding any other provisions of this Code, when the city conducts inspections of a tenant's rental dwelling, the city must obtain the consent of such tenant to conduct the inspection. If a tenant refuses consent, the city may attempt to obtain a warrant pursuant to subsection (d) below.

(c)   Prior to the time that the department is scheduled to conduct the inspection, the department shall deliver to the owner and occupants of the structure written notice that includes the following:

　(1)   Date and time of the inspection;

　(2)   A statement that the owner or tenant has the right to withhold his consent to the inspection and require the city to attempt to obtain a warrant to conduct the inspection;

(d)   If the owner or occupant does not consent to the attempted inspection, the director of inspectional services ("director") or his designee shall seek in the circuit court of Cook County a warrant in accordance with the appropriate laws of the State of Illinois to allow an inspection. The application for the warrant shall specify the basis upon which the warrant is being sought and shall include a statement that the inspection will be limited to a determination whether there are violations of the city building and zoning ordinances or any applicable housing, fire or property maintenance codes or regulations. The court may consider any of the following factors along with such other matters as it deems pertinent in its decision as to whether a warrant shall issue:

　(1)   Eyewitness account of violation;

　(2)   Citizen complaints;

　(3)   Tenant complaints;

　(4)   Plain view violations;

　(5)   Violations apparent from city records;

　(6)   Property deterioration;

　(7)   Age of property;

　(8)   Nature of alleged violation;

　(9)   Similar properties in the area;

(10) Documented violations on similar properties in the area;

(11) Passage of time since last inspection;

(12) Previous violations on the property.

(e) If the annual inspection establishes that the rental dwelling complies with all the provisions of the property maintenance code as well as all other health, zoning, and building ordinances of the city, then the department of inspectional services shall issue a certificate of occupancy for said dwelling or structure. The certificate shall indicate the date of the inspection; that such dwelling or structure complies with the requirements of the property maintenance code as well as other health and building ordinances that apply to the dwelling. One (1) copy of the certificate shall be delivered to or mailed to the owner of the dwelling unit. A record of all certificates shall be kept on file by the department, and copies shall be furnished upon request to any person having a proprietary interest or tenancy interest in the dwelling affected. The director shall submit once a month to the mayor and the city council a list of addresses of those dwellings which have been inspected the previous month with an indication whether or not said dwellings have been issued certificate of occupancy permits. Every certificate of occupancy shall be issued for a period of one (1) year after its date of issuance, unless sooner revoked.

(f) Inspection fee schedule.

(1) Fifty dollars ($50.00) yearly.

(2) Ten dollars ($10.00) per additional unit.

(3) All inspection fees as herein provided shall be paid prior to the issuance of a certificate of occupancy.

(4) Each fee set for the above covers the cost of one (1) follow-up inspection to verify compliance. In the event that additional inspections are required because full compliance did not exist at the time of the reinspection, then an additional reinspection fee of fifty dollars ($50.00) plus ten dollars ($10.00) per unit shall be assessed.

(5) If an owner, agent or tenant has failed to appear for two previously scheduled inspections, an additional inspection fee of fifty dollars ($50.00) plus ten dollars ($10.00) per unit shall be assessed.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-712. Notice of violation.

(a) Whenever the building official determines that any rental dwelling or the premises surrounding fails to meet the requirements set forth in this chapter or in applicable rules and regulations issued pursuant thereto, the building official in accordance with the property maintenance code and the other city health, and building codes shall issue a notice setting forth the alleged failures and advising the responsible party that such failures must be corrected. This notice shall:

(1) Be in writing.

(2) Set forth the alleged violations of this chapter or of applicable rules and regulations issued pursuant thereto.

(3) Describe the rental dwelling where the violations are alleged to exist or to have been committed. Such written notice shall specify an appropriate or acceptable method of correction.

(4) Specify a specific date for the correction of any violation alleged.

(5) Be served upon the responsible party of the rental dwelling by the building official, or mailed to the responsible party. If one (1) or more persons to whom such notice is addressed cannot be found after diligent effort to do so, service may be made upon such persons by posting the notice in or about the rental dwelling described in the notice.

(b) At the end of the period of time allowed for the correction of any violation alleged, which was stated in the inspection notice, the building official shall reinspect the rental property described in the notice.

(c) If, upon reinspection, the violations are determined by the building official not to have been corrected, the

building official, in turn, shall issue an O.V. (ordinance violation) ticket to initiate legal proceedings to be handled in Calumet City's housing court for the immediate correction of the alleged violations or shall order the rental property vacated within thirty (30) days, or both.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-713. Responsibility of tenants.

