IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AYANNA WALKER, | ) | |
| Plaintiffs, | ) | Case No. 07C 6148 |
| v. | ) | |
| | ) | Judge Milton I. Shadur |
| CALUMET CITY, ILLINOIS | ) | Magistrate Judge Valdez |
| Defendant. | ) | |

**CALUMET CITY'S MEMORANDUM IN OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION**

**I.      Legal Standard**

In order to be entitled to a preliminary injunction, Plaintiff must show that (1) she is reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) she will suffer irreparable harm which absent injunctive relief outweighs the irreparable harm the City will suffer if the Ordinance is granted; and (4) the injunction will not harm the public interest. Joelner v. Village of Washington Park, 378 F.3d 613 (7th Cir. 2004).

**II.     Pertinent Complaint Allegations**

Ayanna Walker ("Walker") owns a four unit dwelling in the City (¶7). The property is listed for sale. Walker claims that the City's amended Point of Sale Inspection Ordinance (the "Amended Ordinance") interferes "with Walker's right to alienate her property without due process of law." Walker seeks a preliminary injunction based solely on these allegations.

**III.    Summary of the Amended Ordinance**

In order to analyze Walker's likelihood of success on the merits, it is critical that this Court has a full understanding of the scope – and limits – of the Amended Ordinance. Accordingly, we summarize the Amended Ordinance in detail.[1]

*(a) Department Created; Definition*; *General Requirement*. This subsection defines the term "point of sale inspection" and provides that a point of sale inspection shall be required relative to the transfer of real estate "except as exempted herein."

*(b) Notice of Proposed Transfer of Real Property Required.* This subsection requires an owner of property to provide a notice of proposed transfer of real property.

---
[1] The Amended Ordinance is attached **Exhibit 1.**

*(c) Compliance Inspection; Pertinent Code Requirements.* Under this subsection, when the owner submits the notice, the form also constitutes the City's request to conduct a Compliance Inspection. This subsection gives notice to the owners that the inspection will be specifically limited to making sure the structure complies with the various codes the City has adopted, including various property maintenance codes. For purposes of this action the City has adopted the "2000 International Property Maintenance Code." This Code is attached as **Exhibit 2**. This subsection also limits the City's deconversion authority to those properties which have been "illegally converted," defined to mean structures which violate the zoning ordinance and are not legal nonconforming uses.

*(d) The Proposed Compliance Inspection.* This subsection specifically obligates the City to conduct a proposed Compliance Inspection within 28 days of notice and obligates the City to notify the seller of his right to refuse consent to the Compliance Inspection. The City must also advise owners of tenants' rights to contest inspections.

*(e) Refusal to Consent; Warrant Procedures.* This subsection sets forth the warrant requirement, which requires the City to seek a warrant in the Circuit Court of Cook County within 10 days after the owner's nonconsent.

*(f) Uninspected Property; Transfer Stamps.* If an owner declines consent and if either the City does not seek a warrant within 10 days or the court denies the warrant, then the owner may obtain his transfer stamps without a Compliance Inspection.

*(g) Inspection Procedures.* This subsection deals with the actual processing of an inspection upon either consent or a warrant. This subsection obligates the City to give the owner the results of the inspection within 3 business days after the inspection. This means that at the latest, the owner will be on notice as to the repairs/deconversion process within 31 days after the owner initiates the notice of transfer process.

*(h) Follow Up Repairs; Reinspection.* This subsection provides that an owner issued a notice of repairs as provided in subsection (g), shall proceed to make such repairs. Upon completion of the repairs and notice to the City, the City will conduct a reinspection within 3 business days thereafter.

*(i) Payment of Current Water Bill; Predeprivation Hearing.* This subsection provides for payment of the current water bill prior to the issuance of transfer stamps. The subsection

obligates the City to offer a predeprivation due process hearing prior to closing if the owner disputes such obligation, within 3 business days of such a request. If the owner disputes the City's determination as to liability, the owner is allowed to pay the bill under protest and pursue civil remedies to recover any claimed overcharge.

