# EXHIBIT 2

1

1

2                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4
AYANNA WALKER,                        ) DOCKET NO. 07 C 6148
5                                     )
                        Plaintiff,)
6                                     )
       vs.                            )
7                                     )
CALUMET CITY, ILLINOIS                ) Chicago, Illinois
8                                     ) November 21, 2007
                        Defendant.) 9:00 o'clock a.m.
9

10

11

12       TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
                   MILTON I. SHADUR, Judge
13 APPEARANCES:

14 For the Plaintiff:
                   MR. PHILIP C. STAHL
15

16

17 For the Defendant:
                   MR. MARK H. STERK
18

19

20

21               JESSE ANDREWS
       Official Court Reporter - U. S. District Court
22               219 S. Dearborn Street
               Chicago, Illinois  60604
23                (312) 435-6899

24        *     *     *     *     *     *

25

2

1          THE CLERK:  07 C 6148, Walker vs. Calumet City.

2          MR. STAHL:  Good morning, your Honor.  Philip Stahl

3   for the plaintiff.

4          MR. STERK:  Good morning, your Honor.  Mark Sterk

5   for Calumet City.

6          THE COURT:  Good morning.

7          I just received -- I was out yesterday, but I just

8   received this morning -- or that I just saw this morning, I

9   guess, is more accurate -- a motion for class certification.

10  I know that you are taking a leaf from the pages of the Court

11  of Appeals.  I frankly am not so sure that meant that every

12  homeowner in Calumet City was going to qualify for this

13  purpose, because it seems to me that there is an element of

14  remoteness.  After all, people may not be thinking about

15  selling their properties.

16         MR. STAHL:  Your Honor, we did start with the

17  premise that the Court of Appeals had spoken and suggested

18  that all property owners in Calumet City are adversely

19  affected by the ordinance, whether or not they have elected to

20  sell.  We have included in our --

21         THE COURT:  Yes, I read that.

22         MR. STAHL:  We have included, however, additional

23  information regarding the number of property owners whose

24  properties are in fact listed for sale, and that number

25  exceeds 500.  So this is a situation in which we are vitally

3

1  interested in doing the best job that we can with respect to

2  the protection of the property right, given the constraints

3  that the Court of Appeals has placed on us with respect to

4  standing, and we wanted to move forward with alacrity.

5          Before we filed the motion I asked Mr. Murphey and

6  Mr. Sterk whether they would be interested in stipulating to a

7  class.  And Mr. Murphey responded that would be a matter that

8  would be taken up with the Calumet City City's Council at the

9  same time they were conferring with them regarding the Court's

10  suggestion that they might want to take another look at the

11  ordinance itself.

12          THE COURT:  Yes.

13          MR. STAHL:  But we wanted to get our motion on file.

14          THE COURT:  Okay.  Well, it seems to me, given both

15  the thing that I had indicated by my question and also the

16  thing that you've just reflected, the sensible thing to do

17  with this motion is probably to enter and continue it, because

18  we want to find out what's really happening.  Maybe you can

19  fill me in on the result of the inquiry that we last talked

20  about that gave rise to today's status.

21          MR. STERK:  Sure.  We discussed it.  Your comments

22  were discussed with the Mayor and the City Council in

23  executive session on Monday evening.  And I would say to you,

24  Judge, that the principal problem that I am having and John

25  finds himself in right now is the fact that we had

4

1 approximately one hour to discuss the resolution to an issue

2 that has been going on in the court you know for over a year,

3 I think almost also two years now, and that's been subject to

4 two prior revisions, and that have in fact been approved by

5 this Court.

6           THE COURT:  Yes.

7           MR. STERK:  And the program has been going on for at

8 least 30 years.  So there is was no way that the City Council

9 was going to come to a resolution --

10          THE COURT:  I am not going to be critical about

11 that.

12          MR. STERK:  -- the period of time.

13          THE COURT:  When is the next meeting?  Let me put it

14 this way.  Is this not something that can be placed

15 essentially on the agenda as a scheduled item that will give

16 them adequate opportunity for the Council to be reviewing this

17 with the counsel (spelled the other way).