No tenant shall damage or cause to be damaged any unit or building leased nor shall any damage be caused to the general premises of any building used by the tenants. Each tenant and the families of each tenant shall maintain his rental unit free of any litter, and tenants shall not litter any of the premises or the buildings provided for use by the tenants. The tenants must maintain their responsibilities as outlined in the property maintenance code, subject to O.V. citations.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-714. Penalties.

Any responsible party of a rental dwelling who has received an order or notice of an alleged violation of this article shall be subject to a penalty of not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) for each day the alleged violation continues after expiration of the specified reasonable consideration period; provided that no such penalty shall be applicable while reconsideration, hearing or appeal to a court of competent jurisdiction is pending in the matter.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-715. Validity and severability.

If any section, subsection, paragraph, sentence, clause, or phrase of this Code shall be declared invalid for any reason whatsoever, this decision shall not affect the remaining portions of this Code, which shall continue in full force and effect, and to this end, the provisions of this Code are hereby declared to be severable.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-716. Savings clause.

This Code shall not affect violations of any other ordinance, code or regulation of the jurisdiction existing prior to the effective date hereof, and any such violation shall be governed and shall continue to be punishable to the full extent of the law under the provisions of those ordinances, codes or regulations in effect at the time the violation was committed.

(Ord. No. 06-49, § 1, 6-22-2006)

Secs. 14-717--14-750. Reserved.

Exhibit
H

Citation                                    Rank(R)  1 of 1                    Database
1994 WL 601863 (Ill.A.G.)                                                      IL-AG
(Cite as: 1994 WL 601863 (Ill.A.G.))

1994 WL 601863 (Ill.A.G.)

Office of the Attorney General
State of Illinois

File No. 94-024

October 25, 1994

MUNICIPALITIES:

Requirement that Title Insurance Reports Reflect Payment of Document Inspection
Fee

Mr. Frank C. Casillas
Director
Department of Financial Institutions
100 West Randolph Street
James R. Thompson Center, Suite 15-700
Chicago, Illinois 60601

Dear Mr. Casillas

I have your letter wherein you inquire regarding the validity of ordinances
adopted by non-home-rule municipalities which require the inspection of
documents and the payment of fees prior to the transfer of real property lying
within the municipality. Of particular concern to the Department, which
regulates title insurance companies (215 ILCS 155/1 et seq. (West 1992)), is a
provision in the ordinances which mandates that the requirement of inspection
and payment of fees be reflected in title insurance reports. For the reasons
hereinafter stated, it is my opinion that the ordinances in question are not
valid.
In February, 1994, the village of Westchester adopted ordinance no. 94-1387,
which purports to require that any document evidencing the transfer of ownership
of real estate located in the village must be submitted to the village for
inspection and review. Upon payment of a fee of $25, the village will affix a
stamp to the document if the subject property is found to be in compliance with
all village codes in force at the time the document is submitted. The ordinance
further provides that the requirement be reflected on all real estate title
insurance reports conducted precedent to the transfer of ownership, to give
public notice of the mandatory inspection. In April, 1994, the village of River
Grove adopted a similar ordinance. Both Westchester and River Grove are non-
home-rule municipalities.
Non-home-rule municipalities have only those powers which are expressly granted
by statute and the constitution, those powers which are incident to those which
have been expressly granted and those powers which are indispensable to the
accomplishment of the declared objects and purposes of the municipal
corporation. (Pesticide Pub. Pol. v. Village of Wauconda (1987), 117 Ill.2d 107,
111-112.) Consequently, as a threshold issue, it must be determined whether

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 601863 (Ill.A.G.)