*(j) Conditional Certificate of Compliance; Procedures.* This subsection allows for the transfer of property even if the repairs have not been completed before closing. An amount equal to the estimated cost of repair is posted with the City, and the buyer is given up to 180 days to complete the repairs. Upon the buyer's failure to complete repairs, the City must seek a court order to require the repairs.

*City Code Section 82-327(b)*. Section 82-327(b) now provides that the City must issue transfer tax stamps not only upon the issuance of a Certificate of Compliance but also when no inspection takes place because of the combination of (i) no consent and (ii) no warrant. This section maintains the requirement that transfer stamps will not issue unless the current water bill is paid. However, this section also cross-references the procedural due process rights set forth in §14-1(i).e.

### B.    Example Of How The Amended Ordinance Operates

Let's assume that on November 1, 2007, Plaintiff decided to sell her house in Calumet City. They contact a realtor and put the house on the market on November 5th. They know they are going to have to do some work on the house for two reasons: first because the Amended Ordinance may require it; and second, because the typical form real estate contract grants the buyer pre-closing inspection rights. There is nothing to prevent Mr. Johnson from going to City Hall on November 5, 2007 to start the inspection process. The Amended Ordinance does not require that the seller have a sales contract in hand as a condition precedent to requesting the inspection. Subsection 14-1(b) is triggered whenever an owner "proposes to engage in a transfer of real property . . ."

Mr. Johnson comes to City Hall on November 5th and authorizes the inspection. Under the Amended Ordinance, that inspection <u>must</u> take place within 28 days (December 3, 2007) and the inspection report <u>must</u> be furnished to Mr. Johnson by December 6.[2] Assuming Johnson

---

[2] For purposes of this hypothetical, we are not taking weekends into consideration; weekends may stretch the inspection chronology by a few days.

completes the punchlist items by December 16, 2007, the reinspection must be completed within the next 3 days. Therefore, the notice, inspection and reinspection process will be completed within 45 days at the outside.[3]

In the meantime, Mr. Johnson and his realtor are trying to sell the house. If they have a buyer and have signed a contract, the normal pre-closing activities are taking place during this same month and a half. The buyer is doing his own inspection and obtaining a home loan. The seller or his attorney is ordering a survey and title commitment.

If the seller chooses not to consent to the inspection, the burden is on the City to seek and obtain an administrative search warrant. If the City chooses not to seek the warrant, or if the local judge refuses to issue one, the transfer takes place without an inspection. If the City obtains a warrant, the City must proceed with diligence to inspect the property and identify code violations.

The Amended Ordinance also has a safety valve which would further ameliorate a seller's timing concerns. Assume the closing is to take place in February, 2008, but the house has code violations like missing gutters and downspouts. This type of work cannot be done in winter. Under Subsection (j), the cost of these repairs is secured, a conditional certificate of compliance is issued, the sale is closed, and the buyer has an additional 180 days to make the necessary repairs.

The Amended Ordinance does not impose unreasonable time constraints on a seller's ability to close on the sale of his property. The time the process is anticipated to take—on the outside—dovetails with the normal passage of time between contract and closing.

The Amended Ordinance specifically identifies the Code provisions with which structures must be in compliance. See Subsection (c)(1). As discussed above, one of the Chapter 14 codes is found in Article X of the Calumet City Code of Ordinances. This Article, "Property Maintenance Code," specifically adopts the International Property Maintenance Code subject to certain specific amendments and revisions. These codes have specific and objective requirements for property maintenance. See Ex. 2.

---

[3] We emphasize that these are outside dates. The City has no motivation to wait until the very last day under the ordinance to initiate an inspection.

4

### C.     Administrative and Judicial Due Process

When an administrative building official issues a final decision, such as one which might be made under the Amended Ordinance,[4] that decision is subject to multiple layers of review. Sections 111-1 – 111.8 of the Property Maintenance Code provide that any determination by a building official is subject to appeal to the Board of Appeals. A full public hearing is provided (Sec. 111.4 – 111.6), as is judicial review (111.7). An appeal stays enforcement.