18          MR. STERK:  Right.  And I did review it, and it was

19 debated.  And we can put it back on the agenda again.  You

20 know quite frankly the problem is that we have an ordinance

21 that the Court enjoined.  We rewrote the ordinance and the

22 Court enjoined it, which is why I asked John Murphey to come

23 in on the case, because I had taken one swing at it not to the

24 Court's satisfaction, and I asked John to take -- you know, to

25 take an attempt to look at it, and that ordinance didn't pass

5

1   muster.  So I don't know how many times we can, you know --

2         THE COURT:  You know, but I took exception the last

3   time.  That is, I gave you not just a ruling, I gave you what

4   I thought were a lot of signals about how -- the way in

5   which -- it would be possible to obviate the problems, really

6   if not all, the bulk of any problems.  And it seems to me that

7   the sensible thing would be to focus on those rather than just

8   throwing up your hands and saying, "Well, we are never going

9   to get something pass the Court."

10        MR. STERK:  Well, Judge --

11        THE COURT:  I would hope that's not the message.

12        MR. STERK:  -- I am certainly not suggesting that to

13  the Court, and my comments shouldn't be taken that way,

14  because if that was my inclination I would have said that at

15  the last hearing, and I wouldn't have bothered to go back to

16  the City Council, because I had to reschedule another meeting

17  that I had for other clients to make -- you know, to make the

18  appearance to take this issue up with them.  So that certainly

19  is not the intention from my comments.

20        What the City Council has done is they have

21  voluntarily held the enforcement of the current ordinance in

22  abeyance until this can be resolved, which you know they are

23  not obligated to do because they are not under any court order

24  at this time.

25

6

1          THE COURT:  Right.

2          MR. STAHL:  Your Honor, I think it was the great

3 legal scholar Yogi Berra who talked about "deja vu all over

4 again."  We filed the original Complaint against the

5 inspection ordinance in April.  We went through a series of

6 appearances.  Calumet City -- we gave Calumet City an

7 extensive listing of our problems with the ordinance and

8 proposed ways that it could be corrected.

9          Calumet City chose to amend once before they

10 answered and before you enjoined the issue on a preliminary

11 injunction to supply a warrant procedure.  Then we went

12 through a series of conferences where Cal City didn't do

13 enough, and then it was in August that the Court enjoined the

14 ordinance as it was amended -- as it had been amended the

15 first time.

16          After August Calumet City then amended again and

17 cured some but not all of the problems, and the Court denied

18 their motion to dissolve -- granted the motion to dissolve the

19 injunction because a new ordinance was in place, but enjoined

20 it.  That was the ordinance that has been in -- that was

21 enjoined, and the ordinance that now is in play is exactly as

22 it existed I believe at least for a year.  And during that

23 year, including while we were in the Seventh Circuit on the

24 appeal from the preliminary injunction, Calumet City has known

25 what the prior plaintiff's objections to the ordinance were,

7

1  and now what the objections of Ms. Walker are and what the

2  objections of the class will be if it's certified, whether

3  it's a class of all property owners, or whether it's the class

4  of property owners whose homes are listed for sale. And the

5  Court pointed out before the fundamental problem with the

6  ordinance with respect to converted multifamily units or

7  buildings is that it's an undefined concept of illegal

8  conversion. And then there is absolutely no due process that

9  attaches to the determination that a person deconvert the home

10 under the ordinance. With respect to single family homes

11 there is no due process that attaches -- at any point to the

12 order of an inspector to make repairs, whether they are health

13 or safety related at all.

14        And then of course the Court has told Calumet City,

15 as we pointed out repeatedly, that much of what happens in the

16 inspections under the ordinance regime that was in effect is

17 just maintenance, not health or safety. So none of this is

18 new. And you know I feel a sense of frustration that Calumet

19 City's City Council doesn't seem to be able to come to grips

20 with this. They just don't seem to be able to cope with the

21 idea that they as a political body can act here to act and

22 enact an ordinance that will pass constitutional muster, and

23 yet can be directed to accomplishing what is legitimate for

24 local government, and that is to protect the health and safety

25 of the community.