Westchester and River Grove have the power to adopt the ordinances in question.
Only if this question is answered affirmatively will it be necessary to consider
whether the villages' power is preempted by State law relating to title
insurers.
Neither village has cited any authority for the adoption of these ordinances.
The only purpose suggested within the body of each ordinance, apart from the
collection of a $25 fee, is to determine whether the property is in compliance
with village codes (Village of Westchester Ordinance No. 94-1387, adopted
February 8, 1994, at p. 1) or to determine whether any "outstanding obligation
is due to the [v]illage with respect to the property" (Village of River Grove
Ordinance No. 1994-05, adopted April 21, 1994, at p. 1). Municipalities are
authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq.
(West 1992)), to adopt a number of ordinances and codes designed to protect
public health and safety, and are authorized to enforce such codes by requiring
permits, fees, and fines. (E.g., 65 ILCS 5/11-31.1-1 et seq.; 5/11-37-1 et seq.;
5/11-38-4 (West 1992).) Further, municipalities may impose various fees for
other services relating to real property. In no instance, however, are
municipalities authorized to limit the alienability of property in order to
enforce such codes.
Although these ordinances do not expressly so state, I assume that the villages
will refuse to affix the "document review" stamp to any deed for property which
is not in compliance with the village codes (the village of Westchester) or
concerning which unpaid obligations may be deemed to be due (the village of
River Grove). Thus, even if the deeds are returned to the persons submitting
them, if they proceed with the transactions they will violate the application
ordinance and be subjected to its penalties. This attempt to make alienability
subject to municipal regulation clearly exceeds the villages' powers.
Further, non-home-rule municipalities have no authority to impose a tax on the
transfer of real property. The authority to impose such a tax is expressly
reserved to home rule municipalities (65 ILCS 5/8-11-6a (West 1992)). While the
fee imposed by the River Grove and Westchester ordinances is denominated a
document inspection fee, rather than a transfer tax, there can be little doubt
that it operates as the letter. As previously discussed, the villages' authority
to enforce their health and safety codes is entirely unrelated to the transfer
of property. Moreover, a document inspection would provide no basis upon which
to determine whether the property was in compliance with codes, and the
ordinances do not even suggest that the affixing of the required stamp will
depend upon an inspection of the property itself. In my opinion, the inspection
fee is, in both operation and effect, a prohibited transfer tax.
Because the non-home-rule villages in question have no authority to enact or
enforce ordinances restricting the transfer of real property or to impose a fee
or tax thereon, it is my opinion that the ordinances are void and unenforceable.
Because of this conclusion, it is not necessary to determine whether such
ordinances, with respect to their effect on title insurers, are preempted or
superseded by State laws requiring the licensure of title insurers.
Respectfully yours,
Roland W. Burris
Attorney General

1994 WL 601863 (Ill.A.G.)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

1994 WL 601863 (Ill.A.G.)

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Exhibit
I

39 of 72 DOCUMENTS

**LIONEL BORDELON, Plaintiff, v. CHICAGO SCHOOL REFORM BOARD OF TRUSTEES, successor to the Board of Education of the City of Chicago, Defendant.**

No. 98 c 1932

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

1999 U.S. Dist. LEXIS 14836

September 3, 1999, Decided
September 7, 1999, Docketed

**DISPOSITION:**    [*1] Defendant's motions to strike and for summary judgment granted.

**COUNSEL:** For LIONEL BORDELON, plaintiff: Leon Bordelon, III, Tuggle & Bordelon, Chicago, IL.

For LIONEL BORDELON, plaintiff: Clarence S. Wilson, Jr., Attorney at Law, Chicago, IL.

For LIONEL BORDELON, plaintiff: John Thomas Moran, John T. Moran & Associates, Chicago, IL.

For CHICAGO SCHOOL REFORM BOARD OF TRUSTEES, defendant: Marilyn F. Johnson, James Jordan Seaberry, Jr., Chicago School Reform, Board of Trustees, Chicago, IL.

**JUDGES:** Robert W. Gettleman, United States District Judge.

**OPINION BY:** Robert W. Gettleman

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Plaintiff Lionel Bordelon has sued his employer, Chicago School Reform Board of Trustees, alleging that defendant deprived him of liberty and property rights without due process of law when it unilaterally, without prior notice or hearing, reassigned him from his position as principal of Kozminski Community Academy ("Kozminski") to an administrative position in the Central Office. On June 3, 1998, this court held that plaintiff had a property interest in his position as principal, granted plaintiff's motion for a preliminary injunction, ordered defendant to reinstate [*2] plaintiff as principal of Koz-

minski, and enjoined defendant from transferring plaintiff to any position other than as a principal. *Bordelon v. Chicago School Reform Board of Trustees*, 8 F. Supp. 2d 779 (N.D. Ill. 1998). The case then proceeded on plaintiff's claims for a permanent injunction and monetary damages. In January 1999 the Kozminski Local School Council voted to renew plaintiff's contract as principal for 1999-2003, thereby mooting plaintiff's need for a permanent injunction. Defendant has now moved for summary judgment on plaintiff's claim that defendant's action violated his liberty interest. In addition, defendant has moved to strike plaintiff's local rule 12N response filed in opposition to defendant's motion, for failure to comply with the local rule. For the reasons set forth below, defendant's motions are granted.

*Motion to Strike*

In addition to the requirements set out in Fed. R. Civ. P. 56, Northern District of Illinois Local Rule 12M(3) [1] requires a movant to file a statement of material facts to which the moving party contends there is no genuine issue and that entitles it to judgment as a matter of law. The 12M(3) statement "shall [*3] consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12N(3) requires the opposing party to file a concise response to the movant's statement, and allows the opposing party to file a statement of additional facts that require denial of summary judgment. All denials and additional facts must cite to an affidavit or other supporting materials.