This due process protection is also institutionalized by statute. Section 11-13-3 of the Illinois Zoning Code, 65 ILCS 5/11-13-3 calls upon municipalities to create a zoning board of appeals. Section 11-13-3 ("The city council of cities … having a population of less than 500,000 may provide for the appointment of a board of appeals …"). Section 11-13-3(c). Calumet City has implemented this authority. Section 12.5 of the Zoning Ordinance (attached to this Memorandum as **Exhibit 3**) implements this authority.

Among the responsibilities of the ZBA is to "hear and decide appeals from and review any order requirement, decision or determination made by an administrative official charged with the enforcement of any ordinance adopted under this Division 13." Sec. 11-13-3(f). Ordinance Section 12.5(a) similarly vests the Calumet City ZBA with the authority to "hear and decide appeals from any order, requirement, decision or determination made by the zoning administrator under this ordinance …"

Section 11-13-12 of the Illinois Municipal Code establishes appeal rights. An appeal "may be taken by any person aggrieved or by any officer, department board or bureau of the municipality." Once an appeal is filed, the ZBA fixes a time for a hearing, gives the parties notice, and conducts a hearing where "any party may appear in person or by agent or by attorney." The decision of the ZBA following a hearing is subject to administrative review. 65 ILCS 5/11-13-13; Ordinance Section 12.5 ("finality of decisions of the zoning board of appeals.").

The ZBA/administrative review process is specifically available if a municipal administrative official determines that the use of a building as a multi-family residence is not a legal nonconforming use. Taylor v. Zoning Board of Appeals of the City of Evanston, et al., 375 Ill.App.3d 585, (1st Dist. 2007) (specifically so holding, and summarizing the law of legal

---

[4] For example, a determination that a single family home was illegally converted to a multi-family structure or a determination that an existing home's wiring is in violation of City code.

nonconforming use in Illinois). If a property owner invokes her appeal rights, she receives the benefit of an automatic stay. See 65 ILCS 5/11-13-12 ("An appeal stays all proceedings in furtherance of the action appealed from unless the [zoning] officer … certifies … a stay would … cause imminent peril to life or property"). Even then, either the ZBA or the Circuit Court of Cook County has the authority to overturn the administrative certification that a stay is not appropriate.

## IV. Argument

### A. Walker's Claim For Preliminary Injunction is Not Ripe

A claim is not ripe for adjudication if "it rests upon contingent events that may or may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300, (1998). Because Walker has only alleged her house is for sale, the case is not ripe for preliminary injunctive relief. The reason for this is found in the text of the Ordinance itself.

The first step in the transfer tax process requires an owner to provide the City with notice of proposed transfer. 14-1(b). We don't know whether Walker will consent to a Compliance Inspection. Section 14-1(d) requires the City to notify her that she has a right to refuse the inspection.[5] Therefore, we don't know whether the City will seek a warrant. If (i) Walker declines consent to the inspection, and (ii) the City does not seek a warrant (or if the City applies for a warrant and the application is denied) then Walker proceeds to obtain her transfer stamps unaffected in any way by the Amended Ordinance.

This case is not ripe. Whether Walker's proposed transfer will become subject to the Amended Ordinance depends upon her consent to an inspection (which we assume will not be forthcoming, given the fervor of her challenge) and the City makes an enforcement decision. Until we reach this stage of process Walker is not threatened by the challenged provisions of the Amended Ordinance.

To some extent, this ripeness problem is akin to this Court's observation that Walker's standing to challenge the Amended Ordinance is tenuous. At this point, her claim is not ripe. The Court should not grant preliminary injunctive relief at this stage of the litigation.

---

[5] We assume Walker has tenants. They too have the right to contest inspections.

As this Court has noted, "a plaintiff's entitlement to preliminary injunctive relief requires [her], in addition to showing that [her] harm is irreparable, to show that the harm is "imminent" as well." United Asset Coverage, Inc. v. Avaya, Inc., 409 F.Supp.2d 1008, 1041 (N.D.Ill. 2006).