8

1        THE COURT:  I don't get it--

2        MR. STERK:  I object.

3        THE COURT:  I don't know how I could have been more

4 plain.  I mean you know this business about a dirty soap dish

5 or tightening up a screw on something, all of which literally

6 comes into the broad and general language of the code that has

7 been incorporated by reference, the point that I made was that

8 I thought that a way to do that -- a way to deal with that --

9 was to limit the applicability to matters that literally

10 affect the public health and safety, which is certainly a

11 legitimate concern of the City.

12        Now frankly I wasn't there during the time that the

13 communications took place between counsel and the City

14 Council, and I am not faulting counsel for this.  But it

15 sounds to me in candor as though if the Village authorities --

16 the City authorities -- are not able to comprehend that

17 distinction, then you really have not just a Cool Hand Luke

18 failure-to-communicate problem, but you have a failure of

19 understanding on their part.  Because things that I suggested

20 I thought were constructive.  And I was not suggesting

21 something that would point toward knocking out the ordinance

22 in an area where I thought curative aspects were readily

23 available.

24        Now you know I don't know what else to say.  I have

25 got to tell you are never going to get, at least here -- you

9

1 may get it in the Court of Appeals -- but you are never going

2 to get here an approval as constitutional of an ordinance that

3 permits that kind of nitpicking and leaves to administrators a

4 kind of unfettered -- and I really mean unfettered --

5 opportunity to block legitimate sales.  I mean, you know, the

6 example that I gave you is I think a perfect one, when I --

7         MR. STERK:  Which was a good example.

8         THE COURT:  -- in that paragraph 12, you know, about

9 the kinds of things that in the past had given rise to

10 inspectors' requirements, that's just -- and the idea of

11 saying that those things have to be done in order for a person

12 to sell the property legitimately, that can't pass muster.

13         Now I've said that once before.  And I don't

14 understand -- I honestly do not understand how responsible

15 City officials -- I keep saying "Village," I have to be

16 excused --

17         MR. STERK:  That's all right.

18         THE COURT:  -- that's my background and

19 experience -- how responsible City officials can't see that

20 and can't respond in a sensible way.  Because that's what --

21 you know that's what we adjourned until today for.  I would

22 have hoped that even with limited time it would be possible to

23 communicate that and convey that in a way that would be

24 persuasive to the authorities.

25         MR. STERK:  Well, unfortunately due to

10

1  attorney-client constraints, I am not able to say --

2          THE COURT:  I am not asking about that --

3          MR. STERK:  -- everything that I said to them.

4          THE COURT:  Yes.

5          MR. STERK:  But I can say to you that what I did was

6  present to them were a whole variety of ways to resolve these

7  situations.  And what the City Council said to me was that

8  this process that's been going on for so long, and to ask us

9  in one hour to say this is what you need to do to fix it, it's

10 not said to me --

11         THE COURT:  That's the reason that's I started out

12 saying, "Can't you put in on the agenda at a time when they

13 don't feel, 'Oh, we only have an hour and the judge has been

14 unfair, he put us under the gun,'" whatever, whatever

15 whatever.  Because my sense is that everybody is going to be

16 better off -- everybody, plaintiff and the City -- if they can

17 address in a sensible way, a rational way, the things that I

18 have talked about.

19         And you know -- look.  If they are not going to do

20 it, then I guess I am going to have to ultimately decide the

21 question whether this current ordinance will pass muster

22 constitutionally or not.

23         MR. STERK:  And if I can continue, that is why the

24 City Council is not enforcing the ordinance right now, because

25 they want to be reasonable about -- you know about the whole

11

1 situation, while at the same time protecting what they think

2 is a vital City interest.  So we have not -- you know when the

3 Appellate Court decision didn't come - you know came down and

4 dismissed the original case, there was no rush to enforce the

5 ordinance, because we expected that this was going to happen

6 and we are trying to get this worked out.

7          THE COURT:  I am not going to fault you for that.

8 My question, I guess simplistic and what I asked a couple of

9 times, is can't this be put before them in a way and at a time

10 when they are able to reach a rational resolution and maybe

11 come up with a solution.