1    During the preparation of this opinion, the Northern District Of Illinois revised and renumbered its Local Rules. Old Rule 12M is now contained in L.R. 56.1(a) and old Rule 12N is con-

tained in L.R. 56.1(b). For convenience, this opinion will reference the old numbering system.

In the instant case, plaintiff's 12N response is totally noncompliant. It contains, just as defendant describes it, evasive answers, contradictory answers, and legal argument. Indeed, the document contains more legal argument that factual denial. The purpose of the rule [*4] is to aid the court in determining which material facts are not in dispute, in order to determine if summary judgment is appropriate. It is not designed to give the parties additional briefing. Although the court could pick almost any of plaintiff's responses to defendant's 31 statements of uncontested fact, one example is sufficient to demonstrate the character of plaintiff's response:

> 19. Bordelon was assigned to administrative duties in the Office of Schools and Regions from March 11, 1997, to June 22, 1998. (Exhibit "Q", deposition of Lionel Bordelon, dated 2-26-99, pgs. 8-9 and 15.)

> *Response*: Denied. This honorable court has already held that "Nothing in § 10-23.8(b) [of the Illinois Schools Code] gives defendant the right to transfer plaintiff to a "paper shuffler" position in the central office. Judge Ashman held, and this court agreed, that the two positions are not similar for purposes of the Act." As Miguel Rodriguez stated at his deposition, Mr. Bordelon's "office" at Camp Beverly, was in an "old warehouse" "in open space" with one large room with dividers and Mr. Bordelon's "space" was "on the way to the men's bathroom." (M. Rodriguez dep. pp. 16, 55) [*5] Plaintiff had no "duties" and was not evaluated. (Vallas dep. p. 53)

This "response" is totally improper. The 12M statement of fact required plaintiff to admit or deny that he was assigned to administrative duties from March 11, 19997 to June 22, 1998, at the central office. The 12M statement sets forth a fact that can be admitted or denied. Plaintiff may have some quarrel with the term "administrative duties" but he must admit that he was reassigned to the Office of Schools and Regions between March 11, 1997, and June 22, 1998, because he so testified in his deposition. Plaintiff may dispute the legality of the reassignment, but he cannot dispute the fact. Indeed, the fact of the reassignment is the basis of plaintiff's entire complaint. Plaintiff's entire 12N response is replete with such improper legal argument. Plaintiff cannot now deny facts

that he has already admitted in his deposition by raising legal argument. The materiality, relevance or legal significance of the fact can be challenged in a legal memorandum. But the fact must be admitted or denied in response to the local rule 12M statement of undisputed facts. Accordingly, defendant's motion to strike is granted, and [*6] defendant's Rule 12M statement of uncontested fact is regarded as admitted.

## Motion for Summary Judgment

The gist of defendant's motion is that plaintiff has not and cannot show any publicized statements that were in any way "stigmatizing" or that plaintiff has suffered any tangible economic injury or loss of employment. "The Constitution does not forbid libel and slander." *Davis v. City of Chicago*, 53 F.3d 801, 804 (7th Cir. 1995). "Defamation alone by a public officer is not a constitutional tort, because the interest that it invades, the interest in reputation, is not deemed liberty or property within the meaning of the due process clauses of the Constitution . . .." *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997) (citations omitted). When, however, the character and circumstances of the defamation are such as to have foreclosed a person's freedom to take advantage of other employment opportunities, that person can bring a suit based on the deprivation of this liberty of employment or occupation. *Id.* (Citing *Paul v. Davis*, 424 U.S. 693, 710, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976)).

Therefore, for plaintiff [*7] to survive summary judgment, he must present some evidence of damage to his freedom to take advantage of other employment opportunities. He has presented no such evidence and, according to his own testimony, cannot. In his deposition, plaintiff admitted that nobody has refused to hire him as a result of any statements made by defendant. Nor has he even sought any other employment opportunity. Indeed, he has been rehired in his present position for another four year term. Plaintiff has presented no evidence of any "stigmatizing" effect of any allegedly defaming statement. Accordingly, his claim does not rise to a Constitutional level. Defendant's motion for summary judgment is granted.

## Conclusion

For the reasons set forth above, defendant's motions to strike and for summary judgment are granted. This matter is set for a report on status on September 22, 1999, at 9:00 a.m., at which time the parties shall be prepared to discuss what, if anything, remains of this case.

**ENTER: September 3, 1999**

**Robert W. Gettleman**

1999 U.S. Dist. LEXIS 14836, *

United States District Judge