### B. Walker has an Adequate Remedy at Law for Damages in the Event the Amended Ordinance is Applied to Her Proposed Sale

Let's now assume Walker has a contract and invokes the Ordinance. The City obtains a warrant and performs the inspection. The City finds $10,000 worth of code violations. The City also determines that two dwelling units were illegally built and must be deconverted. The four flat must now become a two flat.

At this point, a number of things might occur. Walker could appeal the administrative deconversion determination as well as the property maintenance determinations to the City's Zoning Board of Appeals. Enforcement would be stayed pending her due process appeal. If she fails to appeal or loses her appeal, Walker would have to spend $10,000 to repair her structure. The repairs may either enhance property value or diminish it (the cost burden may be imposed on the purchaser, depending on the private negotiations over the real estate contract). An erroneous deconversion order will reduce the market value of her building because the rental stream is halved. Perhaps this combination of circumstances will cause Walker to lose a sale; this in turn will force her to give up her purchase contract for her new home, thereby causing her to forfeit her earnest money. By the time she is able to sell her house and move to a new place, interest rates have risen. Her sales price has gone down and her cost of funds for her new purchase has gone up.

To be sure, this doomsday scenario is more than a little unlikely. But the essential point for purposes of Walker's present motion is obvious – all of these injuries can be remedied through money damages. All of the damages Plaintiff might suffer as a result of the Amended Ordinance (out-of-pocket costs of unwarranted repair; loss of fair market value due to an illegal deconversion; loss of earnest money on home purchase dependent on sale of Calumet City property, etc.) are capable of calculation and presentation to a factfinder. Walker's ability to be made whole by damages dooms her request for preliminary injunction. These hypothetical losses do not amount to "harm which cannot be repaired, retrieved, put down again, atoned for … so that compensation of money cannot atone for it." United Assets, supra, citing Graham v.

Medical Mutual Of Ohio, 130 F.3d 293, 296 (7th Cir. 1997). In the present case, Walker's potential losses from the application of the Amended Ordinance can be fully rectified at trial. Certainly the papers presented to this Court do not constitute a clear showing of imminent irreparable injury.[6]

Preliminary injunctive relief is particularly inappropriate when the challenge is a limited (and disputed) due process one. In essence, Plaintiff is claiming that the Amended Ordinance deprives her of a property interest without a constitutionally adequate hearing. When a homeowner's sale of a property is delayed or diminished because a government regulation, that owner may have lost something. But she still has her house. When a public employee is fired without a constitutionally adequate hearing, that employee has lost much more – his income stream, his name, his reputation, his future employment prospects.[7]

And yet, absent extraordinary circumstances not present here, public employees cannot enjoin a termination decision imposed without procedural due process. Sampson v. Murray, 415 U.S. 61 (1974). See also Bedrossian v. Northwestern Memorial Hospital, 409 F.3d 840, 845 (7th Cir. 2005); Jones v. Greyhound Exposition Services, 2006 WL 2136440 (N.D.Ill. 2006) (Shadur, Senior J.). Loss of income, humiliation, damage to reputation and the like may all be remedied by money damages even in the case of an egregious procedural due process violation. Baird v. Board of Education, 389 F.3d 685 (7th Cir. 2004).[8] The hypothetical loss which Walker might experience from an application of the Amended Ordinance does not rise to the level of irreparable injury so as to justify preliminary injunctive relief.

  C.  **The Ordinance Is Constitutional On Its Face**

    1.  **History of Point of Sale Inspection Ordinances**

Many cities throughout the country have adopted point of sale housing inspection ordinances. One of the first cases to uphold an ordinance similar to Calumet City's is Dome Realty v. City of Paterson, 83 N.J. 212, 416 A.2d 334 (N.J. 1980). The ordinance required "substantial compliance with the standards of habitability contained in its housing code before a

---

[6] This Court frequently invokes the Seventh Circuit's Roland Machinery analysis. Roland Machinery Company v. Dresser Industries, 749 F.3d 380 (7th Cir. 1984). None of the four Roland factors probative of irreparable injury is present in this case.
[7] Often time the tragedy of such injury recalls Iago's poignant observation in Othello, Act 3, Scene 3.
[8] Having represented Dr. Baird, the undersigned can attest that Baird's constitutional deprivation was fully remedied through money damages.

new tenant may take possession of rented residential premises." 416 A.2d 330, 7-8. The New Jersey Supreme Court upheld the constitutionality of the ordinance in the face of various federal and state constitutional challenges.