12          MR. STERK:  Yes it can, but it will require a

13 special meeting.  Because they cannot -- I can't ask them to

14 take something that's going to take hours and hours of

15 discussion and deliberation --

16          THE COURT:  I am not quarreling with that.

17          MR. STERK:  -- take up on the second and third

18 Thursday in the night when they have all worked all day and

19 come here and take care of the rest of the City's business.

20          THE COURT:  So what do you think in terms of time?

21          MR. STERK:  Well, you know I don't know, because now

22 I will have to go back and ask the Mayor and the Clerk, poll

23 the City Council, find out when they would be willing to have

24 a special meeting, when they are capable of convening a

25 special meeting to discuss that.  What I have said to the

12

1 Court now a couple of times already is that the City has

2 voluntarily stayed the enforcement of the  ordinance.

3          THE COURT:  Let me put it over to not long after the

4 first of the year, to give you a chance to talk with them and

5 find out -- see about setting up a schedule.  And in the

6 meantime -- now look.  If they are not enforcing it on a

7 voluntary basis, it doesn't seem to me that you can point to

8 irreparable harm on the part of the --

9          MR. STAHL:  Your Honor, I agree.  This is the first

10 we have heard --

11          THE COURT:  I know that.

12          MR. STAHL:  -- they are not enforcing.  That's good

13 news.

14          THE COURT:  Okay.

15          MR. STAHL:  That makes the motion for preliminary

16 injunction less urgent than it otherwise would be.

17          THE COURT:  Okay.  So let's put it over.  And if, as

18 I hope would not be the case, something erupts in the

19 meantime, you people can come in on a motion.

20          MR. STAHL:  Yes.

21          MR. STERK:  Right.  And if something interrupts in

22 the interim, and I am told it's not going to happen, they are

23 going to stand with the ordinance the way it is, then I will

24 come back and tell the Court.

25          THE COURT:  Sure.

13

1          Suppose that I give you maybe the second full week
2    in January?  The week of the 14th through the 18th, I can give
3    you 9 o'clock any day that week.
4               MR. STERK:  Any day but Monday, Judge.
5               THE COURT:  How is Wednesday the 16th?  Okay?
6               MR. STERK:  The 16th.
7               THE CLERK:  Is that at 9?
8               THE COURT:  Yes.  Good luck.
9               MR. STAHL:  Your Honor --
10              MR. STERK:  Well, thank you.
11              MR. STAHL:  Your Honor, based on the prior history,
12   indeed the discussion with the Calumet City Council about this
13   ordinance, not the one that we have now, but the prior one --
14              THE COURT:  Yes.
15              MR. STAHL:  -- took place between the Association
16   that I represented in the prior case and Cal City and we were
17   forced to file suit and that was in April of '06.  Would it be
18   possible for the Court to set a response date for the class
19   certification motion, so that we can at least have that?  And
20   I am not asking that counsel have to do anything over the
21   holidays, but that we could at least have a date in place?
22              MR. STERK:  Judge --
23              THE COURT:  No.  I am simply going to enter and
24   continue this one, because it doesn't seem to me that setting
25   that is -- I really do not regard that as a priority item,

14

1  because it all depends upon what we come back with.  If it

2  turns out that they are prepared to provide an ordinance in a

3  modified form that really obviates the principal problem I

4  identified, my guess is that the class certification -- I am

5  not talking about defining the class --

6          MR. STAHL:  Right.

7          THE COURT:  -- which is a separate question, but

8  treating it as a class action, may be after all to the City's

9  benefit, as is so often the case.  If a defendant feels that

10 the defendants have got a solid position, they want to protect

11 themselves against getting picked off by a number of

12 individuals, just the same way as is true on the other side of

13 the case.

14         MR. STERK:  My focus is on fixing the ordinance.  I

15 am not fighting the class-action issue.

16         THE COURT:  Yes.  And I am simply going to continue

17 the case.