The constitutionality of Detroit's ordinance was upheld in <u>Butcher v. City of Detroit</u>, 156 Mich.App. 165, 401 N.W.2d 260 (Mich.Ct.App. 1986), *cert. denied*, 482 U.S. 905 (1987). As summarized by the <u>Butcher</u> court, the Detroit ordinance "requires a valid certificate of approval or a valid inspection report from [the city] before a person may sell a one or two family residential structure in the city." 156 Mich.App. at 168. The court rejected equal protection and takings challenges. The ordinance was rationally related to the legitimate governmental purpose of addressing fraud and dealing with the problem of housing deterioration. Citing its earlier opinion at 131 Mich.App. 698, 347 N.W.2d 702, <u>Butcher</u> found that the ordinance was a rational "way of ensuring that a buyer has more recourse on buying a house less valuable than anticipated, than merely stoically accepting the saw 'caveat emptor.' Moreover, the ordinance helps combat housing deterioration." 156 Mich.App. at 170.

Our research has not disclosed any appellate decision which has invalidated a Point of Sale inspection ordinance based on constitutional defects other than the absence of a warrant procedure. See <u>City of Vincennes v. Emmons</u>, 842 N.E.2d 155, 158 (Ind. 2006) at n.6 (collecting cases). The cases all agree that it is rational for a municipal legislative body to use the impending sale of real estate as a trigger for requiring properties to be brought into compliance with building and zoning codes. A municipality has the undoubted authority to adopt building, housing and zoning codes. The municipality can rationally determine that these codes can best be enforced when property ownership is changing hands. See, Anderson, <u>American Law of Zoning</u>, §19.3 (because illegal alterations frequently occur literally behind closed doors, municipalities "undertake to plug the gap through the use of occupancy permits").

> **2. Count I: The Point of Sale Inspection Ordinance Does Not Amount To An Unreasonable Restraint On "The Right Of Property Owners To Transfer Their Property."**

Count I seeks to state a constitutional claim based on the theory that the Amended Ordinance unreasonably restrains "the right of property owners to transfer their property." See Count I, Heading. Count I (¶¶20-27) fails to cite any provision in the Constitution prohibiting "unreasonable restraints on alienation of property." Paragraph 26 alleges generally that the

Amended Ordinance is invalid because it violates "the protections in the U.S. Constitution against unreasonable government restriction on the right to sell property," without enlightening either this Court or the City as to the specific constitutional right involved. For that reason alone, Count I should be dismissed.

Putting aside this defect, the Ordinance does not violate any common law restriction against alienability of private property. The term "restraint on alienation" has nothing to do with the assessment of the constitutional validity of a law. Rather, that term deals with private property relationships. Restatement of Property, Section 404. The Supreme Court has in passing referred to the "ancient doctrine disfavoring restraints on alienation of property . . . ." Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 188 n.3 (1995). Other courts have identified this concept not in constitutional terms, but more generally as a "tenet of public policy." Transworld Airlines, Inc. v. American Coupon Exch., 913 F.2d 676, 689 (9th Cir. 1990).

Illinois law views this doctrine in general common law terms. The description used by Illinois courts is quite similar to the deferential rational basis due process standard for review of social or economic legislation. See, Gale v. York Center Community Co-op, 21 Ill.2d 86, 92-93, 171 N.E.2d 30 (1960). See also, Drayson v. Wolff, 277 Ill.App.3d 975, 981-2, 214 Ill.Dec. 632 (1st Dist. 1996). To the extent the "restraint on alienation" claim has any place in constitutional jurisprudence, it is akin to a substantive due process challenge, and this Court should apply the rational basis test in assessing such challenge. The Amended Ordinance is rational.