18         MR. STAHL:  Your Honor, with respect to the fixing

19 of the ordinance, I have had numerous conversations with

20 Mr. Sterk and Mr. Murphey about the absence of due process

21 with respect to any determination.  And I would posit that

22 even if we have a situation where the inspection is limited to

23 health and safety matters, it's still possible to have a

24 dispute over whether in fact the violation exists.  And the

25 City has consistently taken the position that they will never

15

1 under any circumstances voluntarily give up their ability

2 under the ordinance to stop a sale until their dictate is

3 complied with.  So --

4          THE COURT:  I really -- you know that's the classic

5 story about the argument in the House of Lords in which one of

6 the Law Lords puts a hypothetical question to the barrister,

7 and the barrister says, "Milord, it puts me in mind of if I

8 had a brother would he like potatoes?

9          I mean you know we are dealing here with something

10 that we don't know is a problem.  It's enough, it seems to me,

11 to look at where this thing stands if the curative aspect is

12 dealt with, although I do expect that defense counsel are

13 going to take a look at questions that you've raised in terms

14 of whether some kind of pre-deprivation hearing is necessary.

15 I am not ruling on that.

16          MR. STERK:  Right.  I don't know what we are arguing

17 about here.  We said -- I mean we said that we are going to go

18 back and take a look at it.  I am not arguing with you, but

19 counsel's point.  We said we are going to go back and take a

20 look at the ordinance.

21          THE COURT:  Right.

22          MR. STERK:  What else does he want me to say?

23          THE COURT:  That's it.

24          MR. STERK:  And we said we are not going to enforce

25 the ordinance --

16

1       THE COURT:  Right.

2       MR. STERK:  -- during the pendency of this.  What

3  else can I say beyond that?

4       THE COURT:  I agree.  Thank you.

5       MR. STAHL:  Thank you, your Honor.

6       MR. STERK:  Thank you, Judge.  See you after the

7  first of the year.

8       THE COURT:  Yes.

9       (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
         THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)
10
                    C E R T I F I C A T E
11
   I HEREBY CERTIFY that the foregoing is a true and correct
12 transcript from the report of proceedings in the
   above-entitled cause.
13

14 JESSE ANDREWS, CSR
   OFFICIAL COURT REPORTER
15 UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
16 EASTERN DIVISION
   DATED November 27, 2007
17

18

19

20

21

22

23

24

25

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AYANNA WALKER,                          )
                          *Plaintiff*,  )
                                        )    Case No. 07 C 6148
        v.                              )
                                        )    Judge Milton I. Shadur
CALUMET CITY, ILLINOIS,                 )
                          *Defendant*.  )
                                        )

## DECLARATION OF CORLISS CARTER
## IN SUPPORT OF RENEWED MOTION FOR TEMPORARY
## RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Corliss Carter declares as follows:

1.      The following facts are personally known to me, and if called to testify, I could and would competently testify thereto.

2.      I live in Calumet City, Illinois. Since 2003, I have been a Realtor for Prudential Partners Real Estate. I am a member of Mainstreet Organization of Realtors®.

3.      In November 2007, I became the broker for the seller of 321 Pulaski in Calumet City, Illinois ("321 Pulaski"). 321 Pulaski is bank-owned due to foreclosure.

4.      After I put 321 Pulaski on the market, two buyers bid on the property. The first buyer bid $45,000 and the second buyer bid $42,000. The seller decided to accept the higher bid of $45,000. I scheduled the closing of the property with the first buyer for January 4, 2008.

5.      On December 26, 2007, I called Calumet City Department of Inspectional Services to find out whether 321 Pulaski had unpaid liens or bills that would prevent the January 4 closing. Calumet City Department of Inspectional Services said that the unpaid water bill was $1,888.42. They faxed me an invoice for the bill (attached at Exhibit A).

6.    On January 3, 2008, I went to Calumet City Department of Inspectional Services and Calumet City Department of Water Billing to find out whether the water bill had to be paid before Calumet City would issue a transfer stamp. I first went to Calumet City Department of Inspectional Services where an employee told me that the water bill needed to be paid before Calumet City would issue a transfer stamp. I then went to the Calumet City cashier to ask whether I could pay the water bill with a check from a title company. The employee for the Calumet City cashier said that the City would only accept payment by an attorney or by cash or certified check. I asked for a copy of the payment policy. The cashier said that there was not a written policy.