State courts have observed that an ordinance can never be a "direct restraint on alienation," because direct restraints "involve restraints contained in property conveyances or contracts." Anderson v. Provo City Corp., 108 P.3d 701, 709 (Utah 2005). At best, an ordinance regulating property transfers amounts to an "indirect restraint on alienation." Id. Anderson went on to hold that even assuming a regulatory ordinance "places an indirect restraint on alienation of property," the restraint should be upheld "as reasonably necessary to protect Provo City's justifiable and legitimate interest in preserving the single-family residential character of the affected neighborhoods." Id. at 710. See also Greater Chicago Combine and Center, Inc. v. City of Chicago, 431 F.3d 1065 (7th Cir. 2005); Butcher I at 347 N.W.2d 707.

Whether viewed in constitutional or common law terms, the Amended Ordinance does not unreasonably prevent the transfer of real estate. It cannot be disputed that a municipality

may enact reasonable measures to maintain its housing stock through the enforcement of building and zoning codes. Camara v. Municipal Court of the City and County of San Francisco, 387 U.S. 523, 535, (upholding "the police power of municipalities to impose and enforce . . . minimum standards even upon existing structures ... the public interest demands that all dangerous conditions be prevented or abated"); Young v. American Mini Theaters, Inc., 427 U.S. 50, 72 (1976) (upholding "the city's interest in preserving the character of its neighborhoods"); Ben's Bar v. Village of Somerset, 316 F.3d 702, 715 (7th Cir. 2003) (emphasizing municipality's right to use land use policies as a means of grappling with difficult socio-economic problems).

Consistent with these holdings, Calumet City may rationally conclude that the maintenance of housing stock and property values, and the prevention of consumer fraud are advanced by focusing inspectional and enforcement efforts at the time when property is changing hands. The time of transfer is the most reasonable time for all concerned to obtain building and zoning compliance. When a person is getting ready to sell her house, she is going to do some repairs to make the house market-ready. The inspection/code compliance checklist will aid the seller in making the house ready for the buyer.

The Amended Ordinance also prevents unscrupulous sellers from taking advantage of first time homebuyers who may not be aware of potential violations which are not visible to the uninitiated eye. The requirement to bring the home into compliance with law is less intrusive if done at the time the seller is packing up to move out. It is much easier to do structural repairs when the house is empty or being readied for move out.

The Amended Ordinance is also a reasonable way of allocating municipal inspectional resources. Rather than engaging in visual sightings, random door knockings, or the issuance of citations resulting in court proceeding, delays, and perhaps a fine but no compliance, Calumet City has chosen to utilize the dynamics of the marketplace to aid in this law enforcement effort. This strategy certainly is not irrational when viewed through the lens of this Court's limited oversight of municipal regulatory legislation. National Paint & Coatings Assoc. v. City of Chicago, 45 F.3d 1124, 1127-8 (7th Cir. 1995).

The impositions on the homeowner are quite modest. The seller has the right to refuse the request for inspection. Should the City decide that there is insufficient evidence of code violations, the closing proceeds. Should the City seek to obtain a warrant, the Amended

Ordinance obligates the City staff to move with due diligence in order to seek a warrant, and if warranted, conduct the inspection at such a time so as not to slow down the property transfer.

The Amended Ordinance also contains fail-safe mechanisms to deal with the inability to complete the repairs in time for closing or disagreement as to scope of needed repairs. The Amended Ordinance allows for the parties to commit that the buyer will complete the repairs by a set date, such as when the weather allows it. If not, the City must still go to court to obtain compliance.

The Amended Ordinance also protects against a property owner giving up her right to challenge her final water bill. While the Amended Ordinance requires payment of the final water bill, it specifically allows the seller to obtain a due process hearing satisfying Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1 (1978).

A municipality has the right to prevent further decline of aging housing stock. Requiring code compliance at the time of property transfer is a reasonable and logical means of achieving this important goal. The Amended Ordinance satisfies the rational basis test. To some extent, any municipal regulation impacting real estate transfers could be viewed as a restraint on alienation. Walker does not challenge the City's transfer tax ordinance. No less than the tax, the inspection requirement is not an unreasonable or confiscatory indirect restraint on property alienation.