7.    Later that afternoon, I called the seller's attorney to discuss the payment of the water bill. Seller's attorney called Calumet City to negotiate the method of payment of the water bill. It is my understanding that Calumet City agreed to accept payment from a title company.

8.    I then called the agent for the first buyer to discuss the water bill. I assured the buyer's agent that the seller would pay the water bill and that the January 4 closing would go forward. The buyer's broker was worried that 321 Pulaski would not have a clear title by January 4, 2008. We rescheduled the closing for January 10, 2008.

9.    On January 10, 2008, the first buyer revoked his offer. The negotiated price of the first sale was $ 45,000.

10.    When the first buyer revoked his offer I called the second buyer. The second buyer renewed his $42,000 bid on 321 Pulaski. I scheduled a second closing for January 29, 2008.

2

11.    On January 23, 2008, the second buyer's agent and I went to Calumet City Department of Inspectional Services, Calumet City Department of Water Billing and the Calumet City cashier to discuss payment of the water bill which, based on my January 3, 2008, conversation with Calumet City, I knew had to be paid before Calumet City would issue a transfer stamp for the sale of 321 Pulaski.

12.    The buyer's agent and I first went to the Calumet City Department of Water Billing to request an updated invoice for the water bill. An employee of the Calumet City Department of Water Billing issued a second invoice dated January 29, 2008. We then went to the Calumet City cashier, where the second buyer's agent paid by credit card the January 29, 2008 invoice for the water bill. We returned to the Calumet City Department of Water Billing where an employee "cleared" the 321 Pulaski file of the notice of unpaid water bill. Afterwards, we went to Calumet City Department of Inspectional Services where we completed a request form for the transfer stamp. An employee checked the 321 Pulaski file and approved the form by initialing it in the upper left hand corner. We then returned to the Calumet City cashier to pay for the transfer stamp.

13.    The closing took place on January 29, 2008. The negotiated price of the second sale was $42,000. As a result of Calumet City's conduct, the seller of 321 Pulaski received $3,000, (or 6.67%) less than the negotiated price of the first sale.

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 12, 2008

_Corliss Carter_
Corliss Carter

143453v2

# EXHIBIT A

(c)Copyright 1979, 1980, 1983, 1985-1993 The Regents of the Univ. of California
12/26/07                          City of Calumet City                        14:30:47
                             Financial Activity Inquiry

         Account #: 0101042010-04   Service name: CURRENT RESIDENT
                              Address: 321 PULASKI RD

| | Activity | Activity Date | Payment or Adjustment Code & Description | Usage | Activity Amount | Balance |
|---|---|---|---|---|---|---|
| 1 | PENALTY | 10/29/07 | ADDED TO 09/30/07 | | 142.62+ | 1,888.42+ |
| 2 | BILLING | 09/30/07 | | 4270 | 1734.31+ | 1,745.80+ |
| 3 | PENALTY | 07/27/07 | ADDED TO 06/30/07 | | .00+ | 11.49+ |
| 4 | BILLING | 06/30/07 | | | 11.49+ | 11.49+ |
| 5 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 6 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 7 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 8 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 9 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 10 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 11 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 12 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 13 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |
| 14 | .......... | ../../.. | ... ................... | ..... | ............. | ........... |

#32642647

ATTN: CORLISS CARTER

**CITY OF CALUMET CITY**
204 PULASKI ROAD P.O. BOX 1519
CALUMET CITY, IL 60409
WATER AND REFUSE BILL

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE PAID
PERMIT NO. 83

| 0101042010-04 | 12-24-07 | 1-4-08 |

321 PULASKI RD

| 16240 | 16240 | 0 | FINAL |

CURRENT RESIDENT
321 PULASKI RD
CALUMET CITY IL

FINAL BILL

PREVIOUS BALANCE    $1,888.42

0101042010-04

TOTAL DUE    $1,888.42

| NET AMOUNT | DATE DUE |
|---|---|
| $1,888.42 | |

GROSS AMOUNT

PAY NET AMOUNT IF PAID BY THE DUE DATE

PLEASE RETURN THIS STUB WITH PAYMENT