Count I (as particularly shown in ¶25) depends entirely on a letter opinion written by the Illinois Attorney General to the Illinois Department of Financial Institutions in 1994. The letter opinion responds to a question of whether non-home rule municipalities in Illinois (Calumet City is home rule) had the statutory authority to "require the inspection of documents and the payment of fees prior to the transfer of real property lying within the municipality." This was an issue of Illinois law having nothing to do with federal constitutional law. The advisory opinion was that non-home rule municipalities lacked the statutory authority to impose a transfer tax. During the course of the letter opinion, the Attorney General stated "[M]unicipalities may impose various fees for other services relating to real property. In no instances, however, are municipalities authorized to limit the alienability of property in order to enforce such codes."

The letter opinion is irrelevant. The Attorney General was commenting on a question of Illinois municipal statutory authority, not a principle of constitutional law. The comment of the

Attorney General lacks any citation to authority. As such, this letter opinion, relating to matters dealing with Illinois title insurance, is worthless as authority on a matter of constitutional law.

A straightforward examination of the Ordinance demonstrates that it does not "improperly interfere with the free alienability of property," as Walker contends. Rather, it is a reasonable exercise of the police power. Count II should be dismissed.

### 3.   Count II: The Amended Ordinance Does Not Violate Procedural Due Process

Before examining this claim, it is important to articulate the nature of the property interest which Walker claims is being deprived by the Ordinance. The Ordinance does not deprive the property owner of the dwelling itself since the Ordinance only regulates transfers. The Ordinance does not prevent the transfer of property in the face of a repair notice because the Ordinance allows the parties to transfer so long as the claimed repair costs are adequately secured, subject to post-closing judicial review. The Ordinance by its terms does not prevent the transfer of a multi-family structure which has a legal nonconforming use.

The Ordinance provides ample pre and post-deprivation procedural due process protection to owners. Under Zoning Ordinance Section 12.1, the City's Building Commissioner is also the Zoning Administrator. The Commissioner's responsibility is to see that the building and zoning ordinances of the City are enforced. The Zoning Board of Appeals has broad authority under Section 12.5(a) to hear and decide appeals from "any order, requirement, decision or determination" made by the Building Commissioner/Zoning Administrator under the City's ordinances. If a homeowner challenges an administrative determination, she receives an automatic stay, so no work need be done pending due process review.

The essence of Walker's Count II (¶29-32) challenge is that the Amended Ordinance "fails to provide procedural due process [because] a hearing must be provided before a property right – here, the right to transfer property – can be taken." Par. 30. Walker is wrong. The Amended Ordinance provides multiple layers of predeprivation due process.

Assume an owner decides to sell a house that has two additional dwelling units. The owner agrees to an inspection and the City determines upon inspection that one of the additional apartments was illegally constructed. If the owner disagrees with that determination, he has the perfect right to appeal to the Calumet City Zoning Board of Appeals. If he disagrees with the

ZBA determination, he has the right to seek administrative review. This is the exact course followed by the property owner in Taylor v. Evanston Zoning Board of Appeals, supra. Walker (Complaint at 15, 31) contends that the City's Zoning Ordinance does not apply to the Amended Ordinance's "deconversion provisions; rather it is limited to the appeal of *zoning* [emphasis added] decisions, i.e. the request for a variance." See ¶31 ("Property owners are not granted a hearing where they can be represented by counsel … or submit evidence to show that the property is not an illegal conversion…. There is also no right to judicial review.").

These assertions are plain error. The Calumet City Building Inspector is also the Zoning Administrator. When the Building Inspector makes a determination that a property has been illegally converted from single-family to multi-family use, that is a quintessential "order, requirement, decision or determination made by the Zoning Administrator" as set forth in Section 12.5(a) of the Ordinance. It is a "determination made by an administrative official" charged with the enforcement of the Zoning Ordinance for purposes of the statutory ZBA appeal rights.

As a matter of law, a property owner's ZBA appeal rights unquestionably apply to the situation posited by Walker. This predeprivation process of local administrative hearing and state court judicial review amply satisfies procedural due process. Stachowski v. Town of Cicero, 425 F.3d 1075, 1078 (7th Cir. 2005); Centres v. Town of Brookfield, 148 F.3d 699, 704 (7th Cir. 1998); Aida Ford & Liquor v. City of Chicago, 2005 WL 736015 (N.D. Il. 2005; J. Coar) (availability of mandamus to obtain building permit defeats procedural due process claim).

Even if there were no built-in administrative procedures, a wrongful failure to issue a certificate of compliance would not violate procedural due process. Under Illinois law, a municipal failure or refusal to issue a building or similar permit is fully redressable by mandamus. Monat v. County of Cook, 322 Ill.App.3d 499, 255 Ill.Dec. 679, 685 (1st Dist. 2001) ("mandamus is the appropriate remedy for a party allegedly aggrieved by a wrongful refusal of the city official to grant him a building permit required by a municipal building or zoning ordinance."); Snyder v. Nolen, 380 F.3d 279, 299 (7th Cir. 2004) (a "random and unauthorized deprivation of property by a state employee does not a violation of procedural due process so long as the state provides a meaningful post-deprivation remedy for the loss."); Polenz v. Parrett, 883 F.2d 551, 558-9 (7th Cir. 1989). But the simple fact of the matter is the Ordinance never

prevents a property transfer. Section (j)'s "conditional certificate of compliance" procedures allows for the transfer of property provided security is posted. The ultimate determination would then be made by Illinois courts, where these determinations belong.

Illinois law and the ordinances of Calumet City provide predeprivation due process in connection with Amended Ordinance inspectors and enforcement. An individual directed to repair faulty wiring or deconvert an illegal apartment need only file an appeal with the Zoning Board of Appeals in order to be entitled to a presumptive automatic stay and a prompt due process hearing. Illinois law provides post-deprivation judicial review. This administrative/judicial structure plainly satisfies procedural due process. Walker has no likelihood of success on the merits.

### 4. The Public Interest Tips in Favor of the City

As both the majority and concurring opinions in the Realtors case noted, this Ordinance is not unusual. It is aimed "to prevent the surreptitious conversion of single family homes to multi-family dwellings and to retard the physical deterioration of the housing stock." 2007 WL 3010633 at *1; see also concurring opinion at 7 ("point-of-sale ordinances like this one are common building and zoning code enforcement measures and are aimed at maintaining the quality of municipal housing stocks."). These are significant public interests. The public interest is better served by allowing this Ordinance to remain in effect so that the legitimate public goals can be served. Walker's private interest does not outweigh the interests of all of the residents of the City of Calumet City.

### IV.     Conclusion

The Motion for Preliminary Injunction should be denied.

          Respectfully submitted,

          City of Calumet City

          By:     /s/ John B. Murphey

JOHN B. MURPHEY/ARDC #1992635      MARK STERK/ARDC #3125540
Rosenthal, Murphey & Coblentz      Odelson & Sterk, Ltd.
30 North LaSalle Street, Suite 1624      3318 West 95th Street
Chicago, Illinois 60602      Evergreen Park, Illinois 60805
Tel. (312) 541-1070/Fax (312) 541-9191      Tel. (708) 424-5678/Fax (708) 424-5829

**CERTIFICATE OF SERVICE**

       I hereby certify that on November 8, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

Philip C. Stahl
Maggie M. Hanel
Patrick Thomas Nash
Grippo & Elden
111 South Wacker Drive
Chicago, Illinois 60606

Mark H. Sterk
Michael Joseph Hayes, Jr.
Robert Wilder
Richard F. Bruen, Jr.
Odelson & Sterk
3318 W. 95th St.
Evergreen Park, Ill. 60805


      /s/   Douglas M. Doty
ROSENTHAL, MURPHEY & COBLENTZ
Attorneys for Calumet City
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070
Fax: (312) 541-9191